

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case: 1:20−cv−00423 |
| v. | ) Assigned To : Moss, Randolph D. |
| | ) Assign. Date : 2/13/2020 |
| ONE BELL 214 HELICOPTER, Serial | ) Description: Gen. Civ. (E−DECK) |
| Number 28118, | ) |
| | ) |
| ONE BELL 412 HELICOPTER, Serial | ) |
| Number 36403, | ) |
| | ) |
| $2,999,930.50 OF FUNDS SEIZED FROM | ) |
| BANK OF AMERICA ACCOUNT | ) |
| XXXXXX5559, PREVIOUSLY HELD BY | )   UNDER SEAL |
| AAR CORPORATION, | ) |
| | ) |
| Defendants. | ) |

---

### VERIFIED COMPLAINT FOR FORFEITURE *IN REM*

**COMES NOW**, the plaintiff United States of America, by and through its attorney, the United States Attorney for the District of Columbia, to bring this verified complaint for forfeiture in a civil action *in rem* against the defendant properties, which are: 1) a Bell 214 Helicopter, with serial number 28118, currently located in India ("Target Helicopter 1"); 2) a Bell 412 Helicopter, serial number 36403, currently located in Dallas, Texas ("Target Helicopter 2"); and 3) $2,999,930.50 of United States funds that were previously held in Bank of America Bank Account XXXXXX5597, and are currently in the custody of the United States ("Target Property 3"). In further support of its cause, Plaintiff states as follows:

## I.     NATURE OF THE ACTION AND DEFENDANT *IN REM*

1.      This *in rem* forfeiture action arises out of a scheme to launder funds into the United States to illicitly procure helicopters for the Islamic Republic of Iran and evade U.S. sanctions. The conspirators employed sophisticated evasion techniques and front companies in dealing with the aviation industry and financial system to disguise the true nature of the conspirators' illicit business dealings, as well as to protect and promote the ongoing illicit procurement scheme. Their actions evidence a conspiracy to procure U.S.-origin Bell 412 Helicopters for FARSCO Aviation MRO Centre of Tehran, Iran, in violation of the International Emergency Economic Powers Act ("IEEPA"), the federal money laundering statute, and other related U.S. laws and regulations.

2.      The defendant properties are subject to seizure and forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) as property constituting or derived from proceeds traceable to violations of IEEPA, codified at 50 U.S.C. §§ 1701-1707, the smuggling statute, codified at 18 U.S.C. § 554(a), or a conspiracy to violate these statutes, as codified at 18 U.S.C. § 371.  In addition, the defendant properties are subject to seizure and forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) as property involved in a violation of the money laundering statute, codified at 18 U.S.C. §§ 1956(h), 1956(a)(2)(A) and (B).

## II.    JURISDICTION AND VENUE

3.      This court has jurisdiction over this matter pursuant to 28 U.S.C. § 1345 because it has been commenced by the United States and pursuant to 28 U.S.C. § 1355 because it is an action for the recovery and enforcement of a forfeiture under an Act of Congress, specifically, 18 U.S.C. § 981(a).

4.      Venue is proper in this District pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts and omissions giving rise to the forfeiture took place in the District of Columbia.  Nasir Ibrahim, Marilog, InTran and their coconspirators failed to seek a license from the Department of the

Treasury's Office of Foreign Assets Control ("OFAC"), which is located in Washington, D.C., for conducting the transactions described below, in violation of U.S. law.

## III.   STATUTORY AUTHORITIES

### A.   The International Emergency Economic Powers Act ("IEEPA") and Executive Orders Issued Thereunder

5.     Under IEEPA, 50 U.S.C. §§ 1701-1707, the President of the United States was granted authority to deal with unusual and extraordinary threats to the national security, foreign policy, or economy of the United States. 50 U.S.C. § 1701(a). Pursuant to that authority, the President may declare a national emergency through Executive Orders that have the full force and effect of law. Among other things, IEEPA empowers the President to issue regulations governing exports from the United States.

6.     Under IEEPA, it is a crime to willfully violate, attempt to violate, conspire to violate, or cause a violation of any order, license, regulation, or prohibition issued pursuant to the statute. 50 U.S.C. § 1705(a). Willful violations of the ITSR constitute criminal offenses under IEEPA, and carry a 20-year maximum term of imprisonment and up to a $1,000,000 fine. 50 U.S.C. § 1705(c).

7.     On March 15, 1995, the President issued Executive Order 12,957, which declared that the actions and policies of the Government of Iran constituted an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States and declared a national emergency under IEEPA to deal with that threat. 60 Fed. Reg. 14,615 (Mar. 17, 1995). In two subsequent Executive Orders in 1995 and 1997, the President clarified his original declaration of a national emergency. *See* Exec. Order No. 13,059, 62 Fed. Reg. 44,531 (Aug. 21, 1997); Exec. Order No. 12,959, 60 Fed. Reg. 24,757 (May 9, 1995). Since 1997, the President has continued the national emergency with respect to Iran and the 1995 and 1997 Executive Orders.

The most recent continuation of this national emergency was executed on March 12, 2019.  84
Fed. Reg. 9,219 (Mar. 13, 2019).

8.      To implement the national emergency with respect to Iran, OFAC issued the Iranian
Transactions and Sanctions Regulations ("ITSR") (31 C.F.R. Part 560).

**B.      Export Controls and Sanctions Regulations**

9.      Under the ITSR, the export or reexport of any U.S. good, software, or technology
(collectively, "items") from the United States to Iran without the requisite OFAC license was
prohibited.  31 C.F.R. §§ 560.203-.205.  The ITSR similarly prohibited conspiring, attempting,
aiding, abetting, or facilitating in any way the unlicensed export of U.S. goods or technology to
Iran, or engaging in a transaction to evade the provisions of the regulations.  31 C.F.R.
§ 560.203.

10.     Specifically, absent permission from OFAC in the form of a license, the ITSR
prohibited, among other things:

> a.  The exportation, reexportation, sale, or supply, directly or indirectly, from the
> United States, or by a United States person, wherever located, of any goods,
> technology, or services to Iran or the Government of Iran, including the exportation,
> reexportation, sale, or supply of any goods, technology, or services to a person in a
> third country undertaken with knowledge or reason to know that such goods,
> technology, or services are intended specifically for supply, trans-shipment, or
> reexportation, directly or indirectly, to Iran or the Government of Iran (31 C.F.R. §
> 560.204);
>
> b.  The reexportation from a third country, directly or indirectly, by a person other than
> a United States person, of any goods, technology, or services that have been

exported from the United States, if: (a) such reexportation is undertaken with knowledge or reason to know that the reexportation is intended specifically for Iran or the Government of Iran, and (b) the exportation of such goods, technology, or services, was subject to export license application requirements under any United States regulations (31 C.F.R. § 560.205); and

c.   Any transaction by any United States person or within the United States that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions contained in the ITSR (31 C.F.R. § 560.203).

## C.   Smuggling Goods from the United States

15.   Title 18 U.S.C. § 554(a) criminalizes fraudulently or knowingly exporting or sending from the United States, or attempting to export or send from the United States, any merchandise, article, or object contrary to any law or regulation of the United States, or concealing, buying, or in any manner facilitating the transportation, concealment, or sale of such merchandise, article or object, prior to exportation, knowing the same to be intended for exportation contrary to any law or regulation of the United States (emphasis added). A violation of the ITSR, which are based on the President's invocation of IEEPA, serve as the predicate "contrary to any law or regulation" required by 18 U.S.C. § 554(a).

## D.   Money Laundering Statute

16.   Title 18 U.S.C. § 1956(a)(2)(A) (the international *promotional* money laundering statute) criminalizes transporting, transmitting, or transferring, and attempting to transport, transmit, or transfer a monetary instrument or funds, *inter alia*, to a place in the United States from or through a place outside the United States with the intent to promote the carrying on of specified unlawful activity.

17.    Pursuant to 18 U.S.C. § 1956(c)(7)(D), the term "specified unlawful activity" includes violations of IEEPA and the smuggling statute.

18.    Title 18 U.S.C. § 1956(h) criminalizes a conspiracy to violate Section 1956.

**E.    Forfeiture Statutes**

19.    Pursuant to 18 U.S.C. § 981(a)(1)(C), any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of IEEPA (50 U.S.C. § 1705) or the smuggling statute (18 U.S.C. § 554) is subject to civil forfeiture.

20.    Pursuant to 18 U.S.C. § 981(a)(1)(A), any property, real or personal, involved in a transaction or attempted transaction, in violation of 18 U.S.C. § 1956, or any property traceable to such property is subject to civil forfeiture.  Money laundering forfeiture, pursuant to these statutes, applies to more than just the proceeds of the crime.  Rather, money laundering forfeiture encompasses all property "involved in" the crime, which can include untainted or legitimate funds that are comingled with tainted funds derived from illicit sources.

**IV.    FACTS GIVING RISE TO FORFEITURE**

**A.    Overview**

21.    This conspiracy involved multiple attempts to purchase some subset of 10 particular Bell 214 and Bell 412 EP helicopters[1] for Iran.  For ease of reference, the helicopters are identified as follows:

| Helicopter Designator | Serial Number | Implicated Deals | Add'l Identifying Information |
|---|---|---|---|
| Helicopter A | 36373 | 2, 3, 5 | |
| Helicopter B | 36378 | 2, 3, 5 | |
| Helicopter C | 36386 | 2, 3, 5 | |
| Helicopter D | 36401 | 2, 3 | |
| Helicopter E | 36421 | 2, 3, 5 | |
| Helicopter F | 36387 | 2, 3 | |

---

[1] Helicopter X is the only Bell 214 helicopter; the remaining nine are Bell 412 EP helicopters.

| Helicopter G | 36433 | 2, 3 | |
| Helicopter X | 28118 | 1 | Target Helicopter 1 |
| Helicopter Y | 36403 | 4 | Target Helicopter 2 |
| Helicopter Z | 36396 | 5 | |

22.     Since sometime on or before at least October 2014, Nasir Ibrahim ("Ibrahim") and others attempted and conspired to export and re-export Bell 214 and Bell 412 helicopters from the United States to Iran via a third-party in Thailand, in violation of U.S. law and regulations. The conspirators made these attempts, through different intermediaries, to purchase particular Bell 214 and Bell 412 helicopters from an aviation company in Illinois (hereinafter "Illinois Aviation Company"), an aviation company in Texas (hereinafter "Texas Aviation Company"), and an aviation company in North Dakota (hereinafter "North Dakota Aviation Company"). These helicopters are made by a U.S. company, and, according to the manufacturer, "can be configured to an airborne command center, an air ambulance platform, special operations, or a homeland security base."[2] Both OFAC and BIS have confirmed that at all times relevant to this Complaint, a license was required to export or re-export these helicopters to Iran.

23.     As described *infra* in Sections IV.E. through IV.I., Ibrahim and his coconspirators engaged in five separate negotiations, designated Deals 1 through 5, with the goal of purchasing and exporting helicopters from U.S. companies to foreign entities in order to evade U.S. sanctions regimes and ultimately deliver helicopters to Iran.

**B.      Relevant Entities**

24.     Nasir Ibrahim – Ibrahim is a Canadian citizen who is connected to many of the entities involved in these attempts to purchase helicopters. In the negotiations between InTran, Marilog, and Transworld for Deal #1, according to an InTran employee, Ibrahim represented

---

[2] https://www.bellflight.com/commercial/bell-412ep.

Transworld. He traveled to the United States to inspect the helicopter involved in Deal #4 and met with the Illinois Aviation Company regarding Deal #5. When the Illinois Aviation Company was negotiating with Ibrahim for Deal #5, its representatives were under the impression that Ibrahim was the owner of Marilog. Ibrahim also shares an address with InTran – his bank statements are sent to him at InTran's address in Arizona.

25.     Airborne Logistics LLC FZC – Airborne Logistics is a company under the laws of Sultanate of Oman and legally domiciled at C.R No 1/79103/6, Postal Code: 112, Ruwi, Sultanate of Oman. Airborne was the seller of the six Bell 412 helicopters in the July 1, 2015 contract that was recovered from Ibrahim's iPad as described in greater detail below.

26.     FARSCO Aviation MRO Center – FARSCO is an aviation company registered under the laws of the Islamic Republic of Iran and having its principal place of business at Sanaye Havapeymaei Blvd., Karaj Makhsous Road, 13976-13511 Tehran, Iran, with registration No. 200130. It is an aircraft maintenance, repair, and overhaul services provider. FARSCO was the purchaser of the six Bell 412 helicopters in the July 1, 2015 contract that was recovered from Ibrahim's iPad. Ibrahim also exchanged emails with S.M. Mirbagheri, the Managing Director of FARSCO.

27.     InTran, LLC – InTran is an Arizona limited liability company, having its principal place of business at 170 S William Dillard Drive, Suite 1-100, Gilbert, AZ 85233. InTran purchased Target Helicopter One and then sold it to Marilog (Deal #1). Before the failure of Deal #2, InTran attempted to purchase eight helicopters (Deal #3). InTran also paid $1,544,450 towards the purchase of Target Helicopter 2 (Deal #4). InTran also paid the $2,999,930.50 for Deal #5, which comprises Target Property 3.

28.     Marilog Avion Services Co. Ltd. – Marilog is a Bangkok, Thailand based corporation. Marilog was identified as the end user for Deal #1 and Deal #3, and leased the warehouse where Target Helicopter 1 was stored in Thailand. When agents interviewed Ibrahim, he told them that he had inspected a helicopter in Dallas, Texas that was being sold to Marilog in Thailand and that Marilog was owned by his employer. When the Illinois Aviation Company was negotiating with Ibrahim for Deal #5, its representatives were under the impression that Ibrahim was the owner of Marilog. In fact, official filings with the Thai Companies Registration Office listed Ibrahim as a Marilog director until January 2016. Marilog was also the buyer in a Helicopter Purchase and Resale Agreement with the Illinois Aviation Company's subsidiary dated December 2015 for the purchase of seven helicopters.

29.     PremiAir Aviation - PremiAir is a corporation operating in the United Kingdom and the UAE. Its Chairman, Graham Avery, received a fax from the Iran Helicopter Support and Renewal Company in December 2014 regarding the acquisition of Bell 412 helicopters. PremiAir and Avery were involved in the attempted purchase of the helicopter in Dallas (Deal #4).

30.     Transworld Aviation Group - Transworld is a company registered under the laws of the United Arab Emirates and located in the free enterprise zone in Dubai. Transworld was the purported buyer of seven helicopters in October 2015 (Deal #2), and Transworld agreed to jointly finance the purchase of a helicopter in October 2015 (Deal #4). Transworld also sent the majority of the funds ($2,349,910) that make up Target Property 3.

31.     Texas Aviation Company – The Texas Aviation Company cancelled Deal #2 for seven helicopters when it received an unsatisfactory answer as to where the helicopters were going, and subsequently cancelled Deal #3 for eight helicopters due its similarity to Deal #2.

32.     Illinois Aviation Company – A Florida-based subsidiary of the Illinois Aviation Company sold Target Helicopter 1 to InTran before it was shipped to Thailand.  The Illinois Aviation Company also entered into a contract to sell Marilog five helicopters that it was going to purchase from the Texas Aviation Company.

**C.     Interview of Ibrahim and Searches of His Devices and Emails**

33.     On December 9, 2015, Customs and Border Protection ("CBP") Officers interviewed Ibrahim as he entered the United States at the Dallas Fort Worth airport from Dubai. Ibrahim was traveling on a Canadian passport, and said that he lived in Canada. Ibrahim told CBP that he was in the United States to meet with a representative of Helicopter International Shipping Services and to conduct business regarding a helicopter sale.

34.     On December 16, 2015, CBP Officers at Chicago O'Hare Airport conducted a border search and interview of Ibrahim as he was leaving the country.  Several of his electronic devices were detained at that time. He first advised he was in the United States to shop, and then said he was purchasing mining equipment.  When asked why he was in Chicago, Ibrahim advised he was there to purchase ground equipment from the Illinois Aviation Company.  The investigators found pictures of helicopters in his bag.  When asked about the pictures, Ibrahim admitted he met with the Illinois Aviation Company about a sale of helicopters to "Transworld" in Thailand. Ibrahim further admitted to inspecting a helicopter in Dallas for a company called Marilog in Thailand.  He advised his employer owned Marilog and Transworld.  Finally, when asked, he advised that his employer did not conduct business in sanctioned countries, such as Syria or Iran.

35.     On January 6, 2016, a federal search warrant was obtained for Ibrahim's detained devices – three Apple iPhones and an Apple iPad.

36.     On May 27, 2016, a federal search warrant was obtained for various email accounts Nasir Ibrahim used.

**D.     Ibrahim's ties to Iran**

37.     While Ibrahim claimed TransWorld did not do business with Iran, documents seized in the search of Ibrahim's electronic devices indicate that his attempts to purchase helicopters in the United States were on behalf of and funded by the Iranian government or entities associated with the Iranian government. One of Ibrahim's iPhones contained photographs of two documents written in Farsi. The first document appears to be dated October 23, 2014 and to have been photographed on October 24, 2014 in Tehran, Iran. The document has a letterhead reading in part: "Ministry of Defense and Support of the Armed Forces, Organization for Armed Forces Aviation Industry"; it is from the "Iranian Helicopter Support and Renewal Company"; it is directed to the "Sepah Bank, Office of Helicopter Manufacturing"; and it requests the issuance of a 10 billion Rial check for payment on a contract.[3] The other document is dated October 19, 2014 and appears to have been photographed on August 20, 2015 in Tehran, Iran. The document has a letterhead that reads in part: "Ministry of Defense and Armed Forces Logistics of the Islamic Republic of Iran." It is addressed to the Director of the Central Bank of the Islamic Republic of Iran with a subject of "Request for appropriation of authoritative bank guarantee letter for banks outside the country." The document requests a guarantee letter of at least $50 million "from the closed funds in Oman" for the purpose of importing "state of the art helicopters" to support the development of oil and gas fields and for air emergencies.

---

[3] Rial is the form of currency used in Iran. In mid-October 2014, 10 billion rial was approximately US $375,000.

11

38.     Ibrahim's iPad also contained a July 1, 2015 unsigned contract for Airborne Logistics, LLC, a company in Oman, to sell FARSCO Aviation, a company in Iran, six helicopters - Helicopters A, B, C, E, F, and G.

39.     Ibrahim's email account contained a December 11, 2014 email that Ibrahim sent to "Shehab Ahmed" that was titled "Fwd: tender". The body of the email stated, "This is for your and abdulah eyes only." The email was forwarded to Ibrahim on December 11, 2014, with an attachment that was a December 10, 2014 fax from the Iran Helicopter Support and Renewal Company located in Tehran, Iran. The fax was addressed to PREMIAIR AVIATION, "ATTN: Graham AVERY" and stated the following:

> "DEAR SIR,
>
> Please be informed that we attend [sic] in the tender regarding supplying five helicopters model 412 EP& eight company has been participated but at the end just two company remained for supply.so we hope for getting successfully result in this tender. We will inform you the outcome as soon we receive any news in this regard.
>
> Best regards
>
> General Director of IHSRC [Iran Helicopter Support and Renewal Company]
> Dr. Mohammad Ahmadabadi".

### E.     Deal #1 – The Export of Target Helicopter 1 to Thailand

40.     Ibrahim's emails also contained a contract attached to an email sent to Ibrahim on January 31, 2015. That contract concerned the sale of several Bell 214 helicopters, including Target Helicopter 1. The parties to the contract were Gulf Technical Solutions FZE, a company located in either the UAE or Oman, and International Sepehr Kaveh Kish ("ISKK"), a company located in Iran according to the contract's language.

41.     In other emails between Ibrahim and the managing director of FARSCO, they appear to negotiate the prices of certain helicopters, including one labeled "N28014." This

combination of a letter and numbers corresponds with identifiers that the Federal Aviation Administration ("FAA") places upon helicopters registered in the United States. N28014 is the FAA identifier for Target Helicopter 1.

42.     Target Helicopter 1 was the subject of negotiations involving InTran, the Illinois Aviation Company, and Marilog. According to a helicopter purchase agreement, InTran purchased Target Helicopter 1 from a subsidiary of the Illinois Aviation Company on April 17, 2015. The contract identified Target Helicopter 1, among other helicopters, by using its serial number (28118) and its FAA registration number (N28014). This contract valued Target Helicopter 1 at approximately $1.9 million.

43.     After InTran purchased Target Helicopter 1, it exported Target Helicopter 1 from Jacksonville, Florida, to Bangkok, Thailand. InTran listed the Electronic Export Information it was required by law to file in the Census Bureau's Automated Export System database that the ultimate consignee for Target Helicopter 1 was Marilog.

44.     A logistics company located in Bangkok (hereinafter, the "Thai Logistics Company"), leased a warehouse to Marilog beginning in approximately August 2015. A representative from the Thai Logistics Company confirmed that the warehouse stored a Bell 214 helicopter bearing serial number 28118, i.e., Target Helicopter 1. That same representative indicated that Target Helicopter 1 would eventually be shipped to another, unknown country.

45.     The end user agreement between InTran and Marilog and two invoices for Target Helicopter 1 demonstrate that InTran sold Target Helicopter 1 to Marilog for approximately $2 million, and separately charged Marilog approximately $60,000 in shipping costs.

46.     In the negotiations between InTran, Marilog, and Transworld, according to an InTran employee, Ibrahim represented Transworld, and Transworld financed the helicopter that was to be sent to Marilog.

47.     Target Helicopter 1 remained unclaimed in Thailand until March 2019.

48.     In March 2019, Marilog claimed Target Helicopter 1, whereupon Target Helicopter 1 was rapidly prepared for transshipment.  Marilog reexported Target Helicopter 1, and it is currently located in India.  Based upon the contract attached to the email Ibrahim received on January 31, 2015, the country that the helicopter ultimately was meant to be shipped to was Iran.

**F.      Deal #2 - The Attempted Purchase of Helicopters from the Texas Company**

49.     Beginning in late July 2015, two UK aviation companies (UK Aviation Company 1 and PremiAir) and Transworld contacted the Texas Aviation Company regarding the purchase of seven Bell 412 helicopters.  On July 24, 2015, UK Aviation Company 1 emailed the Texas Aviation Company a letter of intent from Transworld Aviation to purchase seven particular helicopters: Helicopters A, B, C, D, E, F, and G.  Ibrahim had a copy of the same letter in his possession when he was searched on December 16, 2015. UK Aviation Company 1 also forwarded to the Texas Aviation Company an email from Transworld that attached the end use certificate ("EUC") for the seven helicopters, signed by PremiAir's chairman, Graham Avery.  The purpose of an EUC is to detail the ultimate destination of a shipment.  The certificate for this transaction stated that three of the helicopters would be shipped to PremiAir in London.  The Texas Aviation Company noticed that the EUC had two boxes checked on the form: one box stated that the end user would use the items in the country listed on the certificate, and the other box stated that the items would be placed in inventory because "the end user information is not yet, known" and that the end user information would be provided after the items were sold.  The Texas Aviation

Company contacted UK Company 1 in September 2015 with questions about the certificate and to ask if the helicopters were to be delivered to London or Dubai.  On September 16, 2015, UK Aviation Company 1 replied that it was Transworld's contractual understanding with PremiAir that the helicopters would be delivered to Dubai.  On September 18, 2015, the Texas Aviation Company canceled the deal, stating it was not comfortable with the proposed resale of the helicopters from Transworld's headquarters in Dubai.

### G.    Deal #3 - The Attempted Purchase of Helicopters by InTran

50.    On September 11, 2015, a few days after the Texas Aviation Company first expressed concerns about the Transworld deal, InTran, LLC (an Arizona-based company) reached out to the Texas Aviation Company about purchasing seven Bell 412 helicopters.  The Texas Aviation Company responded and provided a list of eight helicopters that were available for sale. The list provided to InTran included Helicopters A, B, C, D, E, and three others, but it did not include helicopters F or G.  On September 14, 2015, InTran emailed the Texas Aviation Company a letter of intent to purchase seven Bell 412 helicopters, specifically Helicopters A, B, C, D, E, F, and G.  The Texas Aviation Company had not mentioned Helicopters F and G to InTran, but had previously discussed them with Transworld before it canceled Deal #2.  On September 15, 2015, InTran sent the Texas Aviation Company an EUC in which the end user was listed as Marilog Avion Service Co. Ltd., of Bangkok, Thailand.  On September 17 or 18, 2015, the Texas Aviation Company advised InTran that it was canceling the sale, noting that it was very similar to another attempted purchase that had been denied and remarking that it had been unable to find information on Marilog or indicating that Marilog had the capacity to operate seven helicopters.

51.    Intran, LLC was also associated with Ibrahim.  When Ibrahim was searched at the border on December 16, 2015, the Department of Homeland Security, Homeland Security

Investigations found two personal bank statements. These statements were addressed to Ibrahim at 170 S William Dillard Dr, Ste 1-100, Gilbert AZ, 85333, which was also InTran's address. Ibrahim also had in his possession a draft contract for InTran to buy helicopters (the contract related to a later attempted purchase).

52.     Marilog is also connected to Ibrahim. When interviewed on December 16, 2015, Ibrahim advised that he had inspected a helicopter in Dallas, Texas that was being sold to Marilog in Thailand and that Marilog was owned by his employer. Additional investigation suggested Ibrahim was a Director of Marilog at that time.[4]

### H.    Deal # 4 - The Purchase of the Helicopter in Dallas (Target Helicopter Two)

53.     On October 8, 2015, Ibrahim sent an email an email to S.M. Mirbagheri, the Managing Director of FARSCO and Ali Asghar Ahmadi and Mehdi Alipour, respectively, the Secretary General and the Treasurer General of the Red Crescent Society of the Islamic Republic of Iran. The title of the email was "Fwd: 1425". The body of the email stated "ATT Mr Mir", and "Ple find 3 one 1425 H. I am in 001-788-837-3251 In case of any Q". Attached to the email were photographs of what appeared to be the Bell 412EP with serial number 36403 (Target Helicopter 2). The photographs sent were of an aircraft with the same interior and paint scheme as Target Helicopter 2.

54.     As noted above, FARSCO is an aircraft maintenance, repair, and overhaul services provider based in Tehran, Iran. Ibrahim exchanged multiple other emails with S.M. Mirbagheri.

55.     According to the International Federation of Red Cross and Red Crescent Societies web page (www.ifrc.org), the secretary general of the Red Crescent Society of the Islamic

---

[4] On January 29, 2016 (approximately six weeks after Ibrahim was interviewed in Chicago), Marilog informed the Companies Registration Office in Thailand that Nasir Ibrahim had resigned as a Director of Marilog. As of February 8, 2016, the following persons were listed as directors of Marilog Avion Services: Hameed Ibrahim and Mohammed Rifan.

Republic of Iran was Ali Asghar Ahmadi, and the Treasurer General was Mehdi Alipour, which names coincide with the above email recipients.

56.    In November 2015, the North Dakota Aviation Company entered into an Aircraft Purchase Agreement to sell PremiAir a helicopter for $5.8 million that would be exported from the United States. The aircraft was the Bell 412EP helicopter, Serial Number 36403, registration N412EA (Target Helicopter 2) about which Ibrahim wrote to the Iranians. The agreement was signed by Graham Avery, Chairman of PremiAir, on November 21, 2015, and by a representative of the North Dakota Aviation Company on November 23, 2015.

57.    The last page of the agreement was an "End Use/End User Certification" which Avery signed on behalf of the purchaser, PremiAir, on November 21, 2015. In signing the Certification, Avery agreed that he and PremiAir: (1) would not export or re-export the North Dakota Aviation Company's products to Iran unless otherwise authorized by the United States Government; and (2) would abide by all applicable U.S. export control laws and regulations for any products purchased from the North Dakota Aviation Company and would obtain any licenses or prior approvals required by the U.S. government prior to the export or re-export of the North Dakota Aviation Company's products, software or technology.

58.    On October 25, 2015, Ibrahim sent an email to Mirbagheri, Ahmadi, and Alipour. The title of the email was "Fwd: 412 UNIT 3- EXTRA CHARGE". The body of the email stated the following: "Mr Mir, Please find attach extra on this units. for your info." Attached to the email was a document named "UNIT 3 EXTRA CHARGES –FOC.xlsx". The document was a list of charges for Target Helicopter 2.

59.    On December 7, 2015, a Shipper's Export Declaration ("SED") with Internal Transaction Number of X20151207080028 was filed electronically with the Automated Export

System. The SED was for the export of a "Used Bell 412 Model Civil Helicopter, Serial Number (s/n) 36403," which was valued at $5.8 million. The United States Principal Party of Interest was the North Dakota Aviation Company and the declared ultimate consignee was Marilog in Bangkok, Thailand. The SED also identified a helicopter shipping company as the Forwarding Agent/Filer. The date of exportation was listed as December 12, 2015, and the Port of Export was Dallas/Fort Worth, Texas.

60.     On December 7, 2015, a confidential and reliable source informed a law enforcement agent that a person named "Nasir" was due to enter the United States to inspect a Bell 412 helicopter in Dallas, Texas, in connection with a potential export of that helicopter. The source had concerns about the potential export because the end use destination had been suddenly changed from the UAE to Marilog Avion in Thailand. The source also mentioned that Graham Avery of PremiAir was involved in this transaction. Based on the information provided, law enforcement concluded Nasir Ibrahim was the person the source had described.

61.     As noted above, Ibrahim arrived at the Dallas Fort Worth airport from the UAE on December 9, 2015. During secondary inspection at the border, he indicated that he was in the Dallas area to inspect a helicopter and he had a meeting with the helicopter shipping company that was the forwarding agent for the transaction.

62.     During a subsequent search of one of Ibrahim's iPhones, agents located multiple images of what appeared to be Target Helicopter 2 being prepared for shipment. According to data retrieved from the forensic exam of the electronic devices, the images were photographed in Burleson, TX, the same location where Target Helicopter 2 was packaged for shipment out of Dallas Fort Worth airport.

63.     On December 8, 2015, CBP detained Target Helicopter 2 and subsequently administratively seized it.

64.     After CBP detained Target Helicopter 2, PremiAir Chairman Graham Avery contacted CBP about the detained helicopter.  Avery provided a copy of a document titled "Joint Purchase of 1 EA Helicopter of Model Bell 412EP" and dated October 6, 2015.  That contract was between PremiAir and Transworld Aviation Group.  The document was signed by Avery on behalf of PremiAir and Shehab Ahmed Al Breiki, Director of Operations of Transworld.  The Agreement proposed that PremiAir and Transworld would jointly finance the purchase of the Bell 412 Helicopter bearing S/N 36403[5], at a total price of $5,825,000, with PremiAir supplying $1,000,000 and Transworld providing $4,820,000.[6]  The parties agreed that they would re-sell the helicopter for $6,200,000 and would share profits proportionally.  PremiAir would be responsible for delivering the helicopter by December 20, 2015.  The contract did not state where the delivery would occur but noted that it was subject to U.S export control laws and regulations.

65.     During an interview with law enforcement, Avery said PremiAir found the helicopter advertised on the internet in August 2015.  He stated the helicopter was being purchased by PremiAir "for the UK and our EU operations and it was going to be used by us through our client base," and that the helicopter was financed jointly with Transworld Aviation.  Avery stated Ibrahim contacted PremiAir regarding the helicopter and a PremiAir employee negotiated a deal for the sale of the helicopter, with the promise of future sales of helicopters.

66.     An employee of an affiliate of the North Dakota Aviation Company confirmed that Avery first contacted them in August 2015 concerning Target Helicopter 2, which was for sale.

---

[5] This is the serial number for Target Helicopter 2.
[6] The parties' contributions as listed in the contract appear to be $5,000 less than the total purchase price.

The employee indicated, however, that Target Helicopter 2 was originally intended to go to Dubai, and contrary to Avery's assertion, was never going to the United Kingdom.

67.     The North Dakota Aviation Company received several payments in connection with this attempted export by the following entities, all of which (except for InTran) are located outside the United States:

| Date: | Amount: | Source: |
|---|---|---|
| 10/28/2015 | $  600,000 | Aero Tech FZE (UAE) |
| 11/12/2015 | $1,058,380 | Transworld Aviation FZE (UAE) |
| 11/12/2015 | $1,000,000 | Lester Aldridge LLP (PremiAir's law firm) (UK) |
| 11/16/2015 | $1,544,450 | Intran LLC |
| 11/20/2015 | $1,099,970 | Transworld Aviation FZE (UAE) |
| 11/30/2015 | $  517,130 | Transworld Aviation FZE (UAE) |

$5,819,930     Total

68.     An employee of the helicopters shipping company said that they were contracted by Ibrahim to package and ship Target Helicopter 2. The employee said that around December 9 and 10, 2015, he travelled to the Dallas-Fort Worth area to meet with Ibrahim for the purpose of inspecting and supervising the packaging and shipping of the Bell 412EP helicopter. Ibrahim told the employee that he wanted to see what he had purchased and took many photographs of Target Helicopter 2.[7] The employee stated he knew Ibrahim was a broker and also the purchaser of the Target Helicopter from Avery and that Ibrahim was also involved with Marilog, the purported end user of the Bell 412EP, but he did not know in what capacity. The employee stated that Ibrahim was vague in answering questions concerning Marilog. The employee stated he had known Ibrahim for over a year, and during that time frame, he knew Ibrahim only to be interested in

---

[7] As noted above, during a search of one of Ibrahim's iPhones, agents located multiple images of what appeared to be Target Helicopter Two being prepared for shipment. According to data retrieved from the forensic exam of the electronic devices, the images appear to have been photographed in Burleson, TX, the same location where Target Property 2 was packaged for shipment out of Dallas Fort Worth airport.

acquiring Bell 412EP and Bell 214 helicopters. The employee stated that he exchanged emails with Ibrahim at several different email accounts, all of which were generic and did not reference any company or business.

69.    On February 4, 2016, Mohammed Rifan (a Director of Marilog Avion Service Co. Ltd, in Bangkok, Thailand) advised that Marilog had never conducted business in Iran and had no plans to do so in the future. [8] Rifan stated the end use of the helicopter would be for lease and sale to interested government departments and the high-end commercial industry in the Kingdom of Thailand. In contrast to the official filings with the Thai Companies Registration Office, which listed Nasir Ibrahim as a Marilog director until January 29, 2016, Rifan also stated that Ibrahim only did work for Marilog on a freelance basis and was not an employee of Marilog, nor had Ibrahim ever been an employee of Marilog.

---

[8] On November 4, 2015, "hameed ibrahim" sent an email to Nasir Ibrahim and "Mohammed Rifan". The email was a forwarded email chain titled "Air-Freight." The content of the email is as follows:

"Ni/Hi
Pls advise Consignee name in Tehran and Baku. Also advise if all charges at Tehran will be paid for by Consignee.
They need get over-flight permission / clearances from all countries enroute to confirm schedules. We are trying fix between 12 and 15th if all going well with clearances, InshaAllah. Pls arrange to remit funds ($340,000), per our offer towards freight to the following

Beneficiary:  MARILOG Port Tech Service LLC
Bankers:  Emirates Islamic Bank SZD, Dubai
Account No:  03800765544002
IBAN no:  AE 3040 0003 8076 5544 002
Swift/BIC:  MEBLAEAD
Details:  towards freight.
Pls remit & advise immediately. Thanks.
Brgrds Hameed"

This e-mail belies Rifan's claim that Marilog did not engage in business in Iran.

I.   **Deal # 5 - The Attempted Purchase of Helicopters using the Illinois Company and the Payment of $2,999,930.50 (Target Property 3)**

70.    Sometime between December 9 and 16, 2015, Ibrahim met with representatives of the Illinois Aviation Company and InTran near Chicago.  The Illinois Aviation Company was under the impression that Ibrahim was the owner of Marilog.  According to the Illinois Aviation Company representative, the plan was for Marilog to send the money to InTran, which would send it to the Illinois Aviation Company.  In turn, the Illinois Aviation Company would buy the helicopters from the Texas Aviation Company.

71.    One of the documents found on Ibrahim when he was searched at the border on December 16, 2015 was a draft Helicopter Purchase and Resale Agreement between the Illinois Aviation Company's subsidiary and Marilog dated December 2015 for the purchase of seven helicopters.

72.    On December 15, 2015, the Illinois Aviation Company offered to purchase five of the seven helicopters from the Texas Aviation Company: Helicopters A, B, C, E, and Z. Helicopters A, B, C, and E were all listed in the draft sales contract to the Iranian Company, and in Deal #2 and Deal #3.

73.    Between approximately December 7, 2015 and January 20, 2015, InTran made initial payments of $2,999,930.50 to the Illinois Aviation Company for the Bell 412 helicopters. InTran received the funds for those payments between approximately December 7, 2015 and January 20, 2015, from Transworld Aviation and three other overseas entities.  Transworld sent the majority of the funds, $2,349,910; the remainder, $650,020.50, came from other offshore companies: AeroTech FZE, Gulf Technical Solutions, and AHE International. As discussed previously, Transworld is a UAE registered entity associated with Ibrahim.

74.     On December 21, 2015, InTran's representative told U.S. authorities that Marilog had informed him the helicopters were for leasing to the Royal Thai Police. Representatives from the Royal Thai Police were unaware of any deal with Marilog. InTran's representative further advised that Marilog had told him the helicopters would not be re-exported and sent an end user statement in which Marilog confirmed in March 12, 2014 that it was aware of and in compliance with U.S. export law.

75.     On January 27, 2016, InTran wrote investigators an email to the effect that they had "potential customers" in Iran and they were wondering if they would be able to export civil or commercial helicopters to Iran. They stated that they had not started any negotiations.

76.     On February 3, 2016, InTran canceled the deal with the Illinois Aviation Company and asked for its money back. On February 12, 2016, InTran sent investigators another email saying that the transaction with the Illinois Aviation Company had "nothing to do with the Iran questions we asked before."

77.     On or about February 29, 2016, Magistrate Judge Alan Kay authorized the seizure of the $2,999,930.50.

## COUNT ONE

78.     The statements made in the above paragraphs are restated as if fully set forth herein.

79.     Nasir Ibrahim and others known and unknown acted individually and conspired together to attempt to procure the above identified helicopters in violation of IEEPA, specifically 50 U.S.C. § 1705, the smuggling statute, 18 U.S.C. § 554(a), and the conspiracy statute, 18 U.S.C. § 371.

80.     As such, the defendant properties are subject to forfeiture, pursuant to 18 U.S.C. § 981(a)(1)(C), as property which constitutes or is derived from proceeds traceable to a conspiracy to violate IEEPA and the smuggling statute.

## COUNT TWO

81.     The factual statements made in the above paragraphs are restated as if fully set forth herein.

82.     Nasir Ibrahim, and others known and unknown, conspired to transmit and transfer the $2,999,930.50 to a place inside the United States from or through a place outside the United States, with the intent to promote the carrying on of violations of IEEPA and 18 U.S.C. § 554, in violation of 18 U.S.C. §§ 1956(h), 1956(a)(2)(A).

83.     As such, the defendant properties are subject to forfeiture to the United States, pursuant to 18 U.S.C. § 981(a)(1)(A), as property involved in transactions in violation of 18 U.S.C. §§ 1956(h), 1956(a)(2)(A), or as any property traceable to such property.

## PRAYER FOR RELIEF

**WHEREFORE,** the United States of America requests that as to the above referenced defendant properties, that warrants for arrest *in rem* issue according to law; that pursuant to law, notice issue on the defendant properties as described above; that due notice be given to all parties to appear and show cause why the forfeiture should not be decreed; that judgment be entered declaring that the defendant properties be forfeited to the United States of America for disposition according to law; and that the United States of America be granted such other relief as this Court may deem just and proper, together with the costs and disbursements of this action.

Respectfully submitted,

TIMOTHY J. SHEA
United States Attorney
DC Bar No. 437437

By: ___/s/Arvind Lal_____
Arvind K. Lal
D.C. Bar No. 389496
Assistant United States Attorney
National Security Section
555 Fourth Street, N.W.
Washington, D.C. 20530
(202) 252-7688 (Lal)
arvind.lal@usdoj.gov

*Attorneys for the United States of America*

## VERIFICATION

I, Michael Boone, a Special Agent with the Homeland Security Investigations, United States Department of Homeland Security declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing Verified Complaint for Forfeiture *In Rem* is based upon reports and information known to me and/or furnished to me by other law enforcement agents and that everything represented herein is true and correct.

Executed on this <u>12th</u> day of February, 2020.

_____/s/_____

Michael Boone
Special Agent
Homeland Security Investigations

**RECEIVED**

FEB 1 3 2020

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia