**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| ONE BELL 214 HELICOPTER, Serial | ) |
| Number 28118, | )   Civil Action No. 20-cv-423 (RDM) |
| | ) |
| ONE BELL 412 HELICOPTER, Serial | ) |
| Number 36403, | ) |
| | ) |
| $2,999,930.50 OF FUNDS SEIZED | ) |
| FROM BANK OF AMERICA | ) |
| ACCOUNT XXXXXX5559, | ) |
| PREVIOUSLY HELD BY AAR | ) |
| CORPORATION, | ) |
| | ) |
| Defendants. | ) |

_____ _____)

## VERIFIED CLAIM OF INTEREST BY CLAIMANTS
## GRAHAM AVERY  and PREMIAIR AEROSPACE LTD.

1. COME NOW, Graham Avery and PremiAir Aerospace Ltd. ("PremiAir") by their Attorney, The law offices of David E. Price, PC ("Price"), pursuant to Rule 6(b) of the Federal Rules of Civil Procedure, hereby file this Verified Claim and assert their interest and right in the Defendant *in rem* in this Action.

2. Graham Avery and PremiAir have a claim to, interest in, and right to helicopter # 36403 and $1,000,000 in US currency seized by the United States pursuant to the "Verified Complaint for Forfeiture *In Rem*" filed in this action under Title 18, USC Sections 492 and 981 on February 13th, 2020 (referred to as the "Defendant's property). Said property is "currently in the custody of a United States Government agency".

3

3. This Seizure action under USC §981 was brought by the Government against the above referenced Defendants for alleged knowing violation of §50 USC 1701 (the Iran Sanctions Act), §USC 1956 (Money Laundering) and §18 USC 554, attempted knowingly smuggling goods out of the US.

4. Each and every one of these allegations is fervently denied in their entirety.

5. By way of more expansive Answer to these allegations, below is the Affidavit and Claim of Graham Avery, CEO of PremiAir Aerospace Ltd. ("PremiAir"), which sets forth in great detail the factual particulars supporting a denial of the Government's allegations.

6. I GRAHAM AVERY of Station Cottage, Nacton, Suffolk, IP10 0HR, United Kingdom do solemnly swear under the penalties of perjury that the foregoing is true and to the best of my knowledge:

7. I make this Affidavit on behalf of PremiAir Aerospace Limited (hereafter "PremiAir"), a company registered in England and Wales under company number 08817419. I make this Affidavit from facts that are known to me unless I state otherwise where I honestly believe them to be true.

8. In this Affidavit when I refer to "PA" it is to PremiAir together with its officers and employees which includes Daniel Basden (hereafter "Mr. Basden") and myself.

9. There is attached to this Affidavit two files of supporting papers, Exhibit A and Exhibit B. These will be referred to at times in this Affidavit.

10. This Affidavit is made in relation to Bell 412 helicopter, serial number 36403 (hereafter "'403'"). This Affidavit is made in support of the application for relief under SECTIONS II, III and IV of the PETITION FOR REMISSION sent to PremiAir under cover of a letter dated April 14, 2021, from the Department of Justice, which letter was accompanied by a NOTICE OF CIVIL FORFEITURE ACTION (hereafter "the Notice"). This letter and the Notice were received on April 19, 2021.

Overview

11. The background to PremiAir and the key employees of PremiAir are detailed in Exhibit A, which is a copy of a REQUEST TO END-USERS REVIEW COMMITTEE TO REMOVE FROM THE ENTITY LIST (1) PREMIAIR AEROSPACE LIMITED (2) GRAHAM AVERY (3) DANIEL BASDEN (hereafter "the Request"). The United States Attorney (hereafter referred to as "the Attorney") is referred to paragraphs 6 – 12 inclusive of the Request.

12. In 2014-18 PremiAir was one of the largest aircraft service companies in the United Kingdom and one of the most highly rated. PremiAir buys and sells helicopters and supplies spares parts for aircraft, and in the period up to 2018 when it moved from its then base in Blackbushe, in the county of Hampshire, United Kingdom, it also arranged the operation of helicopters for others and had its own fleet of helicopters that it operated on charter. At around this time the fleet consisted of, approximately, five Bell and Sikorsky helicopters and it had nine pilots on the payroll and at times PremiAir also had to use sub-contract pilots to help deal with the work. In 2014 -2016 PremiAir also supplied hangarage and maintenance for helicopters run by some of the biggest companies in the United Kingdom. A short video of the history of the company can be found at www.premiairaviation.com

13. The most prestigious contract that PremiAir had at that time was to supply hangarage for, and to assist the military in the maintenance of, the helicopters of the Queen's Flight. These helicopters were used, and still are, to fly members of the Royal Family.  In around late 2015, this work was moved, for security reasons, to a military airfield, RAF Northolt, just outside London. I was proud to have PremiAir chosen to supply these services from its base in Blackbushe and of the prestige this brought to PremiAir, which prestige continued even after the Queen's Flight moved to Northolt. I would never have done, or will do at any time, anything to jeopardise my reputation or that of PremiAir.

14. However, the effect of this matter and the addition of PA's name to the Entity List has caused severe damage to the company and to Mr. Basden and me. I would never, directly or indirectly,

knowingly engage in any activity that was against the national interest of the United Kingdom or its ally the United States of America.

15. When buying helicopters, the first step is to source them. This can be done, for instance, by using existing contacts in the business or through the internet. Mr. Basden is responsible for sourcing virtually all the helicopters bought by PremiAir.

16. Dealing in helicopters is not as straight forward as simply buying a helicopter knowing that there is a customer ready to buy it from you. PA does at times buy helicopters on spec and holds them in its inventory waiting for the right purchaser, or agrees with the seller to act as an agent to go out and find a buyer for the helicopter. If PA acts as an agent to sell the helicopter it does not itself buy or own the helicopter it just takes an agreed fee from the seller when the helicopter is sold.

17.  Bell helicopters are much sought after and if Mr. Basden tracks one down for sale at a good price he will usually try and buy it whether or not there is an immediate purchaser in mind in the knowledge that sooner or later a buyer will be found. Alternatively, Mr. Basden may agree a deal with the seller to act as an agent to find a buyer.

18. Sometimes while negotiating to purchase a helicopter PA will already have a potential purchaser for that helicopter in mind. However, it sometime happens that the potential purchase falls through and does not go ahead. This then leaves PA with a helicopter and no immediate buyer so PA then has to revaluate the position. PA then has a number of options. It may, if it is able, withdraw from the purchase or it can seek a new buyer to re-sale the helicopter to and, in the meantime, keep the helicopter in its inventory or, until 2018, it could have completed the purchase and operated the helicopter itself.

19. Bear in mind the purchase of a helicopter is a large capital expense and the business of buying and selling helicopters is a very competitive one. It is common in the business for parties to join together to fund the purchase of helicopters. In these circumstances two or more parties will agree to the amount of funding that each will supply and to the split between them of the price

achieved on the sale of the helicopter. The "*Joint Purchase*" agreement between Transworld Aviation Group (hereafter "TWA") and PA that is referred to at paragraph 64 of the VERIFIED COMPLAINT FOR FORFEITURE *IN REM* (hereafter referred to as "the Complaint"), which is dated February 12, 2020, and was sent with the letter of April 19, 2021, is such an agreement, as is the COLLABORATION AGREEMENT and the HELICOPTER COLLABORATION AGREEMENT referred to in paragraphs 26 and 28 of this Affidavit.

20. When buying and selling helicopters PA always carries out the necessary legal and administrative checks on a number of issues and caries out due diligence on third parties with which PA is dealing. As can be seen from this case, and from The High Court of Justice, Queen's Bench Division, Claim Number QB-2017-005748 (hereafter "the High Court Action"), details of which are given in the Request at paragraphs 40 – 46, it is possible that third parties, if determined to act illegally may do so by hiding their true aims behind a facade of legitimate commercial activity and lie to and mislead legitimate companies, such as PA, to further their illegal ends.

21. The similarities of how Nasir Ibrahim (hereafter "Mr. Ibrahim") and TWA have used and mislead PA in this case and in the High Court Action are marked. It is clear from what I have now seen in the Complaint that in 2015/16 Ibrahim and TWA were working entirely separately from PA to try and advance their aim of buying helicopters for Iran. Mr. Ibrahim even appears to have used contacts with whom I put him in touch.

22. When the High Court Action started in October 2017, PA did not even know that Mr. Ibrahim and TWA were involved in the scam that had led to PA having $1,000,000.00 stolen from it. It was only as the High Court Action developed that PA found out about the part played by Mr. Ibrahim and TWA in stealing money from PA, and in July 2018, PA joined both of them as Defendants in the case.

23. The Pleadings to the High Court Action are part of Exhibit A. However, it may be of assistance to the US Government to have a brief synopsis of the case before considering some of the details of the allegations against PA in the Complaint in *this* matter.

24. In 2015, I told a contact of mine, Mr. Michael Foley (hereafter "Mr. Foley") who was a broker for the sale and purchase of aircraft, that PA was looking for helicopters to buy and to let me know if he found any for sale. This was a general request and had nothing to do with Mr. Ibrahim or TWA. Mr. Foley operated his business through a company, Privaero Limited (hereafter "Privaero") based in Cyprus. Privaero is Mr. Foley's alter ego and does not have any independent corporate identity; it is for all practical purposes, Mr. Foley.

25. In early 2016, Mr. Foley informed me that he was interested in buying a Bell helicopter (hereafter "a Bell Helicopter") and Mr. Foley asked if PA would be interested in buying it from him. I told Mr. Foley that if all the supporting paperwork was in order and the price was right then PA would be interested in buying a Bell Helicopter. Mr. Foley then suggested that it would help him secure the deal if he had a guaranteed onward sale, but I told him that PA would only purchase the helicopter if all the due diligence and paperwork checked out. Mr. Foley then suggested that if he could show the seller that he had some cash available towards the purchase this would show that he, Mr. Foley, was a serious buyer. To this end Mr. Foley asked me to have PA place approximately $1,000,000.00 in an escrow account.

26. I was not happy about this but agreed to do it on condition that the terms to release the cash from the escrow were crystal clear, and simple. It was agreed that the money could only be released on my specific written consent, and if the purchase of the helicopter did not go ahead then the money would also immediately be returned to PremiAir. At this time, I considered that I was only dealing with Mr. Foley and his alter ego Privaero.

27. While I was waiting to hear if PA had been successful in securing a Bell Helicopter, Mr. Foley, Mr. Ibrahim and TWA were, behind PA's back and without its knowledge, engaged in negotiating the purchase of a Bell 412 serial number 36500 (hereafter "'500") using in part the

$1,000,000.00 that was held in escrow by Aeronautical Title and Escrow Services LLC of Oklahoma, United States (hereafter "Aeronautical") to purchase a Bell Helicopter for PA.

28. When PremiAir issued proceedings against the original Defendants in the High Court Action it joined Aeronautical as a Defendant. However, as soon as it was served with the papers in the High Court Action Aeronautical contacted our attorney and declared that it wanted to cooperate with us as it considered that PremiAir had been misled by Mr. Foley and others. It was Aeronautical that told us that the escrow money had been used not to buy a Bell Helicopter but for TWA to buy '500 from a company in Nigeria. In return for this cooperation, I withdrew the action against Aeronautical.

29. When I found out about the involvement of Mr. Ibrahim and TWA in stealing money from PA, I had the option of either continuing the action against the original Defendants and trying to obtain the money from them, or widening the net and joining Mr. Ibrahim and TWA as Defendants in the High Court Action.

30. In the High Court Action Mr. Foley had made untrue allegations that TWA and Mr. Ibrahim were in partnership with PA. The only agreement that PA had with TWA was the "*Joint Purchase*" dated October, 6, 2015, of which I gave a copy to the United States Government agents at the beginning of 2016, and which is mentioned in paragraph 64 of the Complaint. PA has never been in any partnership with either Mr. Ibrahim or TWA.

31. By joining Mr. Ibrahim and TWA as Defendants in the High Court Action I opened up the possibility that all forms of correspondence between PA, Mr. Ibrahim and TWA would become discoverable in the case. If it was true that PA was closely involved with Mr. Ibrahim and TWA in some form of partnership, as alleged by Mr. Foley and in that matter, then all of the relevant communications about the alleged partnership would have been made available to the High Court by Mr. Ibrahim, TWA and Mr. Foley to defend the Claim against them. Such communication has never been produced, because it does not exist.

32. If PA was a co-conspirator in the purchase of '403' with Mr. Ibrahim and TWA then all would have been potentially laid open in Court in further discovery and eventually at trial. Therefore, to join Mr. Ibrahim and TWA as Defendants in the High Court Action, if all that is alleged in the Complaint was true, would have been a highly risky move by PA. In any event, because PA knows that it has never been in partnership with Mr. Ibrahim or TWA and what is claimed by Mr. Foley, and in the Complaint, about PA working with Mr. Ibrahim and TWA, is not true; PA purposely added Mr. Ibrahim and TWA as Defendants in the High Court Action.

33. PA now has judgement against Mr. Ibrahim for £718,330.34. There is at pages 1a copy of the Judgment against Mr. Ibrahim.

34. During the progress of the High Court Action two interesting documents have come to light which clearly show how Mr. Ibrahim and TWA, along with Mr. Foley, were engaged in trying to buy helicopters at least as early as the beginning of 2016. At pages 8 to 12 of Exhibit B there is a copy of what is called a "HELICOPTER COLLABORATION AGREEEMNT" between Privaero and company called Helicopteros Nacionales de Colombia S.A.S. (hereafter "Helicol"). The agreement goes into detail of how Privaero and Helicol will try and sell a helicopter, Bell 412 serial number 36428, and to use the proceeds of sale to settle a dispute between Helicol and In Tran LLC, Mr. Ibrahim's company. The dispute has arisen because In Tran LLC has reneged on the purchase of the helicopter under the terms of an agreement dated April 6, 2016.

35. Under the terms of the agreement Mr. Foley is in effect trying to help In Tran LLC out of a hole and this shows a deep relationship between Mr. Foley and Mr. Ibrahim that may have been going on for some time. The agreement also shows that Mr. Ibrahim has a track record of dishonesty and failing to honour agreements with other parties.

36. The second document obtained is headed COLLABORATION AGREEMENT between Privaero, Mr. Foley's alter ego, and TWA and is dated May 02, 2016. This document refers to Privaero arranging the purchase of '500 for TWA. This is the helicopter that TWA used the

stolen $1,000,000.00 escrow money to purchase. A copy of this agreement is at pages 13 and 14 of Exhibit B.

37. Since '500 was bought PA has investigated its whereabouts. It appears that '500 was sold by a company called Calvetons, in Nigeria. PA once believed that '500 then went to Turkey but now believes that it was sent by Russian Topelov aircraft to Armenia. It was unloaded at Zvartnots airport in Armenia, PA believes, under the supervision of Mr. Ibrahim. From Armenia PA believes that '500 was sent, perhaps via Syria, to Iran, where it is now.

38. These documents, and all that PA has discovered during the High Court Action, have made it plain that during the time that PA dealt with Mr. Ibrahim and TWA they were operating a number of simultaneous scams to try and buy helicopters and were using legitimate businesses, like PA, as cover for their activity.

39. Further, if as is alleged in the Complaint, PA was a co-conspirator with Mr. Ibrahim and TWA why were they engaged in stealing money from PA to purchase a helicopter to send to Iran? If PA was a co-conspirator, then it, not Mr. Foley, would have been part of the scam to buy '500. The truth is that PA has been an innocent party from the very beginning and has been used and cheated by Mr. Ibrahim and TWA.

40. It is only now, with the intervention of the United States agencies using all the tools at their disposal, including the ability to search Mr. Ibrahim and his computers, that PA has discovered all that was happening. As can be seen in the Request and in particular at paragraphs 18-26, PA did carryout a thorough due diligence on all the parties involved in this case, and did not find any reason to be concerned about any of them. The US Government should note that PA and the group of which it is part, has increased its emphasis on due diligence by appointing an Ethical Compliance Officer, details of whom are in the Request at paragraphs 47- 51.

41. PA's part in the history of the seizure of '403' is given in Exhibit A, in particular at paragraphs 1-5 inclusive of the Request. However, the record will reflect that PA has since '403' was seized tried to resolve any issues that the United States Government has with PA and to have '403''

returned to it. PA has always stressed to any United States Government Agencies with which it has dealt that it will do anything to assist the United States Government to sort out the issues surrounding the seizure and this remains its position.

42. PA has asked, both through me personally and through the attorney that once acted for PA, Arman Dabiri of Washington D.C., to have full details of the complaints against it so that they could be answered. It is only now, almost *six years* after the seizure, that PA has seen the details of the evidence upon which it appears that the United States Government has relied to bring PA into this quagmire of muddle and confusion. PA even went to the cost and time to file on June 30, 2016, through Arman Dabiri, the Petition for Relief a copy of which is at Exhibit 1 of Exhibit A. No substantive reply has ever been received to this Petition. The first time that PA saw the allegations in the Complaint was when the Complaint arrived with the April 14, 2021, letter from the Department of Justice.

43. Notwithstanding all that has taken place so far in this matter PA wants to make it clear that neither it, nor any agent acting under its instruction, has ever, nor would ever, undertake or participate in or has knowledge of, the conduct that resulted in '403' (or any helicopter or aircraft) being subject to forfeiture and has always taken all reasonable steps under the circumstances to ensure that '403' (or any helicopter or aircraft) could not be used, acquired, or disposed of contrary to US law, or the laws of England and Wales. I am a patriot and would never do or condone any act by PA or any other company I own or work in, which would directly or indirectly cause damage to, or be in breach of the laws of, the United Kingdom or its ally the United States.

44. The Notice of Forfeiture and the Complaint refer to actions in respect of two helicopters and a bank account at Bank of America. PA has no knowledge of, and was not involved in, any action concerning Bell 214 helicopter serial number 28118 or bank account number xxxxxx5559. Therefore, PA cannot make any comment on any part of the Notice or the Complaint which deals with these two issues. PA is surprised and concerned that these two issues have been in

any way connected with the alleged actions of PA. PA feels that this mixing of issues adds to the problems from which PA has to extricate itself as a result of this incorrect association with Mr. Ibrahim and TWA.

### Answer to The Complaint

45. I will deal now with each specific reference in the Complaint to PA so that I can clarify a number of what appear to be misconceptions as to PA's involvement in the matter of '403' and to show that PA is not guilty of *any action* of the sort alleged in the Complaint and should have the $1,000,000,00 that it paid towards the purchase of '403' returned by equity and law. I will refer to paragraphs in the Complaint.

46. Paragraph 1 of the Complaint. PA has never laundered money or taken part in any scheme to launder money (§18 US 1956). All the funds used by PA in the purchase of '403' came from its own resources and were subject to audits by a Chartered Accountant in the United Kingdom and to the laws and standard operating procedures for yearly audits that govern all limited liability companies in England and Wales. There is no evidence presented in the Complaint that supports any allegation against PA that it directly or indirectly laundered money. Indeed, there could not be any such evidence as none exists, as such demand for such evidence is hereby requested.

47. The purchase of '403' was carried out by PA as detailed in the Request, specifically in paragraphs 18-26 inclusive of the Request. At no time did PA intend that '403' would go to Iran in breach of United States and United Kingdom law. This is clear from the documentation shown in the Request. There is no evidence shown in the Complaint that PA was knowingly taking part in any conspiracy with Mr. Ibrahim, TWA, Marilog, or any one of them. All that is presented is hearsay evidence and speculation based upon the fact that PA for a short time, did business with Mr. Ibrahim, TWA and Marilog. PA has been deemed guilty by association with Mr. Ibrahim, TWA and Marilog, which PA now knows from information gained through the High Court

Action and by reading the Complaint where we are suddenly labeled as "co-conspirators" to facts we were wholly unaware of.

48. The background of how I met Mr. Ibrahim is set out in the Request. However, I wish to stress some specific points. I was introduced to Mr. Ibrahim by Donald Hannah (hereafter "Don Hannah") of Phoenix, Arizona, in 2014. Don Hannah told me that he had been doing business with Mr. Ibrahim and brought him to visit me at my office in Blackbushe airport. Don Hannah has been involved in the aircraft industry for many years and in 2014 and now, is well known and respected in the industry.

49. I have known Don Hannah for some time and consider him a trusted friend and ethical businessman. Therefore, when he came to Blackbushe in person and introduced Mr. Ibrahim, and told me that he, Mr. Ibrahim, was looking to buy companies that traded in aircraft and associated equipment and services, and had the backing to pay for them, I was happy to accept the introduction at face value. I was reassured as to Mr. Ibrahim's background when I was told by Don Hannah that he himself had done business with Mr. Ibrahim. I did check up on Mr. Ibrahim but there was nothing in 2014 that gave any cause for concern. Mr. Ibrahim told me that he was in particular looking for companies to buy that had agencies for Bell helicopters and asked that I pass on any contacts that I had that fitted this bill.

50. On and off for some time in 2014 and into 2015, Mr. Ibrahim and I discussed the possible sale of PremiAir to him but in the end, nothing came of this. During this time, I remember that Mr. Ibrahim did try and impress me with talk of the many deals that he could bring to PA, but I took most of this as petty boasting. However, there was the possibility that some of what he said was true. Though somewhat cautious with Mr. Ibrahim, I did pass on the names of some companies that I thought he might be interested in buying. I hoped that out of any such purchased PA might get some work, either supplying parts or services.

51. At the end of 2014 and the start of 2015, Mr. Ibrahim also started to ask if PA could source helicopters that were for sale. I understood that Mr. Ibrahim had already bought helicopters from

14

companies in the United States and had used a company, Helicopter International Shipping Services, Inc. (hereafter "HISS") in Houston, Texas to export them. Mr. Ibrahim told me that he knew a manager in HISS, Kurt Kapota (here after "Mr. Kapota").

52. I introduced Mr. Ibrahim to Ken Wills (hereafter "Mr. Wills") who ran a number of very well-respected aviation companies in the United Kingdom including Heli Charter Limited and Summit Aviation Limited. Mr. Wills owned a company that was an agent for Bell helicopters. Initially I thought that Mr. Wills might have a company to sell to Mr. Ibrahim. However, it became clear to me that Mr. Wills only wanted the opportunity to sell helicopters to Mr. Ibrahim or to use Mr. Ibrahim as an agent to arrange the sale of helicopters to third parties. On or about November 12, 2015, I took Mr. Ibrahim to visit Mr. Wills at his office in Manston in the county of Kent in the United Kingdom. I recall that Mr. Ibrahim gave Mr. Wills and me a presentation as to the types of helicopters in which he was interested.

53. Paragraphs 21, 22, and 23 of the Complaint. In October 2015, Mr. Ibrahim and I were contacted by Mr. Wills about three Bell helicopters which were all for sale in Nigeria. At pages 15 to 27 of Exhibit B there is an email chain starting on September 21, 2015, and finishing on November 7, 2015. The early emails in the chain are between Mr. Wills and a representative of Bristow US, an agent for Bell helicopters.

54. In the email of September 22, 2015, a copy of which is at page 18 of Exhibit B, a representative of Bristow sends Mr. Wills a list of Bell 412 helicopters that Bristow had for sale. In this list there are all of the helicopters, bar two being '403' and Target Helicopter 1, listed in paragraph 21 of the Complaint which it is alleged shows helicopters that Mr. Ibrahim was trying to buy and send to Iran.

55. By an email dated October 1, 2015, Mr. Wills told me and Mr. Ibrahim about three of these helicopters, serial numbers 36373, 36378 and 36386 and makes the comment that the prices being asked for them were interesting. The email is at page 15 of Exhibit B. In my reply email of November 7, 2015, which is at pages 15 and 22 of Exhibit B, I mention the sale that I thought

that PA had just completed of '403' to Marilog and the visit that I was due to have to Mr. Wills with Mr. Ibrahim on November 12, 2015. This is the visit mentioned at paragraph 43 above.

56. I do know that in or around September 2015, I had been asked by Mr. Ibrahim to try and find helicopters for sale to Marilog in Thailand. In fact PA had, entirely independently to what Mr. Wills was telling me and Mr. Ibrahim in his email of October 1, 2015, already sourced the two helicopters, serial numbers 36373 and 36378. These two helicopters do appear in the list at paragraph 21 of the Complaint, but they were sourced *independently* by PA.

57. PA was hoping to sell these two helicopters to Marilog in Thailand. It is important to note that when PA found these helicopters Mr. Basden immediately took the correct steps with the United Kingdom authorities to establish if there were any reasons why PA could not export these helicopters to Thailand. All of Mr. Basden's due diligence activities are noted in the Request at paragraphs 20 including the letter from the Department for Business Innovation & Skills dated October,30, 2015, to PremiAir informing Mr. Basden that there were *no restrictions* on the sale of helicopters to Thailand.

58. There is no evidence that PA had any intention to send these two helicopters to Iran, either via Thailand or at all or to work with others to do so. Indeed, the plain evidence is that PA conducted itself entirely correctly as a responsible company and that the evidence, which is in the Request, proves exactly this. Nor is there anything to show that PA was in any way dealing with the company mentioned in paragraph 49 of the Complaint, "UK1", whatever and whoever that is, in relation to these helicopters or at all. The purchase did not go ahead.

59. In relation to the comments in paragraph 22 of the Complaint, PA has only ever been involved in the purchase of one helicopter, '403', where Mr. Ibrahim acted as an agent and TWA helped fund the purchase of the sale to Marilog. PA has in the Request given full details of the process by which '403' was found and purchased and how it was to be sent to Thailand. At paragraphs 18-26 of the Request PA has supplied details of the due diligence carried out on Mr. Ibrahim, TWA and Marilog.

60. Nowhere in the Complaint is there, nor could there be, any evidence that contradicts the statements made in the Request on the purchase and intended eventual destination of '403'. If Marilog and the other conspirators intended to re-export '403' to Iran, or anywhere else, then PA was not, and could not have been aware of this. Further if I, or Mr. Basden, had become aware of any such plot then we would have immediately withdrawn from the sale/purchase and informed the United States and United Kingdom authorities.

61. The only companies/individuals, apart from Mr. Ibrahim, TWA and Marilog, with which PA dealt as part of the purchase/sale of '403' were Fargo Jet Center Inc. of North Dakota (hereafter "Fargo") from whom '403' was purchased and HISS who packed and prepared '403' for shipping to Thailand. They were all engaged in the one transaction called in paragraph 21 of the Complaint "*Implicated Deals 4*". PA had no part in, and no knowledge of, the so called "*separate negotiations*" referred to in paragraph 23 of the Complaint.

62. Paragraph 49 of the Complaint. In understanding references to the End User Certificate (hereafter "EUC") in paragraph 49 of the Complaint it is important to understand how EUCs are used in the business of the sale of aircraft and associated equipment. There is no standard style or content for an EUC, which is sometimes called end user undertaking. In my experience not every company that deals in aircraft equipment requires an EUC for the sale of aircraft equipment. The ones that do all have their own boiler plate EUC.

63. An EUC is used to help a seller find out where the equipment that is being sold is to be used so that if a seller is challenged at a later date by, for instance, any Government authority, it can rely on the EUC to show that it, the seller, was endeavouring to make sure that all the correct procedures for tracking the equipment were being followed. I have never come across any seller who, once they have sold equipment, then checks up on the equipment's use to make sure that it was in accordance with the statements in the EUC.

64. In paragraph 49 of the Complaint there are details of what is claimed to be an attempt to purchase seven helicopters from a Texas Aviation Company. It is also claimed that there was an EUC

associated with the attempted purchase which I had signed on behalf of PremiAir. The attempted purchase took place almost six years ago. I and Mr. Basden have searched the files of PremiAir and cannot find any record of this EUC or of any correspondence concerning it. In fact, the helicopters listed in paragraph 49 of the Complaint as being for sale in July 2015, from a Texas company also appear in the email of 22 September, 2015, from Bristow in Louisiana to Mr. Wills, a copy of which is at page 8 of Exhibit B.

65. I cannot remember any details concerning this transaction. However, it is possible that PA had been asked, perhaps by Mr. Ibrahim, if it could operate some helicopters in the United Kingdom if they were bought by a third party perhaps Mr. Ibrahim or TWA. I would have no issue in considering the legal and commercial aspects of such a proposal and if they worked then agreeing to it. Operating helicopters owned by a third party is not a problem. If this was the proposal, then PA would be the end user of any such helicopters and I would complete the EUC to state that the helicopters would be used in the United Kingdom under PA's control.

66. As I cannot recall this transaction, I do not know what boxes were ticked on the EUC. However, if, as it is claimed, a box on the EUC was ticked showing that some helicopters were to be held by PA in the United Kingdom pending further sale then again that is not sinister, but could reflect the exact intended situation. Indeed, if at the time that the EUC was prepared PA did not know where the helicopters were to be used then it would be correct for PA to note this on the EUC. If PA was being asked to hold any helicopters pending onward sales by a third party, then to state that they were to be used in, say, the United Kingdom would be misleading to the seller and perhaps not true. In fact, it appears that, if this EUC was completed by PA, the EUC correctly recorded the situation as it then existed and, in the event, allowed the seller to decide not to go ahead with the sale.

67. There is mention at paragraph 49 of the Complaint of a United Kingdom company, UK Aviation Company 1 (hereafter "UK1"), being involved with this attempted purchase of the seven helicopters in July 2015. Neither Mr. Basden nor I have any idea who this company is or

18

anything about it. In relation to Mr. Ibrahim, TWA and Marilog, PA has never worked with any other company based in the United Kingdom, other than taking referrals for the possible purchase of helicopters from brokers, to actually buy and then sell on helicopters. All mention of UK1, and its involvement in any transaction in which PA was involved is news to PA.

68. In paragraph 49 of the Complaint there is mention of the Texas Aviation Company in September 2015, contacting UK1 with questions about the EUC. I note that it appears that it is never claimed that the seller, Texas Aviation Company, had any dealing directly with PA, which ties in with the fact that PA cannot find any records of this purported transaction. It is also odd that the seller is contacting UK1 about an EUC that it is claimed was signed *by me*.

69. The claim that UK1 then told the Texas Aviation Company that there was an agreement between TWA and PA to deliver the helicopters to Dubai is not true. PA has no idea what or whom UK1 is, and it follows that PA has not had any dealings with, or knows any of the business of, UK1. There was only one agreement between PremiAir and TWA and that was in relation to '403' and I passed that agreement to Agent Boone to assist the US Government in early 2016.

70. On reading paragraph 49 of the Complaint, I can see clear parallels between what appears to have happened in relation to these helicopters and the scam that was pulled by Mr. Ibrahim and TWA, with others, to steal money from PA and which is the subject of the High Court Action. In both cases there was at least one company, in this case UK1, working behind the scenes with Mr. Ibrahim and TWA, about which PA had no knowledge, to try and mislead and use PA regarding their true aims.

71. Paragraph 50 of the Complaint. PA has no knowledge of any of the points raised in Paragraph 50 of the Complaint. All of these appear to be part of the parallel plans that were being run by Mr. Ibrahim and TWA and highlights the way that PA was being kept away from the plotting that Mr. Ibrahim and TWA were carrying out.

72. In considering all of the points in paragraphs 21, 22, 23, 49 and 50 of the Complaint, and indeed the whole Complaint, it is worth remembering that Mr. Ibrahim and the other conspirators are

19

capable of changing and forging documents. I am aware of this as a result of all that I have discovered during the High Court Action, which has illustrated the way Mr. Ibrahim and TWA work. I now know that they are all dishonest and capable of changing documents to suit their requirements. I now objectively believe that this must be considered regarding the EUC that is mentioned in paragraph 49, which is the one that it is alleged that I signed, in fact may be *a forgery*, and not a true original.

73. <u>Paragraph 29, 39, and 58 of the Complaint</u>. In paragraph 29 of the Complaint, it is claimed that PA operates in UAE. This is not true. PA does business in a number of countries, including the United States, but it is wrong and misleading to make the statement that PA is "*operating*" in any of them, and especially not the UAE. The term "*operates*" as used in paragraph 29 of the Complaint suggests a physical corporate presence in the country. The only country where PA is situated is the United Kingdom and it always has been.

74. It is claimed in paragraph 29 of the Complaint that on December 10, 2014, I received a fax from the Iran Helicopter Support and Renewal Company (hereafter "IHSRC"). Regarding the acquisition of Bell helicopters and that I was involved in what is called "*Deal #4*". At paragraph 39 there is shown what is claimed to be the text of the fax to PremiAir marked for my attention from IHSRC. Although this is six and a half years ago, I believe that I would recall receiving such a fax, but I do not. I can however, state that I have never, either through PA or at all, knowingly done business with IHSRC or encourage IHSRC to do business with me or PA. I do not believe that I have seen the fax referred and I can only speculate that it was Mr. Ibrahim that arranged for IHSRC to send it, if indeed it was sent.

75. I have read what is claimed to be the text of the fax in paragraph 39 of the Complaint and find it hard to follow. I am unsure what it is being offered, if anything. I can state, from my own knowledge and having checked with Mr. Basden, that PA never tendered *any work* from IHSRC. At this time in 2014, Mr. Ibrahim was still on the scene trying to negotiate a purchase of PremiAir and it may have been that he had made representations to others, including IHSRC

20

about what he may have considered would be possible if he bought PremiAir. In any case all this is speculation in attempt to explain this mysterious alleged fax.

76. The main point is that the unsupported allegation that the contents of paragraphs 29 and 39 of the Complaint show that PA was engaged in the acts claimed in the Complaint and the Notice are not true. *Even if* the fax from IHSRC was sent and correctly addressed and delivered to PA, (no proof of which is shown or detailed in the Complaint), even this does not show that PA was engaged, as alleged, in any illegal act or that it intended to do so in the future.

77. Paragraphs 53 to 55 and 58 of the Complaint. These paragraphs appear in the Complaint under the heading that purports to layout the allegations against PA in relation to what is called "*Deal#4*". However, I think that this shows a misunderstanding of issues surrounding both the purchase of '403' and the work done by PA to try and do business with the Red Crescent.

78. In paragraph 53 of the Complaint mention is made of communications between Mr. Ibrahim and the Red Crescent. Neither I or Mr. Basden were aware of this communication. If we had been we would have been upset as at this time we were trying to buy '403' and sell it on, but *not* to Iran, a country that would require a special license from both the United States and the United Kingdom governments for such an export. PA determined that it had a buyer in Thailand, Marilog, upon whom it had carried out all necessary due diligence, and executed all relevant legal paperwork.

79. PA cannot be responsible for what Mr. Ibrahim may have been doing or planning. It is now obvious that PA has been used by Mr. Ibrahim and his co-conspirators and that Mr. Ibrahim has worked behind the backs of PA to set up deals that involved manipulating and cheating PA.

80. Mention is made at paragraph 53, 55 and 58 of the Complaint of the treasurer of the Red Crescent, Ali Asghar Ahmadi. This appears to be the same person who wrote a letter to PremiAir on February 11, 2016, requesting that PremiAir assist the Red Crescent to buy helicopters for humanitarian use. This application by Ali Asghar Ahmadi was supported by the Red Cross.

81. A full history of all the dealing that PA had with the Red Crescent is detailed in the Request including copies of correspondence with the Red Crescent, the Red Cross and the United Kingdom authorities from whom PA sought, as it is duty bound to, permission to export helicopters to the Red Crescent. PA has held nothing back in paragraphs 33 – 39 inclusive of the Request to explain these dealings. I do not believe that a company that was engaged in some clandestine plot to export helicopters to Iran would actively raise the profile of the application to allow the export by contacting Ministers of Her Majesties Government for their support of the application to do business with the Red Crescent on humanitarian grounds.

82. The inuendo in these paragraphs of the Complaint is that because PA dealt with the Red Crescent this somehow supports the allegation that PA was engaged in international subterfuge is not supportable, because it is not true and also because the full story of the dealings with the Red Crescent show PA as what it is, a company that operates fully within the rules. One thing that does stand out from the disclosures in the Complaint is that the treasure of the Red Crescent, Ali Asghar Ahmadi was not being truthful in his dealings or requests and that the Red Cross should be told of this behaviour as it undermines all that the Red Cross movement stands for in carrying out its important humanitarian work.

83. Paragraphs 56 of the Complaint. In this paragraph the statement that there was a sale of '403' from Fargo to PremiAir is correct. What is not correct is the implication that in some way PA had knowledge or was complicit in any contact between Mr. Ibrahim and any Iranians. At no time did PA know about the illegal deals in which Mr. Ibrahim or his co-conspirators were engaged. What is more, there is no evidence, nor could there be as there is none, to show that PA was engaged in the illegal deals operated by Mr. Ibrahim and there is simply nothing to justify the implication of guilt in the Complaint.

84. Paragraphs 60, 63 – 67 of the Complaint.   In these paragraphs there is references to a "*confidential and reliable source*" and "*an employee of an affiliate of the North Dakota Aviation Company*", which company I understand to be Fargo. It is unfortunate that I have not been told

22

the names of these sources, the details of the questions that they were answering or the exact answers which they gave. Without this information I am unable to deal with specifics and to put comments that they made into context. What is clear from the comments in paragraph 60 and 65 of the Complaint is that either the agents that spoke to the sources, or the sources themselves, have drawn incorrect conclusions from what may have been said, or what the sources understood may have been said, during conversations with me and others in 2015/16.

85. In paragraph 60 of the Complaint there is a statement that "*a confidential and reliable source"* in Dallas, Texas told the United States Government agents that there was a potential export of a helicopter due to take place with the destination being Thailand. As I have already stated I understood that Mr. Ibrahim and Mr. Kapota of HISS had known each other for some time and had already done business sending helicopters aboard so there was no issue with PA agreeing to use HISS to send '403' to Thailand. It seemed reasonable to use HISS and was not in any way a "clandestine move" to export the helicopter, as is implied in the Complaint. Rather this is standard business procedure, and nothing more.

86. The way that the information in paragraph 60 of the Complaint is presented appears designed to make the whole process of exporting '403', in particular my part in it, appear sinister; which is was not. All the facts concerning the transaction have been set out in the Petition, which is at Exhibit 1 of the Request, the Request and now in this Affidavit. In fact, there is nothing unusual set out in this paragraph 60 as far as I, or PA, are concerned. The export of the helicopter was to be carried out by a company that Mr. Ibrahim had used for this type of work before without, so I understand, any problems with customs. Mr. Kapote and Mr. Ibrahim were known to each other.

87. The background to the purchase, and possible sale of '403' was not in any way unusual for such deals. The helicopter was found in August 2015, by Mr. Basden who discussed the possible purchase with me. For a very short time it appeared that PA had a potential purchaser for '403' in Nigeria. This possible sale was detailed to United States Customs and Border Protection in

the Petition filed by Mr. Dabiri on June 30, 2016. This potential sale did not materialise and Mr. Ibrahim, who was acting as an agent looking to buy helicopters, said that he knew of a possible purchaser, which was Marilog.

88. At an early stage I believe that it suggested by TWA, with whom we were negotiating to fund part of the purchase, might want to buy '403'. If TWA had bought '403' then the final destination would have been Dubai. There is no restriction on exporting to Dubai and if the deal had gone ahead then all of the paperwork would have shown Dubai as the final destination.

89. As I have stated above, deals to buy and sell helicopters are complicated. Once you find a helicopter to buy it is not always immediately clear what you will end up doing with it. Getting hold of the helicopter is the main thing, as they are fairly rare commodities and sorting out the onward sale or use may change over the period that it takes to buy the helicopter.

90. In the case of '403' Mr. Ibrahim very quickly came up with what appeared to be the best deal, and that was selling to Marilog in Thailand. There is nothing unusual about this change, as implied by the so called "*confidential and reliable source*" mentioned in paragraph 60.

91. The deal between Fargo and PA had been agreed by October 15, 2015, the date shown in the agreement, but it was not signed until November 21 and 23, 2015. The agreement to sell to Marilog was drafted by 26th October, 2015, which is the date shown on the agreement and was ready to sign subject to agreeing the final price. In an email dates November 7, 2015, to Mr. Wills, a copy of which is at pages 15 and 22 of Exhibit B, I mention the sale by PA of '403' to a company in Thailand. These references all show that PA was intending from at least the end of October 2015, to export '403' to Thailand. I have no way of knowing on what the source based his or her feeling that there had been a sudden change in December 2015, of end user from "*UAE*" to Thailand, but they are wrong.

92. The deal with Marilog appeared to be a good one and the time between preparing the agreements for the purchase of '403' by PremiAir and the sale to Marilog was eleven days which does not tie in with the implication that all was set to sell to a "*UAE*" user up until the last moment before

24

the helicopter was exported. For ease of reference, I attach at pages 28 to 35 and 36 to 44 of Exhibit B copies of the agreements between Fargo and PremiAir and PremiAir and Marilog.

93. PA even arranged a trip for the some of the Marilog management to the United Kingdom to meet a company, Heli Charter Limited, to discuss the maintenance of, and supply of spare parts to, '403'. This visit is referenced in the Petition at Exhibit 1 of Exhibit A sent with this Affidavit. I do not believe that if PA was going to send '403' to Iran it would have gone to the trouble and expense of setting up such a visit, which serves no function. Also, such actions are not undertaken on short notice, so the "*source*" has drawn the wrong conclusion from whatever information to which he or she had access. The export to Thailand, as far as PA was concerned, was fixed in October 2015, and never changed.

94. It is to be regretted that I have not been given, either now or in the past, full details of the facts upon which the "*source*" based his or her speculation. If I had, it may have been possible to sort this misunderstanding out long ago.

95. There is at Paragraphs 65 and 66 of the Complaint further misunderstandings and incorrect conclusions being drawn from contact with third parties referred to as "*an employee of an affiliate of the North Dakota Aviation Company*" and a so called "*interview*" that I had with law enforcement. I surmise that the North Dakota Aviation Company is Fargo and that the affiliate company is Exclusive Aircraft Sales, and it may be that the employee is Mr. Mike Higgins (hereafter "Mr. Higgins") but I do not know how he, or she, had "*indicated*" that '403' was intended to go to Dubai. I have laid out above the development of the onward sale of '403', and the fact that there was nothing out of the ordinary about the sale. I set out below my dealings with Mr. Higgins from which, if he is the "*employee*" referred to, he may have obtained the incorrect idea about '403' going to the United Kingdom.

96. It appears that the whole point of paragraphs 65 and 66 of the Complaint is to try and discredit me and to try and cast doubt on my assertion about the eventual end user of '403'. The whole idea that I said during a telephone conversation that '403' was going to the United Kingdom is

based on what I now learn was an "*interview*" with law enforcement. There is no date given as to when, or with whom, I had this "*interview*" but I assume it was after '403' was seized. After the seizure I called a number of law enforcement officers to try and find out what was going on. I was frustrated and very concerned as it was clear that we were going to lose the Marilog deal, and I had no idea why '403' had been seized, for how long it was going to be held or what I could do to have it released.

97.  During this period, I did telephone different agents from different US agencies and stressed to them that I wanted to help so that PA could get '403' back and to sell it or use it. PA had $1,000,000.00 tied up in the helicopter. Immediately after '403' was seized I believe that I spoke to Mr. Jack Cannon of United States Customs and Border Protection. I answered all questions that he put to me and when he told me by email dated January 28, 2016, that the case had been passed to Agent Michael Boone (hereafter "Mr. Boone") of Homeland Security Investigations, he thanked me for my cooperation. A copy of that email is at pages 45 to 47 of Exhibit B.

98. Thereafter I had a number of telephone calls to Mr. Boone and as far as I can remember after all these years, I initiated them all. I also had email communications with Mr. Boone and at all times tried to help him in whatever way he requested. At no time during any of these calls initiated by me did Mr. Boone ever tell me that I was being "*interviewed*" with a view to my comments being used against me and PA. Had I known that these calls were being regarded as adversarial I do not believe that it would have changed anything that I said because it was all true, but I certainly would have taken great care to make sure that all that Mr. Boone was understanding from these calls was correct and factual.

99. I was trying during these calls to get information as to when '403' was to be released and why it had been seized. I certainly did not regard them as some form of formal interview, with all that such formality entails. I needed to know when I could try and find a new buyer for the helicopter. If I had known that I was being "*interviewed*" I would also have followed up the calls with a confirmatory email to make sure that all that I had said was clear. By taking such

steps we should have avoided the kind of misunderstanding that is shown in paragraph 65 of the Complaint.

100.   At all times when dealing with Mr. Boone I gave him all the information that he asked of me. Mr. Boone accepts at paragraph 64 of the Complaint that I passed a copy of the agreement between TWA and PremiAir to him. There was no reason why I should not pass him this information. PA had, and still has, nothing to hide. However, my assistance went further as I believe that I gave Mr. Boone the breakdown of the source of the funds used to purchase '403' which breakdown is shown at paragraph 67 of the Complaint.

101.   I offered to come to the United States to meet Mr. Boone. Attached at pages 48 and 49 of Exhibit B are a sample of emails between me and Mr. Boone. As it happened, the COVID pandemic started to take hold in 2019 and at aged 75 I became concerned by air travel, so I had not yet met Mr. Boone. However, in September 2020 my name and that of Mr. Basden and PremiAir were suddenly added to the "Entity List".

102.   The addition of our names to the Entity List has had a profound, and extremely damaging, effect on the business of PA and on the private lives of Mr. Basden as well as myself. When any internet search is carried out on any of the three names amongst other incorrect and extremely damaging results, there is one that is linked to an Iranian nationalist website, www.ifmat.org in which we are referred to as being responsible for "*atrocities and Human Rights Violations*" and states that, "*working with this entity means supporting Iranian regime terrorist activities & development of WMD*".

103.   The commercial damage done to PA as a result of being added to the Entity List is beyond calculation. On a personal basis Mr. Basden, I and our families have suffered considerable distress and have had the media hound us and try and publish so called news stories about the comments on the Iranian website. The US Justice Department should also be aware that when we were added to the Entity List, because I could not travel due to the COVID restrictions, I contacted the United States Embassy in London and again offered to meet *any representative* of

the United States Government in London to clear up this matter. I was told that they could not help and that I would have to deal with the correct department in Washington DC. Copies of the email to and from the United States Embassy are at pages 57 to 59 of Exhibit B.

104.   In paragraph 65 of the Complaint, it is alleged that I told "*law enforcement*", which I surmise is Mr. Boone, that '403' was being purchased for "*the UK and our EU operations*". Although there is no date as to when this "*interview*" took place it is clearly after Marilog cancelled the purchase of '403'. After the cancellation of the Marilog sale I was considering what to do with '403', but there was a major problem in that Mr. Boone would not tell me when the helicopter would be released. I therefore considered taking it into the inventory of PA and for PA to use it, when we eventually had it in hand, in the United Kingdom.

105.   At pages 50 and 56 of Exhibit B there are a series of emails dated January 7 and 8, 2016. These emails are from and to Mr. Higgins of Exclusive Aircraft Services, Mr. Kapota of HISS, Randall Jenson of Fargo and myself. The point of this email exchange was to have a representative of Fargo, the company that sold '403' to PremiAir, sign the Statement by Intimate Consignee and Purchaser, Form BIS-711. Initially Mr. Kapota asked Mr. Higgins to sign the form and Mr. Jenson raised the point that Marilog was not the end user or buyer with which Fargo had contracted. Mr. Higgins raised this with me and I replied on January 8, 2016, and, with the exception of the initial idea being a sale to Nigeria, laid out the history of the sale to Mr. Higgins. There is a copy of the email starting on pages 51 and 52 of Exhibit B.

106.   In the email I tell Mr. Higgins that initially it was intended to sell '403' on to a company in Dubai, but a better deal very quickly came up, to sell it to Marilog. The purchase agreement with Fargo was prepared in October 2015, but not signed until November 21 and 23, 2015. As can be seen from the purchase agreement when it was prepared, I wanted PA to be the owner and the end user so PA could control the onward sale. My comments to Mr. Higgins in the mail reflect *exactly* what my thinking had been since '403' was sourced and there is nothing incorrect or in any way underhand about any part of the this.

107.  In the email to Mr. Higgins of January 08, 2015, at point 5, I make the point that PremiAir could now loose the contract with Marilog and if it did then PA would "*move to plan B then I will bring it to the UK and use it in the UK/EU."*  In paragraph 65 a great deal is made of me allegedly telling Mr. Boone during an "*interview*" that I intended that '403' should be used in "*UK and our EU operations*". By the time that I was speaking to Mr. Boone, Marilog had cancelled the contract for '403' so I had moved to *"plan B*" as outlined to Mr. Higgins on January 8, 2015.

108.  It would objectively appear that Mr. Boone had surmised that I had crossed wires because when I spoke to Mr. Boone, after the cancellation of the Marilog deal, it *was* my intention that when PA took possession of '403' it was to use it in the United Kingdom and European Union, *as detailed on the January 8, 2015, correspondence to Mr. Higgins*. In the email to Mr. Higgins, I go on and point out if PA does loose the deal, then a new Customs form will be required. All above board and nothing to hide, so Form BIS-711 was signed by Mr. Higgins, a copy of which is at page 56 of Exhibit B, on behalf of Fargo showing the destination of '403' as Bangkok and the ultimate consignee as Marilog.

109.  It follows that the comment in paragraph 66 of the Complaint attributed to "*The employee*" that "*contrary to Avery's assertion*" '403' was going to the United Kingdom are wrong and that there can be no adverse inference drawn from it. It appears very possible that Mr. Higgins has passed on my comments in paragraph 5 of my email of January 08, 2016, and either he has not remembered the information correctly or the person to whom he confided the information misunderstood it. In any case it is wrong as, until the cancellation of the contract by Marilog, there was never any suggestion that '403' was coming to the United Kingdom.

110.  Paragraph 68 of the Complaint. Here "*an employee*" of HISS is quoted as stating that he, or she, knew that Mr. Ibrahim was the purchaser of '403' from me. There is no context to this statement nor any form of corroboration. However, it is possible that it has come from a misunderstanding by the "*employee*" of an agreement that PA had with Mr. Ibrahim to make

sure that he, Mr. Ibrahim, in effect stood as surety for Marilog. PA had not done business with Mr. Ibrahim, TWA or Marilog before this agreement for Marilog to buy '403' was brokered by Mr. Ibrahim, hence PA wanted to make sure that it was covered if Marilog did not have the money to complete the purchase. To guard against this PA asked Mr. Ibrahim, who had brokered the deal, to agree that if the sale to Marilog fell through and a new one, at the same price, could not be found then Mr. Ibrahim would arrange to have '403' bought.

111.   It is not true to say that Mr. Ibrahim was the purchaser of '403' from me. It is clear that PA bought '403' to sell to Marilog as has been set out in this Affidavit and the unknown and un-named employee of HISS is wrong. If, as alleged in the Complaint, I and PA had conspired with Mr. Ibrahim to buy '403' to re-export it to Iran, there would have been a guaranteed buyer for '403' and it would not have been necessary for PA to have the agreement with Mr. Ibrahim for him to stand as surety to make sure that PA was not out of pocket if the deal with Marilog fell through and another purchaser could not be found.

**CONCLUSION**

112.   PA, as a result of the High Court Action that it has taken against Mr. Foley, Mr. Ibrahim and TWA, has been able to show the full extent of the dishonesty and duplicity of these parties. Without the High Court case PA would have struggled understand, much less to show what Mr. Ibrahim and TWA are capable of and how they have made use of PA. The similarities in the way that Mr. Ibrahim and TWA have behaved in this matter and in the events that make up the key features of the High Court case are synchronized and obvious. They use legitimate companies and people to hide behind while manipulating them for their own dishonest purposes.

113.   PA has waited *six years* to see the grounds upon which the US Department of Justice has joined it in the case against Mr. Ibrahim and TWA. In that time PA has suffered financially as a result of the loss of the $1,000,000.00, but even far more due to the catastrophic effects of the loss of reputation and business as a result of the addition of its name to the Entity List, which

would not have happened if PA had been given the opportunity to see the extent of the case against it and be given the opportunity to explain to the United States Authorities all the issues. PA could also have helped the US Department of Jusitice with information from the High Court Action to make sure that Mr. Ibrahim and TWA are brought to justice. PA can still help and as always is available to offer what it can.

114. Mr. Basden and I have also suffered as a result of the unnecessary and unfair addition of our names to the Entity List. Like PA we have done nothing wrong other than to do business with what appear, based on the allegations in the Complaint and in the High Court Action, to be manipulative and dishonest parties. PA, Mr. Basden and I have all been considered as guilty by association with Mr. Ibrahim, TWA and Marilog. There is nothing in the Complaint that, once the circumstances of events are explained, links PA to *any* dealings with Iran. It appears that the word of third parties has been treated as being true without any other possible explanation for key events being considered. It appears that having seen what has come out of the High Court Action and having read the factual statements in the Complaint that Mr. Ibrahim and TWA were committing criminal acts, (though PA did not), yet we have suffered severe punishment to date by being held as guilty by association.

115. In particular, PA has never exported, or attempted to export or reexport '403', or any other helicopter, from the United States in contravention of United States economic sanctions against the Islamic republic of Iran. PA at no time attempted, or caused to be attempted, a third party to export or re-export, '403' to any prohibited country, including but not limited to Iran.

**REQUEST FOR REMISSION – OWNER OR LIENHOLDER**

116. There can be no doubt that PA is the legal owner of '403'. PA is also innocent of the wrongdoing outlined in the Notice and the Complaint. However, PA is not the beneficial owner of all of '403' as PA only paid $1,000,000.00 of the total purchase price of $5,875,000.00. For these reasons PA, as an innocent party in the seizure of '403', is entitled to claim the return of

the $1,000,000.00. PA may also be entitled to other payments and costs, though is prepared to waive these in consideration if there is now an expedited resolution to this matter.

117.  PA understands that because of the length of time that '403' has been in storage it will not be airworthy or even in reasonable repair. However, if it is sold as is it will still make enough to cover the claim made by PA. PA also needs to have a statement from the US Government to the effect that the United States accepts that PA was not a party to the wrong doings of Mr. Ibrahim, TWA and Marilog and has not been supporting the Iranian regime. PA also requires that PremiAir, Mr. Basden and I are immediately removed from the Entity List before any more damage and hurt can be done.

118.  For the reasons given *supra*, Defendants Graham Avery and PremiAir refute in full all the Government's allegations of any knowing wrongdoing with regard to Helicopter 36403, and as such request the refund of the $1,000,000 the US Government has held for nearly six years.

## **VERIFICATION**

I, Graham Avery, Director of PremiAir Aerospace Ltd., hereby declare that I have read the foregoing Verified Claim, and do aver and declare under the penalties of perjury that: 1) the foregoing Claim as written *supra* is true and correct, and; 2) that I have been authorized by PremiAir Aerospace Ltd. to execute this verification on its corporate behalf. Executed this 23rd day of July, 2021.

Graham Avery

Respectfully submitted,


By:___*/s/ David E. Price*_____
        David E. Price, Esq.

Law Offices of David E. Price, PC
#3 Bethesda Metro Center
Suite 700
Bethesda, Md 20814
(202) 536-5191
David@TopTier.eu
*Attorney for PremiAir Aerospace Ltd.*


### **CERTIFICATE OF SERVICE**

        I certify that on July 26th, 2021, true and correct copies of the foregoing Motion for Extension of Time, and proposed Order, were filed with the Clerk of the United States District Court for the District of Columbia and a copy served via electronic mail on the following:

Arvind K. Lal, Esq.
Assistant United States
Attorney
555 Fourth Street, N.W.
Washington, D.C. 20530
(202) 252-7688
arvind.lal.@usdoj.gov