# UNITED STATES OF AMERICA

v.

## ONE BELL 214 HELICOPTER, Serial Number 28118,

## ONE BELL 412 HELICOPTER, Serial Number 36403

## $2,999,930.50 OF FUNDS SEIZED FROM BANK OF AMERICA ACCOUNT XXXXXX5559, PREVIOUSLY HELD BY AAR CORPORATION

### Civil Action No. 20-423 (RDM)

## AFFIDAVIT OF GRAHAM AVERY

### EXIBIT A

Signed Graham Avery ...............................

This ..20.TH.... day of July 2021

**EXHIBIT A**

**REQUEST TO END-USERS REVIEW COMMITTEE**
**TO REMOVE FROM THE ENTITY LIST**

**(1) PREMIAIR AEROSPACE LIMITED**
**(2) GRAHAM AVERY**
**(3) DANIEL BASDEN**

1. We, PremiAir Aerospace Limited (PA), Mr Graham Avery (Mr Avery) and Mr Daniel Basden (Mr Basden), together the "Applicants", make this Request to be removed from the Entity List. Prior to, nor at any time after, their addition to the Entity List on September 22, 2020 have the Applicants had any communication from the End-User Review Committee (the "Committee") concerning the Entity List and therefore make this Request without knowledge of the specific issues that the Committee relied upon when deciding to add the Applicants to the Entity List. This lack of information puts the Applicants at a major disadvantage. However, the Applicants have taken the decision to make the Request based on what they surmise are the issues in the hope that they are correct, and on the basis that they know that they have done nothing wrong.

2. The Applicants at no time, either together or individually, have been involved in, or posed a risk of any kind of being or becoming involved in, activities contrary to the national security or foreign policy interests of the United States, or any country. The inference from the wording of the entry in the Entity List is the Applicants have been deceitful and dishonest in their dealing with the United States, and by association, the United Kingdom. The Applicants treat this allegation extremely seriously as they would never do, or consider doing, any act that would be disloyal to the United Kingdom, or its ally the United States.

3. In this Request the Committee will see reference to a Petition. The Petition is dated June 30, 2016 and was sent by the attorney that was then acting for PA, Mr Arman

Dabiri ("Mr Dabiri"), to the United States Customs and Border Protection office in Irving, Texas. A copy of the Petition and the Attachments that accompany it, are sent with this Request as **Exhibit 1.** In the Petition the Committee will see mentioned a Mr Nasir Ibrahim ("Mr Ibrahim") and of a company based in Dubai called Transworld Aviation ("TWA"). The Applicants believe that they are being held guilty by association with Mr Ibrahim and TWA for wrongdoings carried out by Mr Ibrahim and TWA. The Applicants believe that this is at the heart of both the seizure of the 412EP helicopter, which is detailed later in this Request, and their addition to the Entity List.

4. The Applicants have always been, and remain, willing to assist the United States Government and its agencies in any way it, or they, wish with any enquiries into any matter which it considers relevant to any issue surrounding the facts that led to the inclusion of the Applicants on the Entity List or the seizure of the helicopter.

5. The Applicants make the following representations to assist the Committee in its deliberations. The Applicants will, if requested, repeat each any every statement in this Request under oath or attest to this Request as an affidavit, the governing jurisdiction being English Law, or the laws of any State in the United States requested by the Committee.

## Background of the Applicants

6. PA is a company registered in England. PA, together with its associated companies operating under the group name of PremiAir, has built up a first-class reputation in the international aviation business. PA was formed in 2013 but it and its associated companies carry on a business that was started by their predecessor companies in 1988.

7. Mr Avery is aged 75 and is a successful and respected international business man, whose reputation has been developed all his working life. There is an outline Curriculum Vitae for Mr Avery at Attachment 4 of **Exhibit 1**.

8. Mr Avery has had, and continues to have a strong association with, and business in, the United States. Between 1989 and 1993 he set up and ran Land Rover North America Inc. He masterminded the introduction of Land Rover cars into the United States. During this time, he lived in Beverly Hill, Los Angeles and had a factory in Los Angeles handling the cars. Mr Avery still has his United States social security number, 906665404T. Mr Avery's work in introducing the cars was a huge success. Mr Avery has also been involved in a number of other businesses in the United States, and he has over a considerable time developed a strong affiliation with, and respect for, the United States and its ethos of hard work and strong, but fair business.

9. Mr Basden is aged 72 and is a former soldier in the British Army. When he left school, he joined The Royal Green Jackets, an elite infantry regiment of the British Army. The Regiment has a history that goes back to the 1750's and its troops have often been used as the shock troops of the British Army. Soldiers serving in this regiment are known as "chosen men".

10. Mr Basden served in The Royal Green Jackets until 1976 having completed eleven years service. He left with the rank of Sergeant. During his time in The Royal Green Jackets Mr Basden served in a number of overseas posts and as a United Nations Peace Keeper in Cyprus, for which service he received the United Nations medal. He also saw active service and received the General Service Medal from the British Army for this service.

11. Once he left the British Army Mr Basden served with distinction in the London Fire Brigade for a further ten years, after which he went into business buying and selling

building products until starting work at PA in 2014. Mr Basden is also a member of the Royal British Legion, an association that amongst other roles raises money for the care of veterans.

12. Both Mr Avery and Mr Basden have a strong national pride in the United Kingdom and its allies, in particular the United States, and would not do, or consider doing, any act that would in any way damage the interests of these countries. They will always assist the authorities in these countries in any way that they can.

## Seizure of Bell 412EP Helicopter in June 2016

13. The Applicants have not been informed by any agency of the United States Government of any information that shows that they have been directly, or indirectly, involved in any wrong that could be relied upon by the Committee as a reason for adding the Applicants to the Entity List. It does appear that the reason for the action by the Committee stems from their association with Mr Ibrahim and TWA and the seizure in 2016 of a Bell 412EP helicopter.

14. The background to this seizure is laid out in a Petition that is at **Exhibit 1.** The Applicants are not aware that there has ever been a substantive reply form the United States Customs and Border Protection office to the Petition. Nor has there ever been any correspondence or communication of any type with the Applicants giving any details of the specific issues that the United States Government has with them. The Applicants have been told informally that the United States Authorities have a suspicion that the final destination of the 412EP helicopter was not to be the company Marilog in Thailand. The Applicants deal with this point below.

15. The lack of meaningful detail being supplied to the Applicants is specifically referred to on page 5 of the Petition. Remarkably despite this specific mention in the

Petition and the serious consequences of the actions by the United States Government in seizing a helicopter, valued at $6m, and by the addition of the Applicants to the Entity List, since 2016 there has not been any specific allegations made against the Applicants. It follows that as there have been no allegations made against, or meaningful communication with, the Applicants that they have been unable to explain any mistakes in, or misunderstanding of, the interpretation of the information relied on by the United States Authorities in the decision to seize the helicopter or to add the Applicants to the Entity List.

16. The effect of this lack of communication is not only frustrating, but has meant that the Applicants are not able to deal with the issues that the United States Government has with them. In short, they cannot defend themselves when they do not know of what they stand accused, a situation that has lasted for five years with potentially devastating consequences for the Applicants both as a business and for their personal safety.

17. Notwithstanding the problems inherent with the task of defending yourself when you do not know of what you are accused, the Applicants wants to draw certain points in the Petition, and other issues that have occurred since 2016, to the attention of the Committee.

**Salient Issues**

18. **Due Diligence on Helicopter Sale**: In the Petition at **Exhibit 1,** page 5 has some details of the Due Diligence carried out by the Applicants before completing the purchase of the Bell 412EP helicopter serial number 36403 (the "Helicopter"). The Applicants at all times when purchasing the Helicopter met the normal standards of commercial practice. They checked the details and provenance of Marilog Aviation

Services Co. Limited ("Marilog"), the Thai company that was to buy the Helicopter and to whom the Helicopter was going to be delivered. Details of the agreement with Marilog and of the company are shown in Attachment 11 to the Petition. The Applicants also obtained an End User Certificate from Marilog, which is at Attachment 9 of the Petition, and Marilog executed a US Department of Commerce form entitled "Statement by Ultimate Consignee and Purchaser" confirming that Marilog in Thailand was the final destination of the Helicopter. A copy of this is at Attachment 10 of the Petition.

19. Prior to the sale of the Helicopter agents of Marilog visited representatives of PA and Bell Helicopters in the United Kingdom to discuss the purchase of spare parts and a contract for the maintenance of the aircraft. Under the proposed agreement spare parts were to be sent to Thailand and the maintenance would be undertaken in that country. Such actions and preparations were entirely in keeping with the contract that the Applicants were entering into with Marilog where the Helicopter was to be operated in Thailand.

20. In or around September 2015, prior to the sale of the Helicopter to Marilog, the Applicants had sourced two other Bell 412EP helicopters for possible sale to Marilog, serial numbers 36373 and 36378. As part of the standard procedures carried out by the Applicants Mr Basden had contacted the Export Control Organisation at the Department for Business Innovation & Skills in the United Kingdom to seek whatever licence was required to export helicopters to Thailand. By a letter dated October 30, 2015 the Department informed Mr Basden that no licence was required for the movement of the helicopters to Thailand. There is attached to this Request at **Exbibit 2** a bundle of relevant correspondence. At pages 17 and 18 of **Exhibit 2** there is a copy of the letter from the Department to Mr Basden.

21. The Applicants did not purchase these helicopters. However, when the Applicants were working to purchase the Helicopter Mr Basden wanted to confirm that the transaction was subject to the same exemption as laid out in the Departments letter of October 30, 2015. To do this Mr Basden telephoned his contact at the Department and checked with him that no licence or permission was required by PA from the United Kingdom Government to buy a helicopter in the United States and to have it exported to Thailand. Mr Basden's contact confirmed that no permission was required for such a transaction.

22. In the Petition at **Exhibit 1** the Applicants' then attorney, Mr Dabiri, has mistakenly represented on page 5 under the heading "Due Diligence" that the Applicants wrote to the Government of the United Kingdom to obtain a licence to move the Helicopter to Thailand. Mr Dabiri refers to the Departments letter of October 30, 2015 as if it was dealing with permission for the movement of the Helicopter. As is clear from paragraph 20 above this is not correct. Having received the October 30, 2015 letter Mr Basden considered that a telephone call to the Department to check that there was not issue with the movement of the Helicopter was sufficient, which it was. The Applicants apologise for the mistake.

23. There was nothing in the dealing that PA had with Marilog prior to the sale suggested that Marilog was anything other than a bona fide company engaging in the purchase of a helicopter. This includes the visit made by representatives of Marilog to the United Kingdom to meet representatives of Bell and PA to discuss future maintenance work to be carried out in Thailand.

24. As far as any checking of Mr Ibrahim is concerned, he was originally introduced to Mr Avery by a trusted contact in the United States, Mr Donald Hanna of Phoenix, Arizona. Mr Avery checked Mr Ibrahim and became aware that Mr Ibrahim was a

Canadian citizen and had an office in Dubai, which is a hub for the aviation industry in the Middle East and hosts a large biennial air show. Mr Hanna suggested to Mr Avery that Mr Ibrahim may wish, with others, to buy PA. After a period of on and off negotiations Mr Avery ended the dialogue. However, nothing during these negotiations had raised any suspicions in Mr Avery about the bona fides of Mr Ibrahim.

25. It is important to remembered that in 2015 all the facts that can now be found online about Mr Ibrahim, and TWA, were not publicly available. It is also worthy of note that it has taken the United States Government until September 2020 to add Mr Ibrahim and TWA to the publicly available Entity List.

26. As far as TWA is concerned its office is situated in the Jebal Ali Free Zone in Dubai. In 2012 representatives of TWA had visited Mr Avery in the United Kingdom to discuss the possibility of doing business in the future, but nothing had come of that until the purchase of the Helicopter for Marilog. In his meetings with representatives of TWA, and from enquiries about the company, nothing appeared to Mr Avery to be out of the ordinary. In early 2016, when trying to sort out the seizure of the Helicopter Mr Avery visited TWA and nothing during that visit led him to believe that TWA was not a bona fide business. It was always intended that TWA was only going to supply part of the purchase price for the Helicopter, and it was not going to own the Helicopter or to control to where it was delivered.

27. **The Helicopter Seizure**; The Helicopter was held up for export in December 2015. However, it was not until May 6, 2016 that Marilog was informed that the Helicopter had been seized. However, the seizure notice had been incorrectly issued to Marilog as it was PA that owned the Helicopter. On finding out about the seizure notice to Marilog, PA informed Custom and Border Protection of the error. The correct

seizure notice was served on PA on June 16, 2016. During the period December 2015 to June 2016 PA had not received any explanation of the delay in completing the export and Marilog cancelled the contract.

28. During this period of over five months, other than an informal mention that the United States Authorities had a suspicion that Marilog was not the final destination of the Helicopter, there was no communication from the Custom and Border Protection to the Applicants informing them that there was a specific problem with the export.  Further Mr Avery had been in the United States on December 15, 2015, the day that the final crating up of the Helicopter had been completed. He wanted to make sure that all was in order before the export, which was due to take place the next day. At no time while he was in the United States was he approached or contacted by Customs and Border Protection about the export or asked any questions about the export.

29. When Mr Avery was informed of the seizure, he was surprised and baffled by events. He emailed and telephoned Agent Jack Cannon of the United States Custom and Border Protection and tried to find out what it was alleged that the Applicants had done to give rise to the seizure. Agent Cannon did not give any answer, and eventually informed Mr Avery that the matter had been passed to Agent Michael Boone of Homeland Security. Mr Avery then emailed and telephoned Agent Boone and again did not receive any information on the specific reason why the Applicants had become embroiled in what they saw as a mess that they did not understand. Marilog had by this time cancelled the order for the Helicopter, so the Applicants were not only frustrated and confused by the bureaucratic quagmire in which they found themselves but they were now seriously out of pocket.

30. Having tried to find out what the issues were and the way out of the very serious problem in which the Applicants found themselves, Mr Avery contacted Mr Ibrahim to ask what he intended to do. Mr Ibrahim gave Mr Avery the name of an attorney in Washington DC, Mr Dabiri, and offered to pay the initial costs of instructing Mr Dabiri. Beyond making the initial payment to Mr Dabiri, Mr Ibrahim played no further part in trying to sort out the problem with the Helicopter. Mr Avery contacted Mr Dabiri, who over four years has tried to find out the specific allegations against the Applicants and details of any information upon which the United States Government relied. Mr Dabiri never discovered any relevant information about the matter.

31. Mr Avery has from the moment that he became aware of the seizure of the Helicopter tried every route that he could think of to identify the issue that the United States Government has with the Applicants and to answer any questions that they have so that the record can be put straight and the Helicopter released. The situation has become much more pressing since the Applicants have been added to the Entity List.

32. The actions detailed above are not those of a company, or of a management, that is engaged in illegal international intrigue. At all times the Applicants have behaved in an open and ethical manner. They have carried out due diligence on the people with whom they were doing business and have acted correctly at every step. They even pointed out an error in the seizure notice so that it could be served on PA, the correct party that owned the Helicopter.

33. **The Red Crescent**; In January 2016 while the problems with the seized Helicopter for Marilog in Thailand were starting in the United States, PA was given the opportunity of supplying six Bell 412EP helicopters to the Red Crescent in Iran. At pages 1 to 14 of **Exhibit 2** there are documents relating to that proposed contract.

From these documents the Committee will see that at all times during the negotiations on the proposed purchase of the helicopters, about which Mr Ibrahim was aware, the Applicants worked with the United Kingdom Government to make sure that all was done in accordance with the applicable regulations. During the period of the negotiations the Applicants did try to source six appropriate helicopters, but none were ever purchased.

34. The Applicants received a letter dated February 11, 2016 from the Red Crescent in Iran confirming the request for the supply of six helicopters. A copy of this letter is at page 2 of **Exhibit 2**. The request from the Red Crescent attracted considerable interest in Government in the United Kingdom, and in the Red Cross. In a letter dated April 17, 2016, a copy of which is at page 5 of **Exhibit 2,** the Red Crescent wrote to the Red Cross in the United Kingdom to request help to complete the sale. The Red Cross and the Red Crescent are both part of the International Red Cross and Red Crescent Movement. The Red Cross replied on the April 25, 2015, and a copy of that letter is at page 6 of **Exhibit 2.**

35. As it became clear that the Request to export the helicopters was taking a considerable time the Applicants contacted the local member of Parliament, the Right Honourable Mark Field and also the then Secretary of State for Business, Innovation and Skills ("BIS"), the Right Honourable Sajid Javid MP. A copy of letter from Mr Javid to Mr Avery dated May 05, 2016 is at page 7 of **Exhibit 2**. The reference to SPIRE in that letter is to the online export licensing system operated by Mr Javid's department.

36. Mr Field MP wrote a letter dated May 13, 2016 to the Secretary of State for Defence to ask for support for the sale, a copy of which is at page 8 of **Exhibit 2**. Mr Field also wrote a letter dated July 20, 2016 to the then Secretary of State for BIS, the

Right Honourable Greg Clark MP seeking his support. A copy of that letter is at page 9 of **Exhibit 2**. By August 2016 the Applicants were very concerned by the delay in receiving a decision on the Request to export the helicopters.

37. In early August 2016 Mr Basden telephoned his contact at the BIS and was told that the Request was going to be refused. On August 11, 2016 Mr Basden wrote to the Secretary of State for BIS. A copy of that letter is at pages 10 and 11 of **Exhibit 2**. A copy of the letter stating the formal refusal dated August 26, 2016 is at pages 12 to 14 of **Exhibit 2**. In his letter Mr Basden made the point that: - "*Before our company entered into this arrangement and prior to our Export Licence Request, we carried out a period of due diligence to belay the fears of exactly the reasons you have given for the refusal to grant the licence to us.*" Mr Basden stresses in the letter "…*the implications and necessity to follow the correct procedures in matters of this magnitude.*"

38. It is clear from these actions that the Applicants have always been scrupulous in applying the appropriate rules and regulations to their business activities. In the course of running a responsible business the Applicants have acquired an understanding of some of the most important issues governing export control. The Applicants believe that if they sent or facilitated the sending, of embargoed goods to Iran, even if they originated in the United States, that would be a criminal offence under English Law. The way that the Applicants approach the issues of the possible export of six helicopters to the Red Crescent shows their commitment to a strong ethos of playing by the rules.

39. While the United States authorities were engaged in seizing the Helicopter in the United States the Applicants were attempting to help the Red Crescent, part of a world renowned humanitarian organisation, to acquire six helicopters for use in Iran

by going through all the correct procedures in the United Kingdom. The Applicants were contacting Ministers of the Crown and elected members of Parliament in an attempt to help the Red Crescent, and British commerce. Mr Avery offered to meet the Secretary of State for BIS to discuss the matter. It is inconceivable that while being engaged in such a high-profile negotiation, the Applicants were at the same time engaged in a sleazy, and illegal, deal to dupe the United States Government by diverting a helicopter from its declared end user in Thailand to be sent to Iran.

40. **High Court Proceedings in London:** After briefly dealing with Mr Ibrahim and TWA at the start of 2016 the Applicants have not dealt with either party. However, since then the Applicants have coincidently come up against them both. In 2017 PA had both Mr Ibrahim and TWA added to a case in the High Court in London that PA had started against a company, Privaero Limited ("Privaero") and a Mr Michael Foley ("Mr Foley"). Attached at **Exhibit 3** is a copy of the RE-AMENDED PARTICULARS OF CLAIM (the "Particulars") in this action. In the Particulars the text in black is the original claim, the text in red was added when the Particulars were amended in July 2018 and the text is green was added when the final amendment was made in June 2019. The amendments were necessary as the Defendants were all hiding information from PA and as matters unfolded the amendments were made to cover the new issues, and Defendants, that came to light.

41. The full facts of the claim are laid out in the Particulars, and the background is detailed under the heading The Factual Position from paragraph 5 to 25 of the Particulars. The Applicants now believe that Mr Ibrahim, Privaero, Mr Foley, a Mr Kyriacos Petsas and TWA are part of a conspiracy to steal $1m from PA which sum was deposited by PA in an escrow account towards the purchase of a helicopter by Privaero. When the proceedings were issued the Applicants were not aware of the

involvement of Mr Ibrahim or TWA, or that Privaero and TWA had entered into an agreement to purchase a helicopter in Nigeria (the "Nigerian Helicopter"), about which PA had no knowledge, and to use the Applicant's money in part to buy this helicopter. However, as the case has developed it has become clear that a number of persons are involved in the conspiracy.

42. As a consequence of the money stollen from PA being used by the conspirators to purchase the Nigerian Helicopter, under English Law even although PA had no knowledge of the purchase, PA has an equitable interest in the Nigerian Helicopter. The Applicants, as a result of what has come to light during the court case, now believe that it is possible that after the purchase of the Nigerian Helicopter was completed it was disassembled and shipped to Turkey where it may have been taken across the Turkey/Syria border and into Syria.

43. TWA, the ultimate owners of the Nigerian Helicopter under its agreement with Privaero, has so far denied any knowledge of what happened to the helicopter. However, under English Law and High Court procedure the Applicants are entitled to discovery of all of the documents, including electronically stored correspondence, that the Defendants hold or over which they have control. This means that when the discovery process is complete the Applicants should know what happened to the Nigerian Helicopter and where it ended up. The Applicants, if asked, will share this information with the US Authorities. PA has no interest in dealing with the Nigerian Helicopter and is only interested in this information to force payment of the stollen money.

44. On September 25, 2018 PA entered judgement against Mr Ibrahim for the sum of £708,330.34. On November 6, 2018 Judgement was entered against the First and Second Defendants and on September 16, 2019 Judgement was entered against the

Seventh Defendant. None of the Defendants have paid the sums Ordered by the Court, and the action is continuing against the other Defendants including TWA. If the Committee needs to see more of the Court papers, including affidavits, they can be made available.

45. The Applicants have never had anything to hide about the relationship with Mr Ibrahim and TWA and have always been prepared to open their dealings with Mr Ibrahim and TWA to the public scrutiny that a High Court case in London brings. This scrutiny includes the detailed examination of the case by PA's own solicitors and barristers at all stages, document discovery, and ultimately a trial before a High Court Judge which includes the cross examination of witnesses from both sides. Discovery is due to be completed by the end of March 2021 and the trial is set for October 2021 after which all the details of the Nigerian Helicopter, including its whereabouts, should be known.

46. The Applicants have never been in league with Mr Ibrahim and/or TWA to commit any act of the sort that the Applicants imagine would cause the United States Government to either seize the Helicopter in 2016 or to add them to the Entity List.

**PremiAir Aerospace Limited is an Ethical Company**

47. PA has adopted the highest business standards to ensure that it is run as an ethical company. It has always checked the background of the parties with whom it is doing business. For each contract into which it enters Mr Basden ensures that PA has complied with all the necessary national and international regulations and paper work. PA, and the other companies operating in the PremiAir group, keep their procedures under constant review and have now appointed Mr Alan Howard MBA ("Mr Howard") as the Ethical Compliance Officer for the companies in the PremiAir

group. Mr Howard has the professional qualification of Chartered Accountant (Scotland). Mr Howard served in the Royal Marines for seven years during which service he was seconded to the Sultan of Oman's Armed Forces and commanded local troops. During his service in Oman Mr Howard was decorated for bravery. He retired from the Royal Marines as a Major. A copy of Mr Howard's curriculum vitae is at pages 15 and 16 of **Exhibit 2**.

48. Part of the role of Ethical Compliance Officer is to check and oversee the ethics of the business carried out by PA, and other companies operating under the PremiAir name. This includes considering, and advising on, anti-bribery, corruption, export control and modern-day slavery policies. If the Ethical Compliance Officer tells the board that a contract does not meet the ethical standards of the company then the contract cannot be continued.

49. The details set out in this Request concerning the request from the Red Crescent for helicopters and a maintenance contract illustrates the way that PA operates its business. The Applicants considered that helping the International Red Cross and Red Crescent Movement was a worthy and good cause with which to be involved. The Applicants did all that was necessary to prepare to enter into the contract including sourcing helicopters, although none were purchased, contacting the authorities in the United Kingdom and preparing the correct Requests to export the helicopters. Also, Mr Avery contacted the local Member of Parliament for the constituency in which PA is situated and sought his support for what was seen as a good cause.

50. After going through all the official hoops, the request was turned down. At no time did the Applicants try to circumvent the process or avoid the official route to supply

the helicopter, which, if they were what is alleged in the Entity List, may well have been their first action.

51. Last year PA was given the opportunity to supply four wings for C130 aircraft to the Sri Lanka Air Force. This would have been a very lucrative contract as it also covered ongoing maintenance and support. However, the Applicants considered that there were human rights issues with the government of Sri Lanka and that it was possible that C130s could be used in anti-civilian roles. For this reason, the Applicants turned down the contract. This action is in keeping with the ethical nature of the Applicants' business.

**Summary of the Request**

52. The Applicants have never been given any specific grounds for the seizure of the Helicopter or their addition to the Entity List. Without knowing the nature of the allegations against them, or the information upon which the United States Authorities are relying, it is impossible for the Applicants to comprehensively deal with any mistakes or misunderstandings that are the basis of the seizure of the Helicopter and the addition of their names to the Entity List. One thing is clear to the Applicants, they have not at any time been involved with Mr Ibrahim and/or TWA, or anyone, or posed a significant risk of being or becoming involved in, activities contrary to the national security or foreign policy interests of the United States, or of any other country.

53. The Applicants have always carried out business in compliance with all the applicable laws and regulations for the countries in which PA operates. PA has also ensured that its business does not just meet legal requirements but it also endeavours to meet high ethical standards. Mr Avery and Mr Basden are both patriots and would

never be involved in any way with actions that would, or could, damage the United Kingdom or its ally the United States or in criminal activity.

54. As a result of the Applicants names being added to the Entity List PA the Applicants have had their names added to website operated by extremists who are against the present Iranian regime. The website www.ifmat.org has the Applicants named as being responsible for "*Atrocities and Human Rights Violations*" and states that, "*working with this entity means supporting Iranian regime terrorist activities & development of WMD*". This posting has led to Mr Avery and Mr Basden, and their families, being personally extremely distressed and concerned for their safety in case unstable extremists are encouraged to take direct action against them, and PA finding it increasing hard to carryout business when such remarks can easily be found on a Google search.

55. If PA does cease business, or if Mr Avery or Mr Basden or their families are directly threatened or injured as a result of having inflammatory lies published on websites such as www.ifmat.org then, amongst other ramifications, PA will go into Administration (Chapter 11). The Applicants do not believe that this is the intention of the Committee, or any agency of the United States Government, to be the cause of such potentially serious harm of this nature to the Applicants. It makes sense for PA to continue to trade for the good of the people and suppliers with whom it has business, including many companies in the Unites States, and to act to the highest commercial and ethical standards.

56. The Applicants have since 2016 carried out changes to its business practises to improve internal checks to make sure that all matters to do with compliance with export regulations in all countries in which PA does business are met. The Applicants have paid particular attention to the regulations in the United States and

if the Committee has any further suggestions or requirements to strengthen the controls used by PA then the Applicants will put those into place. The Committee can be assured that the Applicants will comply with all applicable regulation in force in the United States, and if required will go on oath to confirm this, and all other statements in this Request.

57. If the Committee considers that any agency of the United States Government may benefit from talking to Mr Avery and/or Mr Basden about any aspect of matters raised in this Request, in particular about Mr Ibrahim's and/or TWA's inclusion in the High Court case, then they will make arrangements to meet the appropriate representatives of the United States Government. At present it is difficult for United Kingdom citizens to travel to the United States. However, if traveling to the United States is not possible, a meeting at the United States Embassy in London could be arranged.

58. The Applicants consider that the only thing of which they are guilty is meeting and doing business, albeit for a very short time, with Mr Ibrahim and TWA. The Applicants are guilty by association only, they have done nothing wrong.

59. The Applicants ask that the Committee look favourably on this Request, and if any further information is required it will be supplied.

Mr Avery                    Mr Avery                         Mr Basden

For PremiAir Aerospace Limited

… day of February 2021

EXHIBIT 1

# LAW OFFICES OF ARMAN DABIRI & ASSOCIATES, P.L.L.C.

1725 I STREET, N.W., SUITE 300
WASHINGTON, D.C. 20006
PHONE: (202) 349-3893
FAX: (202) 349-3895
E-MAIL: ARMANDAB@ATT.NET

June 30, 2016

*Via FedEx Overnight Delivery*
**Submitted in Duplicate – Hard Copy**

U.S. Customs and Border Protection
FP&F Office
7501 Esters Blvd.
Suite 160
Irving, Texas 75063

Attn: FP&F Officer D.M. Nichols

RE:   **PremiAir Aerospace Ltd. - Petition for Relief and Election of Proceedings
Case number 2016550100026801**

Dear Officer Nichols,

PremiAir Aerospace Ltd. ("PremiAir"), through undersigned US counsel, files this petition for relief pursuant to 19 CFR 171.1 and respectfully asks that Customs reconsider its decision to seize the Bell Helicopter 412EP ("Bell Helicopter") described in its notice of Seizure of June 10, 2016 and further requests that the Bell Helicopter be released to PremiAir in Dallas, Texas.

As described in greater detail below, PremiAir did not attempt to export or reexport the referenced Bell Helicopter from the United States in contravention of United States economic sanctions against the Islamic Republic of Iran ("Iran"). PremiAir at no time attempted, or cause to be attempted, a third party to export, or re-export, the seized Bell Helicopter to any prohibited country, including but not limited to, Iran. Finally, PremiAir despite completing due diligence, could not reasonably ascertain whether the Bell Helicopter was intended for reexport to Iran by any third party.

**The Petition:**

This Petition for relief includes:

1.    An Election of Proceedings - JF Form - the form is attached hereto (**Attachment 1**) with election of option one (1) for a request that CBP consider PremiAir's Petition for relief. It is signed by the undersigned attorney retained by PremiAir as its US counsel.

2.    The property seized is a used Bell 412EP Rotocraft 2006 (SN 36403) with two (2) Pratt & Whitney PT6T-3DF engines (Serial numbers CP-PS-TH0744 and CP-PS-TH0745) . It

Page 1 of 7

is disassembled and prepared for shipping.  The Notice of Seizure lists each disassembled part separately but will be referred to hereafter as "Bell Helicopter" for the purposes of this Petition.  The Petition incorporates all disassembled parts listed within the Notice on pages 1-2 by way of reference.

3.  Proof of PremiAir's legal ownership and interest in the Bell Helicopter is enclosed in **Attachment 2** - Commercial Invoice No. 20150921 issued by the seller, Fargo Jet Center Inc. (Fargo, ND), listing PremiAir as purchaser as well as unit price of $5,875,000 (Five Million Eight Hundered Seventy Five Thousand USD) and a cost of $20,000.00 (Twenty Thousand USD) for disassembly recited within the Invoice.

4.  Secondary proof of PremiAir's legal ownership and interest in the Bell Helicopter is enclosed in **Attachment 3** - document titled "Aircraft Purchase Agreement" executed between Fargo Jet Center, Inc. (Seller) and PremiAir Aerospace Limited (Purchaser). The Agreement was executed on November 21 and  November 23 by the PremiAir and Fargo Jet Center respectively.  The Agreement contains an End Use/End Use Certification signed by Mr. Graham Avery, Chairman and CEO of PremiAir.


**Background:**

PremiAir Aerospace Ltd. is a UK company that is part of the PremiAir group of companies.  It has a combined history of trading in the aviation industry for approximately 35 years and is led by its Chairman and CEO Graham Avery. Mr. Avery's CV is enclosed as **Attachment 4** for your consideration.  The website of the company may be found at www.premiairaviation.com.  A listing of Mr. Avery's companies are enclosed as **Attachment 5**.

In 2014 an introduction was made between PremiAir and Mr. Nasir Ibrahim by an intermediary, Donald Hanna of Phoenix Arizona. Mr. Ibrahim was the agent acting for two potential purchases of PremiAir company in the United Kingdom. Mr. Hanna, in his role as an intermediary and main initiator, had informed Mr. Ibrahim of the availability for purchase of PremiAir Company. Mr. Hanna was instrumental in making the introduction between PremiAir and Mr. Ibrahim. The purchase of the PremiAir Company by the two potential purchasers did not come to a successful conclusion. Despite the falling through of the purchase, Mr. Avery and Mr. Ibrahim maintained their contact.

In 2015 the general procurement manager of PremiAir informed Mr. Avery of the availability of a Helicopter for sale in United States.  PremiAir was initially interested to purchase and resell this particular Helicopter for an oil rig operation in Nigeria. PremiAir, however, through its procurement agent Mr. Danny Basden, first contacted Mr. Ibrahim to ascertain if he was interested in purchasing the Helicopter.  This overture by PremiAir was made to ascertain the interest of Mr. Ibrahim as the sale of the Helicopter to the Nigerian buyer had met with some delays and a potential for a more lucrative deal was possible.

Mr. Ibrahim indicated that he was interested in financing part of the purchase price (as an agent of a Dubai company named TWA) and to resell the Helicopter in joint venture partnership

70/30% profit sharing agreement. The Bell Helicopter was purchased by PremiAir which paid $1,000,000 of the purchase price and the remainder was financed by the parent company of Mr. Ibrahim. The Bell Helicopter was to be resold to Merilog -a company in Bangkok, Thailand for a profit. On or about October/November 2015 PremiAir issued a purchase contract to Merilog for the purchase of the Bell Helicopter. Merilog indicated that it preferred to use its own transport company to deliver the Bell Helicopter to Thailand as it had previously purchased another Bell Helicopter from the United States and successfully exported that unit to Thailand.

On or about December 15, 2015 Mr. Avery and Mr. Ibrahim travelled to Dallas, Texas for the transfer of the Bell Helicopter to the transport company for Merilog. Upon the handover of the Bell Helicopter to Merilog's transport company Mr. Avery left the United States for the UK.

Shortly thereafter, all parties were notified by CBP that additional information would be required for the release of the Helicopter for export to Thailand.

PremiAir was notified by Merilog the purchase contract for the Bell Helicopter would be cancelled if it was not released December 20, 2015.

PremiAir, from the initial request by CBP for additional and supplemental information has fully cooperated and has been responsive to the best of its abilities.

From December 2015 to May of 2016 CBP did not issue a Notice of Seizure to PremiAir.

The Notice of Seizure was issued on May 6, 2016 but to Merilog of Bangkok, Thailand.

Upon retainer of counsel PremiAir notified CBP that it was the owner (and seller) of the seized Helicopter and Merilog (the purchaser) had not taken title of the Helicopter due to the failure to receive the Helicopter by the specified contracted date. **(See attachment 6)**.

CBP reissued a new Notice of Seizure addressed to PremiAir on June 10(dispatched by consent to US counsel) . The Notice of Seizure issued to PremiAir is identical and recited identical legal authority and alleged statutory violations as it did against Merilog.


### Alleged Violations and Applicable Law:

As Officer Nichols is undoubtedly (and expertly) aware, the United States imposes economic sanctions against foreign sovereign states pursuant to the Trading with the Enemy Act, as amended by the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §1701-07 (2012). Economic sanctions against the Islamic Republic of Iran ("Iran") were initially imposed in 1979 (*See,* Exec. Order No. 12170, 44 Fed. Reg. 65, 729 (Nov. 14, 1979). Currently the sanctions regime against Iran is mainly encompassed in the Iranian Transactions and Sanctions Regulations ("Regulations), 31 C.F.R. pt. 560 (2014). In relevant part the regulations prohibit:

> [T]he exportation, reexportation, sale, or supply, directly or indirectly from the
> United States, or by a United States person, wherever located, of any goods,
> technology, or services to Iran or the Government of Iran . . . including the
> exportation, reexportation, sale, or supply of any goods, technology, or services to
> a person in a third country undertaken with the knowledge or reason to
> know that:
>> (a) Such goods, technology, or services are intended specifically for
>> supply, transshipment, or reexportation, directly or indirectly, to Iran or
>> the Government of Iran; or
>> (b) Such goods, technology, or services are intended specifically for use in
>> the production of, for commingling with, or for incorporation into goods,
>> technology, or services to be  directly or indirectly supplied, transshipped,
>> or reexported exclusively or predominantly to Iran or the Government of
>> Iran.

31 C.F.R. § 560.204. The Regulations also provide that "no United States person, wherever
located, may engage in any transaction or dealing in or related to . . . [g]oods, technology, or
services for exportation, reexportation, sale or supply, directly or indirectly, to Iran or the
Government of Iran." *Id.* § 560.206(a)(2).

The Notice of Seizure issued to PremiAir (as well as an identical Notice of Seizure previously
issued to Merilog (date May 6, 2016)) asserts alleged violations of US statutory regulations and
laws as well reciting its authority for seizure of the Helicopter.[1]

The Notice of Seizure asserts violations or the intent to violate United States statutes and
regulations relating to sanctions against Iran and prohibition on export and/or reexport Iran
directly or through third parties.  The following specific regulations and statutes are cited within
the Notice of Seizure:

22 U.S.C. § 401 (*p.* 3, ¶ 1)
50 U.S.C. App. 5 (*p.* 3, ¶ 2)
31 C.F.R. pt. 500 *et seq.* (*p.* 3, ¶ 2)
15 C.F.R. § 736.2 (*p.* 3, ¶ 4)
15 C.F.R. § 746.7 (*p.* 3, ¶ 5)
15 C.F.R. § 742.8 (*p.* 4, ¶ 1)
15 C.F.R. § 764.2 (*p.* 4, ¶ 2)
31 C.F.R. 560.204 (*p.* 4, ¶ 3)

The Notice of Seizure has also asserted an alleged violation of 15 C.F.R. § 746.5 - "Russian
Industry Sector Sanctions" (*p.* 3, ¶ 3).  It is unclear whether this alleged violation and the citation

---

[1] PremiAir is unclear regarding the identical substance and nature of the Notice of Seizure issued
to Merilog on May 6, 2016 and the subsequent Notice of Seizure issued to PremiAir on June 10,
2016. Both Notices of Seizure make identical allegations despite the separate legal identity of
PremiAir and Merilog (as well as personnel and staff) as well as geographical separation of both
companies.

of the statute is simply a clerical error or whether the seizure of the Bell Helicopter is also based upon a possible export or intent to reexport from Thailand to Russia. In an overabundance of caution, as no evidence is presented to address the foundation for the allegations within the Notice of Seizure, PremiAir asserts that it did not intend to export or reexport the Bell Helicopter, nor did it have any knowledge thereof, or could have reasonably ascertained, that the Bell Helicopter was intended for export or reexport to Russia.

PremiAir categorically denies any intentional violation of any of the above statutes or regulations relating to Iran.

The Notice of Seizure does not make available any facts or evidence upon which it has made its determination that PremiAir intended to export the Bell Helicopter to Iran. The Notice of Seizure also does not present any facts or evidence that PremiAir was aware that the Bell Helicopter may have been intended for reexport by any third party to Iran. Finally, the Notice does not provide any evidence that PremiAir conspired with any third party to reexport the Bell Helicopter to Iran.

As CBP has not made any presentation of the evidence for the regulatory and statutory violations PremiAir reserves the right to address any evidence that CBP may present, if any, that it intended to, or had any knowledge, or could have reasonable ascertained that the Helicopter, upon transfer to Merilog was intended for reexport to Iran.

### Due Diligence:

PremiAir took all necessary steps to reasonably ascertain that no US regulations or laws would be violated in selling the Bell Helicopter to Merilog in Thailand:

1.  PremiAir, obtained clearance from the Government of the United Kingdom for the sale of the Bell Helicopter to Thailand and Merilog was cleared as purchaser. (**Attachment 7**). As PremiAir is a UK based company it made all efforts to be in compliance with UK export requirements. The purchase of the Bell Helicopter from the United States was incidental solely to having obtained a good purchase price from the specific Bell Helicopter within the United States.

2.  Merilog had previously (within 4 months prior to its agreement with PremiAir) completed the purchase of a similar Bell Helicopter (Bell 214ST Helicopter) from another seller in the United States and exported that unit to Thailand. (*See* **Attachment 8**). United States Embassy staff have subsequently visited Merilog's custom-bonded warehouse, along with Thai Customs officials, on March 15, 2016 to verify that the first Bell Helicopter continued to be in Thailand and that it had not been reexported to Iran.

3.  Merilog, as is customary in the sale and purchase of fixed wing aircraft and rotary helicopters has signed an end use/end user certification for the purchase of the Bell Helicopter. (*See* **Attachment 9**). Merilog also executed a "Statement by

Ultimate Consignee and Purchaser" from the U.S. Department of Commerce, Bureau of Industry and Security. (*See* **Attachment 10**).

4.  In anticipation of the purchase of the Bell Helicopter, agents of Merilog traveled to the United Kingdom and along with PremiAir met with official agents of Bell Helicopter in the United Kingdom. (Heli Charter based in Kent, UK). The purpose of these meetings were to discuss, agree, and sign agreements for the purchase of spare parts and contracts for the maintenance of the Bell Helicopter. The spare parts were to be exported to Thailand and the maintenance would be contracted to be performed in Thailand and not a third country.

5.  PremiAir, as a part of its internal due diligence and for purposes of export from the United Kingdom, reviewed that Merilog was a properly constituted company in Thailand with all required registrations under the laws of Thailand to operate its aviation business. (*See* **Attachment 11** – Original and English translation). There were no indications of any prior violations by Merilog relating to exports to Iran and no red flags that would alert PremiAir of any possible destination for the Bell Helicopter other than Thailand or any indication of the possibility of reexport. The continued presence of a previously purchased Bell Helicopter in Thailand also acted as an assurance that the Bell Helicopter from PremiAir would also remain in Thailand.

Finally, in its general knowledge of the aviation business, PremiAir is aware that Thailand is not an optimal location for reexport of a Bell Helicopter to Iran.

A violation did not occur in this instance as PremiAir did not have knowledge of an indirect sale through a reexport of the Bell Helicopter to Iran  At the time of the signing of the Agreement with Merilog PremiAir had conducted all due diligence reasonably within its power and no indications of any other end user/end use had been detected.

## Commitment to Compliance with US Export Laws and Prohibitions:

The ultimate destination for the export of the Bell Helicopter was Thailand.  The ultimate end user as reasonably ascertained by PremiAir was Merilog in Thailand.  The end use for the Helicopter was for civilian purposes and the conduct such as the financing for the Bell Helicopter, the contracting and the freight forwarding process was for Thailand.

PremiAir had no knowledge of any possible reexport to Iran and could not have reasonably made any further inquiries from the United Kingdom that would have led to any other conclusion that the export, end user, end use and the financing for the purchase of the Bell Helicopter were intended for Thailand.

The Notice of Seizure does not allege that PremiAir has violated or failed to follow any general or specific US export laws or prohibitions for the export of the Bell Helicopter to Thailand.  It is

conceded that PremiAir was and continues to be in compliance for the export of the Bell Helicopter to Thailand.

PremiAir is committed to compliance with all United States export laws. regulations, and licensing requirements.  PremiAir continues to be ready provide any and all assistance to clarify any allegations of violations of US export laws and prohibition of export to Iran.

### Conclusion:

PremiAir as the seller of the Bell Helicopter to a fully independent and unrelated company. PremiAir did not intend for the re-exportation of the Bell Helicopter contrary to US laws and export regulations and prohibitions.

PremiAir also could have not known, or been reasonably aware of, any intent to re-export by a third party of the Bell Helicopter to Iran, to any entity in Iran, or to any prohibited person as listed by OFAC.

All assertions stated in this petition for relief are based the best information available to PremiAir.

In requesting the release of the seized Bell Helicopter PremiAir, through counsel, has used its best efforts to exercise reasonable care and make a complete and accurate statement of the background regarding the acquisition, financing, individuals involved, and intended buyer/recipient of the seized Bell Helicopter.

Based on the information presented above, PremiAir believes that it was not in violation of, nor did it intend to violate, any of the US laws cited within the Notice of Seizure and the seizure of the Bell Helicopter is not warranted.

The petition for relief outlines PremiAir's prior good record and long standing history of aviation business in the United Kingdom and United States.  PremiAir has demonstrated it willingness prior to receiving the June 10 Notice of seizure to cooperate fully with CBP.  PremiAir stands ready to assist CBP and to provide any and all documentation and respond to any further inquiries from the CBP.  In particular, PremiAir stands ready to address any evidence or specific allegations that it had knowledge of, or that it conspired with a third party, or intended to re-export the Helicopter from Thailand to Iran.

Respectfully submitted,

Arman Dabiri
US Counsel to PremiAir

cc:      Graham Avery - PremiAir Aerospace Ltd. U.K.

**EXHIBIT A 1**

**ATTACHMENT 1**

ATTACHEMENT

1

### ELECTION OF PROCEEDINGS -- JF FORM

NOTE: READ THE LETTER NOTICE OF SEIZURE AND INFORMATION FOR CLAIMANTS BEFORE YOU FILL OUT THIS FORM. THIS FORM SHOULD BE COMPLETED AND RETURNED TO U.S. CUSTOMS AND BORDER PROTECTION (CBP) AT 7501 Esters Blvd., Suite 160, Irving, TX 75063. IF YOU DO NOT COMPLETE AND RETURN THIS FORM, CBP SHALL PROCEED TO INITIATE JUDICAL FORFEITURE PROCEEDINGS REGARLESS OF WHETHER YOU FILE A PETITION OR OFFER.

I understand that property in which I have an interest has been seized by U.S. Customs and Border Protection (CBP) under Case Number 2016550100026801. I further understand that CBP will seek to forfeit the property by judicial condemnation, in accordance with 19 U.S.C. § 1610 and 19 C.F.R. § 162.32.

Check ONLY ONE (1) of the following options:

**1.** **I REQUEST THAT CBP CONSIDER MY PETITION ADMINISTRATIVELY BEFORE FORFEITURE PROCEEDINGS ARE INITIATED.** That document is attached. By making this request, I understand that CBP will halt the forfeiture proceedings, review my petition and render a decision. I further understand that I may request immediate referral of the case to the U.S. Attorney for commencement of judicial forfeiture proceedings by filing a claim and bond at any time prior to the completion of the administrative forfeiture proceedings. By submitting a request for judicial forfeiture, I understand that CBP's consideration of my petition will stop and the case will be sent to the U.S. attorney for court action.

**2.** **I REQUEST THAT CBP CONSIDER MY OFFER IN COMPROMISE ADMINISTRATIVELY** My offer is attached. I also understand that at any time prior to forfeiture I can request referral of the matter to the U.S. Attorney's Office for court action. In that event, I understand that CBP will stop its consideration of my offer in compromise.

**3.** **I ABANDON THE PROPERTY AND I REQUEST IMMEDIATE COMMENCEMENT OF JUDICIAL FORFEITURE PROCEEDINGS.** I understand that I have abandoned all rights with regard to the seized property, including my right to intervene in any judicial forfeiture action against the property.

**4.** **I REQUEST THAT CBP REFER THIS MATTER TO THE U.S. ATTORNEY FOR INSTITUTION OF JUDICIAL FORFEITURE PROCEEDINGS (COURT ACTION).** Please immediately refer the case to the U.S. Attorney for a court decision.

_____
Name (Print)

_____                    _____
Signature                                              Date

Page 1 of 1

**EXHIBIT** A 1

**ATTACHMENT 2**

# ATTACHEMENT

# 2



## COMMERCIAL INVOICE No. 20150921

| SHIP TO: | | DATE: | 9/21/2015 |
|---|---|---|---|
| PremiAir Aerospace Limited<br>Station Cottage<br>The Street, Nacton<br>Ipswich<br>Suffolk<br>IP10 0HR<br>United Kingdom | | **EXPORT REFERENCE:** | |
| | | **COUNTRY OF MANUFACTURE:**<br>USA | |
| | | **FREIGHT FORWARDER:**<br>To be determined | |
| PHONE: | | | |
| FAX: | | | |

| QUANTITY | DESCRIPTION OF MERCHANDISE | UNIT PRICE | TOTAL | Customs Tariff |
|---|---|---|---|---|
| 1 | Bell 412EP Rotorcraft<br>2006, SN 36403, Fully current with export C of A | 1 | USD<br>$5,875,000 | 8802300080 |
| 1 | Disassembly and prep for shipping<br>(Estimate Only and Post Closing expense) | | $20,000.00 | $20,000.00 |
| | | **TOTAL:** | $5,895,000 | |

I HEREBY CERTIFY THAT ALL THE COMMODITIES LISTED ABOVE ARE OF U.S.A. ORIGIN.
DIVERSION CONTRARY TO U.S. LAW PROHIBITED.

I DECLARE ALL THE INFORMATION CONTAINED IN THIS INVOICE TO BE TRUE AND CORRECT

AUTHORIZED SIGNATURE: _____
　　　　　　　　　　　　Mike Higgins

TITLE:　　　Director of Aircraft Sales

C:\Users\mhiggins\AppData\Local\Microsoft\Windows\Temporary Internet Files\Content.Outlook\0AOWZ3QX\Commercial Invoice .xlsx

**EXHIBIT A 1**

**ATTACHMENT 3**

# ATTACHEMENT

# 3

## AIRCRAFT PURCHASE AGREEMENT

This Aircraft Purchase Agreement, hereinafter referred to as "Agreement", between Fargo Jet Center, Inc., 3801 20th Street North, Fargo, ND 58102-0908, Telephone: (701) 373-8800, Fax: (701) 235-9717, hereinafter referred to as the "Seller", and PremiAir Aerospace Limited, Station Cottage,The Street, Nacton, Ipswich, Suffolk, IP10 0HR, United Kingdom, hereinafter referred to as the "Purchaser".

Whereas the Seller agrees to sell and the Purchaser agrees to purchase used: Bell 412EP, Serial Number: 36403, N412EA, with two (2) Pratt & Whitney PT6T-3DF engines , Serial Numbers:  CP-PS-TH0744 and  CP-PS-TH0745, equipped per "Attachment A", hereinafter referred to as the "Aircraft".

Now therefore, in consideration of the terms and conditions herein contained, the parties agree as follows:

1. **Purchase Price.** $5,800,000 USD (Five Million Eight Hundred Thousand U.S. Dollars).

2. **Terms of Payment.** Purchaser has placed a non-refundable deposit of $ 600,000 USD (Six Hundred Thousand U.S. Dollars), hereinafter referred to as the "Deposit", with Seller per instructions listed on "Attachment B".

   At Closing (as defined in Clause 4), balance of purchase price, $ 5,200,000 USD (Five Million Two Hundred Thousand U.S. Dollars) shall be paid to Seller.

3. **Pre-purchase Inspection.** Purchaser has completed its prebuy inspection as of November 3rd, 2015 at Air Center Helicopters, Burleson, TX, hereinafter referred to as the "Prebuy".  All costs for the Prebuy are the responsibility of the Purchaser.

   Purchaser hereby accepts the aircraft in AS-IS, WHERE-IS condition, with no further responsibility by Seller for repairs, or any and all other aircraft expenses whatsoever.

4. **Closing.**  Prior to Closing, Seller shall prepare a Bill of Sale and any necessary Releases of Lien.  Closing shall take place within five (5) business days following the execution of this purchase agreement.

   Seller shall retain title and possession of the Aircraft and no work on the Aircraft shall be authorized by Purchaser in preparation for shipment until the entire Purchase Price has been paid.  Simultaneous with payment of remaining funds, Seller will release the Aircraft, the Bill of Sale and all other documents necessary to transfer title, together with all log books, other records and loose equipment pertaining to the Aircraft.

   Seller shall immediately after closing file a request to the Federal Aviation Administration that the aircraft be de-registered from the US Registry and has been exported to Dubai, UAE.

5. **Certificates and Taxes.** Seller is responsible for all taxes and duties up to the date of Closing.  Purchaser is responsible for all taxes incurred as a result of this sale.

Page 1 of 8                                                Initials

and thereafter. Purchaser and Seller agree to provide the other any documentation required to demonstrate lawful exemption from sales tax, if any.

6.  **Title and Liens.** Seller represents and warrants that it has good title to the Aircraft and that all necessary legal steps have been taken by Seller to authorize and complete transfer of title to Purchaser pursuant to this Agreement. Seller further represents and warrants that the Aircraft will be free of all liens and encumbrances upon sale and delivery to Purchaser and that the Seller agrees to defend Purchaser's title to the same. This warranty and covenant shall survive Closing.

7.  **Acceptance of Condition of Aircraft.** Purchaser, upon Delivery, agrees to accept Aircraft in an "as is, where is" condition, and Seller makes no warranty of merchantability of the Aircraft and/or its equipment. Purchaser understands that Seller is neither manufacturer nor has been the sole owner of this Aircraft and makes no warranties whatsoever either expressed or implied with regard to the Aircraft, accessories log books, fitness for any particular purpose, other than Seller's warranty that it will deliver title to the Aircraft free and clear of all encumbrances.

8.  **Default.** Upon failure of Purchaser, without default by Seller, to purchase the Aircraft by Closing, Seller may elect to cancel this Agreement and retain the Deposit. The Seller retains the right to dispose of the Aircraft with no further liability in accordance with this Agreement. Upon failure of the Seller, without default of Purchaser, to comply with the terms of this Agreement and deliver the Aircraft and accompanying documents as provided herein, Purchaser may elect to cancel this Agreement and have its Deposit returned in full.

9.  **Excusable Delay.** Neither Purchaser nor Seller shall be liable for any failure or delay in performing any of its obligations hereunder caused by an act of God, the public enemy, strike or labor dispute, governmental regulation or priorities and force majeure not involving the fault or negligence of the Purchaser or Seller.

10. **Assignability.** This Agreement shall not be assigned, modified or amended except by the mutual consent of the parties in writing.

11. **Partial Illegality.** If any one or more provisions of this Agreement shall be found to be illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired.

12. **Fax document.** For the purpose of negotiating and finalizing this Agreement, any document, including this Agreement, transmitted by telecopier or electronic mail, herein called "Fax Document", shall be treated in all manner and respects as an original document. The signature of any party on such a Fax Document shall be considered for these purposes as an original signature. Any such Fax Document shall be considered to have the same binding legal effect as an original document. At the request of either party, any such Fax Document shall be re-executed by both parties in the original form. In consideration of the promises made and value received hereunder, the undersigned parties hereby agree that, after a document has been executed and transmitted by facsimile or electronic mail, neither party shall raise the use of a telecopier, electronic mail or the lack of a document bearing

Initials

an original signature, as a defense to this Agreement and forever waive such defense.

13. **General.**
    A. In all respects, time shall be of the essence in this Agreement.
    B. Purchaser shall be entitled to specific performance of Seller's obligations.
    C. This Agreement shall bind and inure to the benefit of the parties hereto and their executors, administrators, heirs and assigns.
    D. In any action or proceeding brought by any party against the other arising under or in connection with this Agreement or any other documents related thereto, the prevailing party shall, in addition to other allowable costs, be entitled to an award of reasonable attorneys' fees.
    E. Risk of Loss shall pass from the Seller to the Purchaser at Closing. Should the Aircraft be materially damaged or the log books lost, stolen, damaged or destroyed prior to Closing, Purchaser shall have the right to terminate this Agreement and have its Deposit returned in full.
    F. All warranties, if any, shall be transferred from Seller to Purchaser at Closing.
    G. The Aircraft Delivery, "Attachment D", forms a part of this Agreement.
    H. Unless waived by the Purchaser, each party will register with the International Registry in a manner required to effect consent and acceptable registration of this transaction with the International Registry in Ireland according to the requirements of the Capetown Convention. However, Seller will not consent to a registration of Purchaser's interest on the International Registry until after Closing.
    I. By executing this agreement, Buyer hereby represents and warrants to Seller as follows: (A) Buyer is and will be in full compliance with all laws and regulations applicable to it including, without limitation, (i) ensuring that no person who owns a controlling interest in or otherwise controls Buyer is or shall be listed on the Specially Designated Nationals and Blocked Person List maintained by the Office of Foreign Assets Control (**"OFAC"**), Department of the Treasury, and/or any other similar lists maintained by OFAC pursuant to any authorizing statute, Executive Order or regulation or a person designated under Section 1(b), (c) or (d) of Executive Order No. 13224 (September 23, 2001), any related enabling legislation or any other similar Executive Orders, and (ii) compliance with all applicable Bank Secrecy Act (**"BSA"**) laws, regulations and government guidance on BSA compliance and on the prevention and detection of money laundering violations. Buyer hereby represents and warrants to Seller that on the date hereof and as of the closing date; (B) Buyer has adequate power and capacity to enter into, and perform under, the transaction as described herein and is duly qualified to do business wherever necessary to carry on its present business and operations; (C) this letter has been duly authorized, executed and delivered by Buyer and upon acceptance of the Aircraft pursuant to Paragraph 1 above will constitute a valid, legal and binding agreement, enforceable in accordance with its terms, except to the extent that the enforcement of remedies may be limited under applicable bankruptcy and insolvency laws; (D) no approval, consent or withholding of objections is required from any governmental authority or entity with respect to the entry into or performance by Buyer of the transaction described herein except such as have already been obtained; and (E) the entry into and performance by Buyer of the transactions described herein do not and will not: (i) violate any judgment

Initials

order, law or regulation applicable to Buyer or any provision of Buyer's organizational documents; or (ii) result in any breach of, constitute a default under or result in the creation of any lien, charge, security interest or other encumbrance pursuant to any indenture, mortgage, deed of trust, bank loan or credit agreement or other instrument to which Buyer is a party.

Signed, sealed and delivered this 15th day of October, 2015.

PURCHASER:
PremiAir Aerospace Ltd.

Graham Avery

Title CHAIRMAN

Date 21st-Nov 2015

SELLER:
Fargo Jet Center, Inc.

Randall S. Jenson

Title

Date 11-23-15

Page 4 of 8

Initials

"ATTACHMENT A" To Aircraft Purchase Agreement
Dated 15th Day of October, 2015
**2006 Bell 412EP**
**SN: 36403   N412EA**



## 2006 Bell 412EP
N412EA, S/N 36403

**Airframe:** 1,429 TTSN

**Engine:** 1,436 TTSN

Single pilot IFR, NDH, AD's and mandatory bulletins current

Empty weight 7,531 lbs





**Avionics:**
3 Axis EDAFCS with dual flight directors
Copilot Instruments
King FLN-900 GPS
Honeywell AN1-2000 weather radar
Radar Altimeter King RT 300 with alert warning
Emdive anti-statue RDR-2041 CWT08  encoding encoder and flight data recorder
Standby attitude indicator
Encoding altimeters (pilot and copilot)
Dual King KTR-908 VHF COMMs
Dual King KNR-634A VOR/LOC/GS
King KDF 806 ADF
King KDM 706 DME
King KXP-756 Transponder
Artex C406-1HM ELT with Nav interface
NAT AA22-431 Cabin PA system with 4 speakers
Digital Clocks (Pilot and Copilot)

**Additional Features:**
Standard litter skid gear
Dual controls
Rotor brake
Passenger cabin steps (2)
Windshield wipers
Air Conditioner/Air conditioner
Heater
Flare dispenser
Wire strike protection system
Pushout window installation
Increased 30min OEI
Provisions for aux fuel tank
Provisions for emergency floats
Crew seat shroud assembly

**Exterior Options:**
White base with a blue trim and orange accent

**Interior Appointments:**
Seating for 2 crew and 13 passengers. 3-point seat belts/harnesses, seats finished in a red fabric.

*All specifications are subject to verification by the buyer



661-459-6200 • sales@exclusiveaviation.com

Initials

"ATTACHMENT B" To Aircraft Purchase Agreement
Dated 15th Day of October, 2015

WIRE TRANSFER INSTRUCTIONS

Bank Wire Instructions for Fargo Jet Center, Inc.

Alerus Financial
15 Broadway
Fargo, ND 58102
ABA Number: 091300159

Account: Fargo Jet Center, Inc.
Account Number: 5009 1625

Initials

"ATTACHMENT D" To Aircraft Purchase Agreement
Dated 15th Day of October, 2015

AIRCRAFT DELIVERY

REG #: N412EA;  SERIAL #:  36403;  MAKE: Bell;  MODEL: 412EP

Purchaser has inspected the Aircraft and all documents, records and logbooks with regard to this transaction to its satisfaction.

Purchaser understands that Seller is neither manufacturer nor has been sole owner of this Aircraft since new, and Seller makes no warranties whatsoever either expressed or implied with regard to the Aircraft, any accessories, log books, Aircraft records, airworthiness, fitness, merchantability or any other aspect of this Aircraft.

Seller agrees that the Aircraft is free and clear of any liens or encumbrances whatsoever caused by the Seller, his agents or assigns.

Aircraft total time as of this date: _____ Hours

Aircraft delivery accepted this _____ day of _____, 2015 at
_____.

PURCHASER:
PremiAir Aerospace Ltd.

Graham Avery
_____
Title

Page 7 of 8

Initials _____

Fargo Jet Center, Inc.
End Use/End User Certification

Compliance with United States Export Regulations

It is **Fargo Jet Center, Inc.** policy to verify the end use and end user in all sales of products, transfer of technical data or software to ensure compliance with applicable U.S. export control laws and regulations. Because the products you are purchasing, software or technology you are licensing, may be exported and used outside of the United States, please confirm the following:

1. I (We) will not export or re-export **Fargo Jet Center, Inc.** products, technology or software to Cuba, Iran, Iraq, Libya, North Korea, Sudan, or Syria (or to any proscribed country), unless otherwise authorized by the United States Government.

2. I (We) will not sell, transfer, export or re-export **Fargo Jet Center, Inc.** products for use in activities which involve the development, production, use or stockpiling of nuclear, chemical or biological weapons or missiles, nor use **Fargo Jet Center, Inc.** products in any facilities which are engaged in activities relating to such weapons.

3. I (We) acknowledge that U.S. law prohibits the sale, transfer, export or re-export or other participation in any export transaction involving **Fargo Jet Center, Inc.** products with individuals or companies listed in the U.S. Commerce Department's Table of Denial Orders, the U.S. Treasury Department's list of Specially Designated Nationals or the U.S. Department of State's list of Specially Designated Nationals or the U.S. Department of State's list of individuals debarred from receiving Munitions List items.

4. I (We) will abide by all applicable U.S. export control laws and regulations for any products purchased from Fargo Jet Center, Inc. and will obtain any licenses or prior approvals required by the U.S. government prior to the export or re-export of **Fargo Jet Center, Inc.** products, software or technology.

5. I (We) agree that the export control requirements in No. 1-4 above shall survive the completion, early termination, cancellation or expiration for the applicable purchase order, agreement or contract. This Certificate is good for three years from the date of last signature.

Company Name: ___PremiAir Aerospace Limited

Company Address: ___Station Cottage, The Street, Nacton, Ipswich, Suffolk, IP10 0HR, United Kingdom

Company Official's Printed Name: ___Graham Avery

Company Official's Signature: _____

Company Official's Title: _PREMIAIR AEROSPACE L-)_

Date: _21 Nov 2015_

Initials

**EXHIBIT A 1**

**ATTACHMENT 4**

# ATTACHEMENT

# 4

# Curriculum Vitae

## Graham Avery

<u>Professional History</u>

**Main Board director of Optima Worldwide Group Plc. Unicrest Marketing Company 23 year old company**

**Advisory board to EMC Power Ltd Indian Company 53 year old company with turnover of £380 million and acquiring companies for the group. Indian, Italian and USA Company**

| | |
|---|---|
| 2009 _ | **Chairman & CEO and major shareholder of off shore company with £500 million net assets with no debt, in the property and manufacturing sector in India.** |
| 2002 – 2008 | **Zerowaste Environmental Ltd – Executive Chairman**<br>An end of life tyre recycling company |
| 1997 – 2002 | **Chairman &CEO Azmara Plc – Executive Chairman**<br>Reconstruction and reorganization, re-capitalization and financing, subsequent long term development an acquisition program, taking the company in a new direction. |
| 1991 – 1996 | **Eastern Europe and the USA**<br>Involved in a variety of projects including, consultancy work in Eastern Europe, development of a successful award card scheme, subsequently purchased by the Today Newspaper Group |
| 1987 – 1990 | **Chairman &CEO WB Industries Plc London Stock Exchange fully listed Company**<br>Engineering and manufacturing company |
| 1983 – 1987 | **CEO Anglia Finance Company Limited – CEO and Shareholder**<br>Responsible for the formation of the company and consumer credit<br>50% owned by an Australian Finance Group – involved in property and investment markets, relating to commercial and industrial products in East Anglia. |

<u>Chairman and CEO of Plc Companies</u>

Have a depth of experience that spans in the first instance the pioneering of a large chain of motor car main dealerships, with distributive agencies consisting of British Leyland, Lotus, Jensen, Mazda and Toyota. The group was sold in 1979 with a minority interest retained. I then went on to launch Range Rover throughout North America. This business was sold in 1983.

The next significant move was into the public market sector and I became a major shareholder in the fully listed WB Industries Plc fully listed London Stock exchange the market capitalization of WB Industries Plc was increased from £1.7m to £11m with synergistic acquisitions, demonstrating my ability to turn around ailing companies

Since 1991 I have travelled extensively in Eastern Europe and the former Soviet Union with a view to developing corporate opportunities. During this time two smaller businesses were successfully developed and ultimately sold on. These enterprises maintain natural growth and profitability to date.

Appointed Chairman of World Cell Net Inc – August 2000. NASDAQ listed company - fully reporting Internet Company trading in the UK, and an ISP, Internet Electronic software and hardware for the domestic market.

Maintain good contacts with well-known investment houses, both in the UK and the USA. Acquired a Small Logistics company in October 2006 and developed the company from a turnover of £85k a year to £9.5 million plus in just 2.5 years, then sold the company

**EXHIBIT** A̶ _1_

**ATTACHMENT 5**

# ATTACHEMENT

# 5

# AVERY GROUP COMPANIES

| Name | Tax Ref | VAT Nr | EORI Nr | Co Nr | Last Acs | Dire |
|---|---|---|---|---|---|---|
| Premiair Aerospace Limited | 37424 16062 | 217 7632 02 | GB217763202000 | 8817419 | 6/30/2015 | G A |
| PremiAir Aviation International Limited | 97251 25888 | NR | | 8524203 | 6/30/2015 | G A |
| Premiair Aircraft Sales Limited | 67750 26580 | NR | | 6637055 | 6/30/2015 | G A |
| PremiAir Business Aviation Limited | 88899 09402 | NR | | 6894530 | 6/30/2015 | G A |
| GMCL 2000 Limited | 201 61722 21135 | NR | | 8975147 | 4/30/2015 | G A |
| (Super Goose Aviation UK Limited) | | | | | | |
| (Premiair Aviation Nigeria Limited) | | | | | | |
| One Charter Limited | 201 27760 25072 | NR | | 8894603 | 2/29/2016 | G A |
| Jetmore Developments Limited | 578 53322 09402 | 221 8745 13 | GB221874513000 | 5619365 | 11/30/2014 | G A |
| Unicrest Marketing Limited | | | | 2840972 | 8/31/2014 | G A |
| PCC Int'l Limited | | | | 7822239 | 10/31/2014 | G A |
| Chi Chi Events Limited | | | | | | |

**EXHIBIT A** 1

**ATTACHMENT 6**

# ATTACHEMENT

# 6

บริษัท มาริล็อก เอเวียน เซอร์วิสเซส จำกัด
อาคารรามาจิวเวลรี่ ชั้น4ช   ห้องเลขที่ 405
987 ถนนสีลม แขวงสีลม เขตบางรัก กทม. 10500

โทร.     +66 (0)2 2668352
โทรสาร. +66 (0)2 2668353
อีเมล.                                          MARILOG AVION SERVICES Company ltd.
วีบไซต์ www.marilogavion.com

MARILOG AVION SERVICES Co. Ltd.
405, 4ᵗʰ Floor, Rama Jewelry Building,
987, Silom Road, Silom, Bangrak,
Bangkok, 10500, Thailand.

Phone: +66 (0)2 2668352
Fax:    +66 (0)2 2668353
Email: hr@marilogavion.com
Web:   www.marilogavion.com

20 Dec 2015

Dear Mr. Graham Avery

Sub: Cancellation of agreement Dated: 26-Oct, 2015

Good day to you.

Here with reference to the Contract Singed Between Marilog Avion Services Co., Ltd. and PremiAir Aero Space Ltd. dated 26th Oct,2015 for the supply of Bell -412EP. We hereby are cancelling the contract between us due to inefficiency in delivering the consignment on the given time period, which has led the customer to source it elsewhere.

This is to notify you about the cancellation of the agreement for the supply of Bell-412EP with immediate effect. This cancellation has been done on the grounds of late delivery of the consignment which has been provided from your firm.

Kindly consider this contract cancelled and we shall contact you on our further requirement of supplies.

Thanking you

With Best Regards

Mohammed Rifan
Marilog Avion Services Co. Ltd.

**EXHIBIT A** 1

**ATTACHMENT 7**

# ATTACHEMENT

# 7

Our Ref: S.T2015/000270
Your Ref: PAAL15915
SPIRE Doc Ref 1674518

Department
for Business
Innovation & Skills

Mr Basden
PREMAIR AEROSPACE LIMITED
STATION COTTAGE THE STREET
NACTON
IPSWICH
ENGLAND
IP10 0HR

Date: 30 October 2015

Export Control Organisation

1 Victoria Street
London
SW1H 0ET

Tel +44 (0)20 7215 4594
Enquiries +44 (0)20 7215 5000

www.bis.gov.uk
eco.spire@bis.gsi.gov.uk

Dear Mr Basden,

I refer to your licence application dated 19 September 2015.

1. Based on the information provided in your application, your involvement in the movement of the items listed in the attached 'No Licence Required Goods Schedule' does not appear to require a trade control licence.

2. The UK's military trade controls extend only to goods specified by Schedule 1 and 2 of the Export Control Order 2008. The EU Dual-Use WMD trade controls extend only to goods specified by Annex I of the EC Regulation 428, 2009, as amended.

Yours sincerely

Signature Not Verified

Digitally signed by Export London
Organisation
Date: 2015.10.30 17:07:17 GMT
Reason: On behalf of the Secretary of State
Location:

Mr Graham Miller
Export Control Organisation

**EXHIBIT A̶ 1**

**ATTACHMENT 8**

# ATTACHEMENT

# 8

ບໍລິສັດ. ມາຣີລ໋ອກ ເອວຽນ ເຊວວິຊເຊສ ຈຳກັດ

ອາຄານຮາ ຊັ້ນທີ 4 ຫ້ອງເລກທີ 405
987 ຖະໜົນ ສີລົມ ບາງຮັກ ກຮຸ. 10500

ໂທ.    +66 (0)2 2668352
ແຟັກ.  +66 (0)2 2668353
ອີເມວ.  info@marilogavion.com
ເວັບໄຊທ໌  www.marilogavion.com

MARILOG AVION SERVICES Company ltd.

MARILOG AVION SERVICES Co. Ltd.
405, 4ᵗʰ Floor, Rama Jewelry Building,
987, Silom Road, Silom, Bangrak,
Bangkok, 10500, Thailand.

Phone: +66 (0)2 2668352
Fax:    +66 (0)2 2668353
Email:  info@marilogavion.com
Web:    www.marilogavion.com

Date: 20- Mar-2016
Ref: MAS010MAR16

Mr. Ernest Payton

Good day!

We are writing this in reference to your Email to Mr. John Hudnall (which he had copied to us). Kindly note That Marilog Avion's business plan is to be investing in a few 4 helicopters of a certain spec to undertake the contract opportunities that are available to us for the leasing and management purpose for the Kingdom of Thailand country and Indian Ocean especially in tourist sector and to support the offshore business

We purchased our first Helicopter, Bell 214ST with the assistance of Mr. John Hudnall and Mr. Nasir Ibrahim as our advisor/agent (Mr. John Hudnall securing our purchase from AAR). However, upon arrival in Bangkok, this Helicopter was very badly damaged due to bad packing and we have requested Mr. John Hudnall to ratify any/all damages and our claims are still pending and remain unresolved due to his illness (heart surgery) We are awaiting his visit soonest to Bangkok to resolve these issues.

Meantime, we tried secure purchase of similar units and Mr. Nasir Ibrahim introduced Mr. Graham Avery of PremiAir of UK who was willing to arrange the purchase of a Bell 412EP (from Fargo) and delivery of same prior to 20ᵗʰ December, 2015 under his own responsibility. Unfortunately PremiAir failed to deliver the unit and accordingly we notified them of the cancellation of the contract. Effectively we do not have any contract with them now.

These two above dealings are independent and we are unaware and unconcerned of any sellers or brokers knowing each other personally or professionally.

I understand from my Office / Agents in Bangkok that US Embassy staff had visited our Custom-Bonded Warehouse with Thailand Custom officials on the 15th March 2016 to witness presence of the Damaged Bell 214ST unit for whatsoever reasons. Further we are attaching photos of the units in our warehouse for your immediate reference.

We have already lost a good opportunity start a genuine business activity and continued to suffer with Millions of Dollars locked in for such a long time.

We would request you to clearly inform us if American-made helicopters cannot be put into service for our purposes. This will help us decide early on for us to consider alternatives. We would highly appreciate your advice soonest.

Thanking you,

Best Regards

Mohammed Rifan
Director
Marilog Avion Services Co., Ltd.

**EXHIBIT A** 1

**ATTACHMENT 9**

# ATTACHEMENT

# 9