IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )  Civil Action No.   20-cv-423 (RDM) |
| | ) |
| ONE BELL 214 HELICOPTER, Serial Number 28118, | ) |
| | ) |
| ONE BELL 412 HELICOPTER, Serial Number 36403, | ) |
| | ) |
| $2,999,930.50 OF FUNDS SEIZED FROM BANK OF AMERICA ACCOUNT XXXXXX5559, PREVIOUSLY HELD BY AAR CORPORATION, | ) |
| | ) |
| Defendants. | ) |

## CLAIMANT TRANSWORLD AVIATION FZE'S VERIFIED CLAIM AND STATEMENT OF INTEREST IN DEFENDANT PROPERTIES

COMES NOW, Transworld Aviation FZE ("TWA") by its attorneys, Foley & Lardner LLP, pursuant to Rule 5G of the Federal Rules of Civil Procedure, Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture, respectfully submits this verified claim and statement of interest to assert its right to the defendant properties. In addition, TWA addresses certain misstatements in the government's verified complaint (Doc. 1) and Graham Avery and PremiAir Aerospace Ltd.'s (collectively "PremiAir") verified claim (Doc. 13). Contrary to some of the assertions made in those filings, TWA was a victim of fraudulent conduct by Nasir Ibrahim and others, and is entitled to recovery of TWA's cognizable interests in the defendant properties.

**I.   BACKGROUND**

1.   Based in Dubai's Jebel Ali Free Zone, TWA is a leading distributor, stockist, OEM representative and technical solution provider for the aviation industry. The company received

1

its business license on January 10, 1994, and was registered as a Jebel Ali Free Zone Entity on August 16, 2003. In addition to selling aircraft and aircraft parts, TWA also provides technical solutions, maintenance, repair and operations services, supply chain management services, and consulting services to a broad spectrum of military and commercial customers in the Middle East, Africa, and Southeast Asia. TWA has longstanding relationships with leading U.S. defense contractors, and serves as a supplier for key U.S. allies in the greater Middle East, including the Armed Forces of the United Arab Emirates.

2. TWA is wholly-owned by Abdullah Khammas Masaud Al Sulaimani ("Sulaimani"), an Omani national residing in Dubai. Sulaimani has over 40 years of aviation industry experience and serves as the chairman of TWA's board of directors. Sulaimaini's son-in-law, Shehab Al Breiki ("Al Breiki"), previously served on TWA's board and is currently the company's Operations Director.

3. Historically, Sulaimani ran a relatively "flat" organization and made most of TWA's business decisions. In 2014, however, he was diagnosed with cancer and his health began to fail. He was frequently absent from the office between 2014 and 2016 while undergoing medical treatment, and periodically sought specialized treatment outside the United Arab Emirates. Al Breiki accompanied Sulaimani on some of this foreign medical travel, and both men delegated responsibility to other TWA personnel during these trips.

4. It was during that period, while Sulaimani and his family (including Al Breiki) were focused on his cancer treatment, that TWA entered into an informal arrangement to work with Nasir Ibrahim as an independent broker.

5. In 2014, based on a prior relationship with Al Breiki's father, Ibrahim approached Al Breiki and offered to identify potential business opportunities for TWA through Ibrahim's

connections in the global aviation industry. Ibrahim presented himself as a Canadian national with a robust network in the civil aviation community and access to discount rotary-wing aircraft suppliers. Later in 2014, Al Breiki introduced Ibrahim to Sulaimani. Ibrahim persuaded Sulaimani that he could help generate new business opportunities for TWA at a time when Sulaimani was suffering from cancer, seeking medical treatment, and unable to oversee TWA's business activities to the same degree as before.

6. Sulaimani subsequently entered into an informal arrangement in which Ibrahim would serve as an independent broker. Under the terms of that verbal agreement, TWA would pay Ibrahim commissions for sales that he brokered with TWA. Ibrahim typically received these payments through AHE International FZE ("AHE"), a Dubai-based company that Ibrahim controlled. At the time, Sulaimani and Al Breiki were not aware of the various press reports and court filings describing Ibrahim's history of fraudulent business practices, lawsuits, and other alleged misconduct. Consistent with TWA's longstanding practice of relying on personal referrals from close family members, they mistakenly believed Ibrahim's claims to be a legitimate businessman.

7. Ibrahim always remained an independent broker and never had authority to act unilaterally on TWA's behalf. He was never a TWA employee. He did not have a TWA e-mail address. He did not have an office on TWA's premises. Nor was Ibrahim ever given authority to hold himself out as TWA's agent or employee, or to bind TWA in any contract or transaction that would violate applicable U.S. economic sanctions or export control laws.

8. While Ibrahim sought to broker deals for TWA during the period between 2014 and 2016, he also continued to pursue his own independent business activities through AHE. For example, records indicate that Ibrahim worked as an independent consultant for Marilog Avion

4829-6602-1620.2

Services Company Limited ("Marilog") for over 20 years, including during the period when he maintained an informal broker relationship with TWA. Records also indicate that Ibrahim pursued and sought to broker deals during that period between PremiAir and other companies, including an Iranian aviation company called IHelicopterSRC ("IHSRC"), without the involvement of TWA. These activities underscore Ibrahim's separate and unrelated relationships with other companies other than TWA.

9. The government's verified complaint and PremiAir's verified claim incorrectly attribute Ibrahim's conduct to TWA. For example, in the verified complaint, the government describes Ibrahim's conduct in detail and then alleges that "Ibrahim represented [TWA]" in negotiations with InTran and Marilog, according to an InTran employee. Doc. 1 ¶ 24. Similarly, the PremiAir verified claim details actions by Ibrahim and then assigns those actions to TWA without specifying any actions by separate TWA representatives. *See, e.g.*, Doc. 13 ¶ 38 (accusing Ibrahim and TWA of "operating a number of simultaneous scams to try and buy helicopters and were using legitimate businesses like PA, as cover for their activity."). Despite making these attributions, however, the government's own factual allegations underscore that Ibrahim cannot be equated with TWA because Ibrahim claimed affiliations with multiple entities—including by sharing an address with InTran, Doc. 1 ¶ 24, claiming to be the owner of Marilog, *id.*, and claiming that his employer owned both Marilog and TWA (which is false), *id.* ¶ 34.

10. As detailed below, the truth is that Ibrahim defrauded TWA in the few transactions that he actually brokered for the company. At all times, TWA's representatives believed the defendant properties would only be used in countries, by end-users, and for end-uses authorized under the applicable U.S. economic sanctions and export control laws. To the extent Ibrahim was

4

making plans to divert the helicopters to Iran, Iranian entities, or other restricted countries or entities, he pursued those plans covertly and separately from TWA.

11. The government's verified complaint contains no allegations that implicate TWA representatives in any action to divert helicopters to Iran. In fact, in only one paragraph does the verified complaint even mention any action by any particular TWA representative, as opposed to referring generally to "TWA." *See* Doc. 1 ¶ 64. That paragraph notes only that Al Breiki signed a Joint Purchase Agreement with PremiAir. *Id.* As detailed below, that Agreement expressly stated that the contemplated transaction *was* subject to U.S. export control laws and regulations. *Id.* Thus, the verified complaint's only allegation concerning an actual TWA representative indicates that he believed TWA was engaging PremiAir in a lawful transaction.

12. In early 2016, TWA came to learn that the United States was investigating Ibrahim for potential export diversion schemes. At that point, TWA terminated its informal relationship with Ibrahim and ceased further communication. Subsequent investigation gave TWA reason to believe that Ibrahim had exploited Sulaimani's absence from the TWA office for Ibrahim's own purposes. Based on information and belief, Ibrahim took photos of himself sitting at Sulaimani's desk, distributed business cards that falsely identified himself as TWA's chairman, and even posted replicas of Sulaimani's qualifications in his personal office at AHE.

13. After terminating its informal relationship with Ibrahim, TWA undertook significant efforts to conduct an internal investigation to determine whether there were legal violations and identify appropriate remedial measures. TWA has strengthened its compliance measures, including enhanced due diligence and restricted party screening; adopting a comprehensive export compliance manual; routinely requiring end-use / end-user certifications;

5

conducting employee training and enhanced oversight; and engaging a qualified, fully resourced trade compliance manager.

## II.     TWA'S INTEREST IN THE DEFENDANT PROPERTIES

As demonstrated below, TWA has cognizable legal interests in each of the three defendant properties.

### A.     TWA's Interest in Bell 214 Helicopter SN 28118

14. In early 2015, Ibrahim brokered a Collaboration Agreement, dated March 1, 2015, between TWA and Marilog, an aviation company registered and located in Thailand. Ibrahim and Marilog represented to TWA that the purpose of the agreement was to finance Marilog's purchasing of three (3) or four (4) helicopters that it would lease in civilian industries in South East Asia and the Middle East. The Collaboration Agreement's terms reflect that same purpose for the helicopters.

15. Ibrahim and Marilog led TWA to believe that the helicopters financed under the Collaboration Agreement would be used only in countries, by end-users, and for end-uses authorized under the applicable U.S. economic sanctions and export control laws. They never disclosed to TWA any plans to divert the helicopters to Iran or any other prohibited country or party.

16. Consistent with this understanding and its normal export compliance practices, TWA took steps to ensure that the Collaboration Agreement contained the following terms and conditions specifically prohibiting the diversion of the helicopters to prohibited countries or parties:

> *The sale of the Aircraft is subject to US export control and sanction laws, namely the Export Administration regulations (EAR) enforced by U.S. Department of Commerce, Bureau of Industry and Security (BIS) and regulations issued pursuant to the International Emergency Economic Powers Act and enforced by the U.S. Department of Treasury, Office of Foreign Assets Control (OFAC).*

17. Upon information and belief, on or around February 6, 2015, Marilog ordered four Bell helicopters, including defendant property Bell 214 Helicopter serial number 28118 ("Bell 28118"), from InTran LLC, an Arizona limited liability company. According to a February 6, 2015 invoice from InTran to Marilog for Bell 28118, the purchase price was $2,050,000, not including the costs of shipping.

18. The Collaboration Agreement entitled TWA to receive payment for the total amount of debt Marilog incurred to purchase the helicopters, to be paid in five (5) yearly equal installments to TWA. The Collaboration Agreement obligated Marilog to issue five PD Cheques (*i.e.* post-dated checks for certain amounts that can be cashed at later dates), for an approximated value, as a guarantee for each of the helicopters to be acquired.

19. In addition, the Collaboration Agreement entitled TWA to 40% of any profit Marilog made from leasing the helicopters.

20. Upon information and belief, on or about July 30, 2015, a company called AAR Corporation ("AAR") sold the Bell 28118 to InTran. InTran subsequently sold and shipped the Bell 28118 to Marilog in Thailand in July 2015, following the order Marilog had placed with InTran, and pursuant to the Collaboration Agreement between Marilog and TWA.

21. On information and belief, the Bell 28118 arrived in Thailand and Marilog stored it in a warehouse under its control. Marilog subsequently alleged that the Bell 28118 had water damage and invoked provisions in the Collaboration Agreement that required TWA to pay for the helicopter's purchase, transportation, handling, and storage. TWA cancelled these storage payments in October 2018 and suspended communications with Marilog after learning that Bureau of Industry and Security ("BIS"), U.S. Department of Commerce, was conducting an inquiry into potential diversion of Bell helicopters to Iran.

4829-6602-1620.2

22. Between 2015 and 2016, TWA paid more than $8,000,000 to InTran, whether directly or through to AHE, Ibrahim's personal company. Those payments included amounts that TWA paid to finance the purchase of Bell 28118, including the following payments:

   a. A payment of $896,000 from AHE International on or about March 18, 2015, designated for Invoice Number 2014-51 (the invoice associated with Bell 28118) and others. TWA's records indicate that it made payments exceeding $1,700,000 to AHE International from January 2015 to March 2015. Upon information and belief, the March 18, 2015 payment that AHE International made to InTran for Bell 28118 was funded by TWA's payments to AHE.

   b. A payment of $1,795,500 made by TWA to InTran on or about June 1, 2015.

23. In summary, TWA financed the purchase of the Bell 28118, which was transferred from AAR to InTran, and then from InTran to Marilog. Marilog obtained the Bell 28118 by funds paid by TWA to InTran.

24. The record demonstrates that TWA fully funded the purchase of Bell 28118. Therefore, pursuant to the Collaboration Agreement, TWA has cognizable interests in (a) the Bell 28118 itself, and (b) 40% of the profits that would have been generated from leasing the Bell 28118 in non-sanctioned countries.

25. To the extent the United States establishes that Ibrahim, Marilog, or other coconspirators intended to divert the Bell 28118 to Iran, Iranian entities, or any other prohibited countries or parties, TWA has a cognizable interest as a beneficiary of a constructive trust in the Bell 28118 because Ibrahim and Marilog fraudulently induced TWA to fund the purchase of the Bell 28118. As noted, Ibrahim and Marilog represented that helicopters financed under the Collaboration Agreement would be used only in countries, by end-users, and for end-uses

authorized under the applicable U.S. economic sanctions and export control laws. TWA would never have authorized payments to InTran to finance the purchase of Bell 28118 if TWA knew the helicopter was intended to be diverted to Iran, Iranian entities, or any other prohibited countries or parties.

26. TWA acknowledges that the D.C. Circuit held in *U.S. v. BCCI Holdings* that a constructive trust is not a cognizable legal interest under the RICO statute, 46 F.3d 1185, 1190-1191 (D.C. Cir. 1995), and that *U.S. v. Emor* extended *BCCI Holdings* to criminal forfeiture proceedings, 785 F.3d 671, 682 (D.C. Cir. 2015). But in *U.S. v. Emor*, the D.C. Circuit stated that, if requested, overturning *BCCI Holding* "would have support" because "[e]very circuit to consider the constructive trust question … has rejected the analysis in *BCCI Holdings*." 785 F.3d at 682. Therefore, TWA requests that the Court decline to extend *BCCI Holding* to this case, which concerns civil forfeiture. Alternatively, TWA will request that the D.C. Circuit overturn *BCCI Holding*'s erroneous position and recognize constructive trusts as a critical remedy for fraud victims, just as every other circuit has.

### B.     TWA's Interest in the Bell 412 Helicopter SN 36403

27. Ibrahim brokered an agreement between TWA and PremiAir for the purchase of the Bell 412 Helicopter with serial number 36403 ("Bell 36403").

28. In early 2015, Ibrahim introduced Sulaimani to Graham Avery, PremiAir's chairman, in London, and arranged several subsequent meetings. Later that year, Ibrahim persuaded TWA and PremiAir to enter into a Joint Purchase Agreement, dated October 6, 2015, to finance the purchase of Bell 36403.

29. Ibrahim and PremiAir led TWA to believe that Bell 36403 would be sold and delivered to Marilog in Thailand pursuant to a separate agreement between PremiAir and Marilog. Ibrahim and PremiAir further led TWA to believe that Bell 36403 would be leased to authorized

9

end-users in Thailand or in other countries that were not subject to restrictions under applicable U.S. economic sanctions and export control laws.

30. PremiAir's verified claim indicates that PremiAir had the same understanding, based upon Ibrahim's representations. Doc. 13 ¶¶ 57-59. Ibrahim and PremiAir gave no indication to TWA that Bell 36403 was destined for Iran, Iranian entities, or any other restricted countries or parties.

31. Under the terms of the Joint Purchase Agreement, TWA and PremiAir agreed to jointly purchase the Bell 36403 from the Fargo Jet Center ("Fargo"), a full-services general aviation company based at the Hector International Airport in Fargo, North Dakota. Under the Joint Purchase Agreement, PremiAir agreed to commit $1,000,000 towards the Bell 36403's $5,825,000 purchase price in exchange for 25% of the profits derived from future sales or leases. TWA, in turn, agreed to pay the remaining balance in exchange for 75% of the future profits.

32. Like the Marilog Collaboration Agreement, and consistent with TWA's understanding and export compliance practices, the Joint Purchase Agreement contained the following terms and conditions barring the diversion of the Bell 36403 to prohibited countries or parties:

> *The sale of the Aircraft is subject to US export control and sanction laws, namely the Export Administration regulations (EAR) enforced by U.S. Department of Commerce, Bureau of Industry and Security (BIS) and regulations issued pursuant to the International Emergency Economic Powers Act and enforced by the U.S. Department of Treasury, Office of Foreign Assets Control (OFAC).*

33. During the same period, PremiAir entered into a second, separate contract with Marilog to sell the Bell 36403 to Marilog for $5,875,000 (the "PremiAir Contract"). Under this second contract, PremiAir authorized Marilog to transact "on [PremiAir's] behalf" to Fargo Jet Center and transfer all payments to Fargo, at their North Dakota address, for the purchase of the

Bell 36403 for $5,875,000. The PremiAir Contract likewise provides that the transaction would comply with applicable U.S. economic sanctions and export control laws.

34. TWA made the following payments towards its financing obligations of the Bell 36403 under the Joint Purchase Agreement:

a. A payment of $1,058,400 from TWA to Fargo Jet Center on or about November 12, 2015.

b. A payment of $1,100,000 from TWA to Fargo Jet Center on or about November 20, 2015.

c. A payment of $517,130 from TWA to Fargo Jet Center on or about November 22, 2015.

35. On information and belief, TWA or Ibrahim directed Aerotech FZE to make a payment of $600,000 on behalf of TWA towards the purchase of Bell 36403, which amount Aerotech FZE offset from other, unrelated transactions with TWA. This payment of $600,000 from AeroTech FZE was made to Insured Aircraft Title Service, Inc. on or about October 24, 2015.

36. TWA was then directed by PremiAir to make a payment to InTran for the purchase of the Bell 36403 under the JPA. This payment for $1,544,470 was made from TWA to InTran on or about November 12, 2015.

37. In 2016, TWA was informed that the U.S. Department of Homeland Security had seized the Bell 36403 at the Port of Dallas-Fort Worth in Texas due to potential export diversion concerns. Realizing that Ibrahim posed an actual threat to TWA and TWA's business relations, TWA severed its informal business arrangement with Ibrahim and cut off all further contact with him.

38.     In total, TWA funded $4,820,000 of the purchase of Bell 36403. That represents 82.8% of the purchase price for the Bell 36403.

39.     Pursuant to the Collaboration Agreement, TWA has cognizable interests in (a) 82.8% of the Bell 36403 itself, and (b) 75% of the profits that would have been generated from leasing the Bell 36403 in non-sanctioned countries.

40.     To the extent the United States establishes that Ibrahim, Marilog, PremiAir, or other coconspirators planned to divert the Bell 36403 to Iran, Iranian entities, or any other prohibited countries or parties, TWA has a cognizable interest as a beneficiary of a constructive trust in the Bell 36403 because TWA was fraudulently induced to fund the purchase of the Bell 36403. As noted, Ibrahim, Marilog, and PremiAir represented that helicopters financed under the PremiAir Joint Purchase Agreement would be used in non-sanctioned countries. TWA would never have authorized payments to finance the purchase of Bell 36403 if TWA knew the helicopter would be diverted to Iran or any other sanctioned country.[1]

### C.   TWA's Interest in the $2,999,930.50 Funds seized from Bank account XXXXXX5559 previously held by AAR

41.     The verified complaint alleges: "Between approximately December 7, 2015 and January 20, 201[6], InTran made initial payments of $2,999,930.50 to the Illinois Aviation Company for the Bell 412 helicopters. InTran received the funds for those payments between approximately December 7, 2015 and January 20, 201[6], from Transworld Aviation and three other overseas entities. Transworld sent the majority of the funds, $2,349,910; the remainder,

---

[1] As noted above, TWA acknowledges the D.C. Circuit's decisions regarding constructive trusts and respectfully submits that *U.S. v. BCCI Holdings*, 46 F.3d 1185 (D.C. Cir. 1995) and *U.S. v. Emor*, 785 F.3d 671, 682 (D.C. Cir. 2015) should be limited to their facts or overturned to bring this circuit's law into alignment with every other circuit to have addressed this issue.

4829-6602-1620.2

$650,020.50, came from other offshore companies AeroTech FZE, Gulf Technical Solutions, and AHE International." Doc. 1 ¶ 73.

42. From December 7, 2015 to January 20, 2016, TWA made the following payments, totaling $3,850,000, to InTran:

    a. A payment of $350,000 from TWA to InTran on or around December 7, 2015.

    b. A payment of $1,500,000 from TWA to InTran on or around December 7, 2015.

    c. A payment of $300,000 from TWA to InTran on or around December 23, 2015.

    d. A payment of $900,000 from TWA to InTran on or around January 20, 2016.

    e. A payment of $800,000 from TWA to InTran on or around January 20, 2016.

43. Upon information and belief, these payments were made in connection with an attempted purchase of one or more helicopters from the Illinois Aviation Company in a transaction that Ibrahim was brokering.

44. TWA representatives were not privy to various communications Ibrahim had with InTran, Marilog, or the Illinois Aviation Company, and therefore lacks information regarding the details of "Deal #5" alleged in the verified complaint. That said, based upon Ibrahim's and Marilog's representations made during 2015, TWA's general understanding was that Ibrahim was seeking to broker the purchase of helicopters pursuant to the Marilog Collaboration Agreement.

45. As discussed above, TWA entered into the Marilog Collaboration Agreement with the understanding that any helicopters TWA financed pursuant to the Collaboration Agreement would only be used in countries, by end-users, and for end-uses authorized under the applicable U.S. economic sanctions and export control laws. TWA only authorized payments to finance helicopter purchases in connection with the Marilog Collaboration Agreement under those conditions.

4829-6602-1620.2

46.     TWA has cognizable legal interests in $2,349,910 of the seized funds because TWA provided those funds.

47.     Upon information and belief, TWA also has cognizable legal interests in the remaining $650,020.50 because TWA likely provided the funds to AeroTech FZE, Gulf Technical Solutions, and AHE International.  TWA reserves the right to supplement this allegation with additional factual allegations.

48.     To the extent the United States establishes that Ibrahim, Marilog, or other coconspirators intended to use the seized funds to purchase a helicopter that would be destined for use in Iran, by Iranian entities, or any other countries or parties targeted under U.S. economic sanctions and export control laws, TWA has a cognizable interest as a beneficiary of a constructive trust in the seized funds because TWA was fraudulently induced to provide the funds. As noted, Ibrahim and Marilog represented that helicopters financed under the Marilog Collaboration Agreement would only be used in countries, by end-users, and for end-uses authorized under the applicable U.S. economic sanctions and export control laws.  TWA would never have authorized payments to finance the purchase a helicopter from the Illinois Aviation Company if TWA knew the helicopter would be diverted to Iran or any other sanctioned country.[2]

### III.    PREMIAIR'S VERIFIED CLAIM SUPPORTS TWA'S POSITION

49.     PremiAir has filed a verified claim that asserts an interest in $1 million, which represents 17.2% of the purchase price that PremiAir paid towards the purchase of Bell 36403. As outlined above, TWA asserts an interest in the remaining 82.8% of Bell 36403, based on the $4,820,000 that TWA paid towards its purchase.  Thus, TWA's and PremiAir's interests in the Bell 36403 do not overlap.

---

[2] Again, TWA respectfully requests that the above-cited D.C. Circuit's decisions regarding constructive trusts be limited to their facts or overturned.

50. As to its factual allegations, PremiAir's verified claim mistakenly conflates Ibrahim and TWA. Nowhere in PremiAir's 33-page verified claim is there a single allegation about TWA representatives. Although PremiAir casts itself as a victim, having lost the $1 million it put towards Bell 36403, TWA lost millions more and experienced much greater harm.

50. Read carefully, PremiAir's verified claim actually reinforces TWA's verified claim. As PremiAir's verified claim details, the parties to the PremiAir Joint Purchase Agreement believed that Bell 36403 would only be used in countries, by end-users, and for end-uses authorized under the applicable U.S. economic sanctions and export control laws. Doc. 13 ¶¶ 54-58. Marilog provided PremiAir with an End Use/End User Certificate and Statement by Ultimate Consignee and Purchaser, pledging that Marilog would not export any product to any countries or parties subject to applicable U.S. economic sanctions or export control laws. Doc. 15 ¶¶ 10-13. TWA relied on the same understanding of Marilog's intentions. To the extent Ibrahim was pursuing a scheme to divert the helicopter to Iran, Iranian entities, or other restricted countries or parties, he did so independently of TWA while defrauding TWA in the process.

51. PremiAir devotes a substantial portion of its filing to discussing the "High Court Action" it pursued in British courts. That litigation concerned a different helicopter (Bell 36428) and has no relation to this civil forfeiture proceeding. In any event, that High Court Action simply underscores a pattern of fraud by Ibrahim. In that action, PremiAir alleged that Ibrahim induced a third party to pay a deposit for a different helicopter (the aforementioned Bell 36428), recouped the value of that deposit from PremiAir, and then sought to withdraw from the transaction the funds without paying the balance for the Bell 36428. TWA's role in that matter was limited to providing Ibrahim with funds to support what TWA initially believed was a legitimate transaction. The High Court Action resulted in no finding of any wrongdoing by TWA, but

15

ultimately did result in a judgment against Ibrahim for more than £700,000 (approximately $970,553.50). Doc. 13 ¶ 33.

## IV.  CONCLUSION

52. TWA has a decades-long record of responsible business practices with leading companies around the world. Ibrahim took advantage of a difficult period for TWA, causing TWA to lose millions of dollars and suffer severe, ongoing harm from placement of the Entity List. TWA is committed to restoring its business and its good standing with the United States government. As part of that process, TWA is entitled to recover its interests in the defendant properties.

                                    Respectfully submitted,

                                    By:   */s/ Christopher M. Swift*
                                    Christopher M. Swift, DC Bar No. 997897
                                    Matthew D. Krueger, DC Bar No. 979682
                                    David A. Hickerson, D.C. Bar No. 414723
                                    Ashley A. Gifford, D.C. Bar No. 1602595

                                    FOLEY & LARDNER LLP
                                    3000 K Street, N.W., Suite 600
                                    Washington, D.C.  20007
                                    (202) 672-5300
                                    cswift@foley.com

                                    *Attorneys for Transworld Aviation FZE*

## VERIFICATION

I, SHEHAB AL BREKI, declare and verify under the penalty of perjury under the laws of the United States of America that the above statements are true and correct, and that as Operations Director of Transworld Aviation FZE, I am authorized to make the above claim on behalf of Transworld Aviation FZE.

By: Shehab Al Brieki, Operations Director
Transworld Aviation FZE

Date:   August 19, 2021

4829-6602-1620.2

## CERTIFICATE OF SERVICE

I certify that on August 19, 2021, true and correct copies of the foregoing **CLAIMANT TRANSWORLD AVIATION FZE'S VERIFIED CLAIM AND STATEMENT OF INTEREST IN DEFENDANT PROPERTIES**, were filed with the Clerk of the United States District Court for the District of Columbia and a copy served via electronic mail on the following:

>Arvind K. Lal
>Assistant United States Attorney
>555 Fourth Street, N.W.
>Washington, D.C. 20530
>(202) 252-7688
>arvind.lal.@usdoj.gov

By: */s/ Christopher M. Swift*
Christopher M. Swift, DC Bar No. 997897
Matthew D. Krueger, DC Bar No. 979682
David A. Hickerson, D.C. Bar No. 414723
Ashley A. Gifford, D.C. Bar No. 1602595

FOLEY & LARDNER LLP
3000 K Street, N.W., Suite 600
Washington, D.C.  20007
(202) 672-5300
cswift@foley.com

*Attorneys for Transworld Aviation FZE*