**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )   **Civil Action No. 20-cv-423 (RDM)** |
| | ) |
| **ONE BELL 214 HELICOPTER, Serial Number 28118,** | ) |
| | ) |
| | ) |
| **ONE BELL 412 HELICOPTER, Serial Number 36403,** | ) |
| | ) |
| | ) |
| **$2,999,930.50 OF FUNDS SEIZED FROM BANK OF AMERICA ACCOUNT XXXXXX5559, PREVIOUSLY HELD BY AAR CORPORATION,** | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| **Defendants.** | ) |
| | ) |

**CLAIMANT TRANSWORLD AVIATION FZE'S ANSWER TO PLAINITFF'S
VERIFIED COMPLAINT FOR FORFEITURE _IN REM_**

Claimant, Transworld Aviation FZE ("TWA") by its attorneys, Foley & Lardner LLP, pursuant to Rule 5G of the Federal Rules of Civil Procedure, Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture, hereby submits its Answer to the Verified Complaint for Forfeiture _In Rem_ ("Complaint").  TWA answers using the same numbering contained in the Complaint.[1] By use of the Complaint headings and/or sub-headings in this Answer, TWA does not admit to the characterizations contained in the United States' (the "Government") headings and/or sub-headings.  TWA answers as follows:

**I.      NATURE OF THE ACTION AND DEFENDANT _IN REM_**

1.      _This_ in rem _forfeiture action arises out of a scheme to launder funds into the United
        States to illicitly procure helicopters for the Islamic Republic of Iran and evade_

---

[1] In order to not confuse text, footnotes from the Complaint have been omitted.

*U.S. sanctions.  The conspirators employed sophisticated evasion techniques and front companies in dealing with the aviation industry and financial system to disguise the true nature of the conspirators' illicit business dealings, as well as to protect and promote the ongoing illicit procurement scheme.  Their actions evidence a conspiracy to procure U.S.-origin Bell 412 Helicopters for FARSCO Aviation MRO Centre of Tehran, Iran, in violation of the International Emergency Economic Powers Act ("IEEPA"), the federal money laundering statute, and other related U.S. laws and regulations.*

1.      TWA lacks knowledge or information sufficient to form a belief regarding the allegations in this paragraph and, for that reason, denies these allegations.  To the extent paragraph 1 alleges that TWA participated in a scheme or conspiracy, TWA denies these allegations.  At all times, TWA believed the defendant properties would only be used in countries, by end-users, and for end-uses authorized under applicable U.S. economic sanctions and export control laws.  To the extent Nasir Ibrahim ("Ibrahim") or any other party engaged in a scheme or conspiracy to launder funds into the United States, illicitly procure helicopters for the Islamic Republic of Iran ("Iran"), or evade U.S. economic sanctions laws, they pursued those plans surreptitiously and separately from TWA.

2.      *The defendant properties are subject to seizure and forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) as property constituting or derived from proceeds traceable to violations of IEEPA, codified at 50 U.S.C. §§ 1701-1707, the smuggling statute, codified at 18 U.S.C. § 554(a), or a conspiracy to violate these statutes, as codified at 18 U.S.C. § 371.  In addition, the defendant properties are subject to seizure and forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) as property involved in a violation of the money laundering statute, codified at 18 U.S.C. §§ 1956(h), 1956(a)(2)(A) and (B).*

2.      TWA denies the allegations in paragraph 2.

## II.   JURISDICTION AND VENUE

3.      *This court has jurisdiction over this matter pursuant to 28 U.S.C. § 1345 because it has been commenced by the United States and pursuant to 28 U.S.C. § 1355 because it is an action for the recovery and enforcement of a forfeiture under an Act of Congress, specifically, 18 U.S.C. § 981(a).*

3.       TWA admits that this court has subject matter jurisdiction over this matter. Paragraph 3 otherwise asserts legal conclusions to which no answer is required.  TWA denies any other factual allegations in paragraph 3.

4.       *Venue is proper in this District pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts and omissions giving rise to the forfeiture took place in the District of Columbia. Nasir Ibrahim, Marilog, InTran and their coconspirators failed to seek a license from the Department of the Treasury's Office of Foreign Assets Control ("OFAC"), which is located in Washington, D.C., for conducting the transactions described below, in violation of U.S. law.*

4.       TWA lacks knowledge or information sufficient to form a belief regarding the allegations in this paragraph and, for that reason, denies these allegations.  To the extent paragraph 4 alleges that TWA participated in a scheme or conspiracy, TWA denies these allegations.

## III.    STATUTORY AUTHORITIES

### A.    The International Emergency Economic Powers Act ("IEEPA") and Executive Orders Issued Thereunder

5.       *Under IEEPA, 50 U.S.C. §§ 1701-1707, the President of the United States was granted authority to deal with unusual and extraordinary threats to the national security, foreign policy, or economy of the United States. 50 U.S.G. § 1701(a). Pursuant to that authority, the President  may declare a national emergency through Executive Orders that have the full force and effect of law. Among other things, IEEPA empowers the President to issue regulations governing exports from the United States.*

5.       Paragraph 5 sets forth a recitation of legal authorities to which no answer is required.  To the extent that a response is required, TWA denies the allegations in paragraph 5.

6.       *Under IEEPA, it is a crime to willfully violate, attempt to violate, conspire to violate, or cause a violation of any order, license, regulation, or prohibition issued pursuant to the statute. 50 U.S.C. § 1705(a).  Willful violations of the ITSR constitute criminal offenses under IEEPA, and carry a 20-year maximum term of imprisonment and up to a $1,000,000 fine. 50 U.S.C. § 1705(c).*

6.       Paragraph 6 sets forth a recitation of legal authorities to which no answer is required.  To the extent that a response is required, TWA denies the allegations in paragraph 6.

7.      *On March 15, 1995, the President issued Executive Order 12,957, which declared that the actions and policies of the Government of Iran constituted an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States and declared a national emergency under IEEPA to deal with that threat. 60 Fed. Reg. 14,615 (Mar. 17, 1995).  In two subsequent Executive Orders in 1995 and 1997, the President clarified his original declaration of a national emergency. See Exec. Order No. 13,059, 62 Fed. Reg. 44,531 (Aug. 21, 1997); Exec. Order No. 12,959, 60 Fed. Reg. 24,757 (May 9, 1995). Since 1997, the President has continued the national emergency with respect to Iran and the 1995 and 1997 Executive Orders.  The most recent continuation of this national emergency was executed on March 12, 2019. 84 Fed. Reg. 9,219 (Mar. 13, 2019).*

7.      Paragraph 7 sets forth a recitation of legal authorities to which no answer is required.  To the extent that a response is required, TWA denies the allegations in paragraph 7.

8.      *To implement the national emergency with respect to Iran, OFAC issued the Iranian Transactions and Sanctions Regulations ("ITSR") (31 C.F.R. Part 560).*

8.      Paragraph 8 sets forth a recitation of legal authorities to which no answer is required.  To the extent that a response is required, TWA denies the allegations in paragraph 8.

### B.      Export Controls and Sanctions Regulations

9.      *Under the ITSR, the export or reexport of any U.S. good, software, or technology (collectively, "items") from the United States to Iran without the requisite OFAC license was prohibited. 31 C.F.R. §§ 560.203-.205.  The ITSR similarly prohibited conspiring, attempting, aiding, abetting, or facilitating in any way the unlicensed export of U.S. goods or technology to Iran, or engaging in a transaction to evade the provisions of the regulations. 31 C.F.R. § 560.203.*

9.      Paragraph 9 sets forth a recitation of legal authorities to which no answer is required.  To the extent that a response is required, TWA denies the allegations in paragraph 9.

10.     *Specifically, absent permission from OFAC in the form of a license, the ITSR prohibited, among other things:*

*a.  The exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran or the Government of Iran, including the exportation, reexportation, sale, or supply of any goods, technology, or services to a person in a third country undertaken with knowledge or reason to know that such goods, technology, or services are intended specifically for supply, trans-shipment,*

*or reexportation, directly or indirectly, to Iran or the Government of Iran (31 C.F.R. § 560.204);*

*b. The reexportation from a third country, directly or indirectly, by a person other than a United States person, of any goods, technology, or services that have been exported from the United States, if: (a) such reexportation is undertaken with knowledge or reason to know that—the reexportation is intended specifically for Iran or the Government of Iran, and (b) the exportation of such goods, technology, or services, was subject to export license application requirements under any United States regulations (31 C.F.R. § 560.205); and*

*c. Any transaction by any United States person or within the United States that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions contained in the ITSR (31 C.F.R. § 560.203).*

10. Paragraph 10 sets forth a recitation of legal authorities to which no answer is required. To the extent that a response is required, TWA denies the allegations in paragraph 10.

### C.      Smuggling Goods from the United States

15. *Title 18 U.S.C. § 554(a) criminalizes fraudulently or knowingly exporting or sending from the United States, or attempting to export or send from the United States, any merchandise, article, or object contrary to any law or regulation of the United States, or concealing, buying, or in any manner facilitating the transportation, concealment, or sale of such merchandise, article or object, prior to exportation, knowing the same to be intended for exportation contrary to any law or regulation of the United States (emphasis added). A violation of the ITSR, which are based on the President's invocation of IEEPA, serve as the predicate "contrary to any law or regulation" required by 18 U.S.C. § 554(a).*

15. Paragraph 15 sets forth a recitation of legal authorities to which no answer is required. To the extent that a response is required, TWA denies the allegations in paragraph 15.[2]

### D.      Money Laundering Statute

16. *Title 18 U.S.C. § 1956(a)(2)(A) (the international promotional money laundering statute) criminalizes transporting, transmitting, or transferring, and attempting to transport, transmit, or transfer a monetary instrument or funds, inter alia, to a place in the United States from or through a place outside the United States with the intent to promote the carrying on of specified unlawful activity.*

---

[2] The Complaint's paragraph numbering skips from 10 to 15. The same numbering is used here.

16.     Paragraph 16 sets forth a recitation of legal authorities to which no answer is required.  To the extent that a response is required, TWA denies the allegations in paragraph 16.

17.     *Pursuant to 18 U.S.C. § 1956(c)(7)(D), the term "specified unlawful activity" includes violations of IEEPA and the smuggling statute.*

17.     Paragraph 17 sets forth a recitation of legal authorities to which no answer is required.  To the extent that a response is required, TWA denies the allegations in paragraph 17.

18.     *Title 18 U.S.C. § 1956(h) criminalizes a conspiracy to violate Section 1956.*

18.     Paragraph 18 sets forth a recitation of legal authorities to which no answer is required.  To the extent that a response is required, TWA denies the allegations in paragraph 18.

### E.     Forfeiture Statutes

19.     *Pursuant to 18 U.S.C. § 981(a)(1)(C), any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of IEEPA (50 U.S.C. § 1705) or the smuggling statute (18 U.S.C. § 554) is subject to civil forfeiture.*

19.     Paragraph 19 sets forth a recitation of legal authorities to which no answer is required.  To the extent that a response is required, TWA denies the allegations in paragraph 19.

20.     *Pursuant to 18 U.S.C. § 981(a)(1)(A), any property, real or personal, involved in a transaction or attempted transaction, in violation of 18 U.S.C. § 1956, or any property traceable to such property is subject to civil forfeiture.  Money laundering forfeiture, pursuant to these statutes, applies to more than just the proceeds of the crime.  Rather, money laundering forfeiture encompasses all property "involved in" the crime, which can include untainted or legitimate funds that are comingled with tainted funds derived from illicit sources.*

20.     Paragraph 20 sets forth a recitation of legal authorities to which no answer is required.  To the extent that a response is required, TWA denies the allegations in paragraph 20.

IV.    **FACTS GIVING RISE TO FORFEITURE**

A.    **Overview**

21.    *This conspiracy involved multiple attempts to purchase some subset of 10 particular Bell 214 and Bell 412 EP helicopters for Iran.  For ease of reference, the helicopters are identified as follows:*

| Helicopter Designator | Serial Number | Implicated Deals | Add'l Identifying Information |
|---|---|---|---|
| Helicopter A | 36373 | 2, 3, 5 | |
| Helicopter B | 36378 | 2, 3, 5 | |
| Helicopter C | 36386 | 2, 3, 5 | |
| Helicopter D | 36401 | 2, 3 | |
| Helicopter E | 36421 | 2, 3, 5 | |
| Helicopter F | 36387 | 2, 3 | |
| Helicopter G | 36433 | 2, 3 | |
| Helicopter X | 28118 | 1 | Target Helicopter 1 |
| Helicopter Y | 36403 | 4 | Target Helicopter 2 |
| Helicopter Z | 36396 | 5 | |

21.    TWA lacks knowledge or information sufficient to form a belief regarding the allegations in paragraph 21 and, for that reason, denies these allegations.  To the extent paragraph 21 alleges that TWA participated in a conspiracy, TWA denies these allegations.

22.    *Since sometime on or before at least October 2014, Nasir Ibrahim ("Ibrahim") and others attempted and conspired to export and re-export Bell 214 and Bell 412 helicopters from the United States to Iran via a third-party in Thailand, in violation of U.S. law and regulations.  The conspirators made these attempts, through different intermediaries, to purchase particular Bell 214 and Bell 412 helicopters from an aviation company in Illinois (hereinafter "Illinois Aviation Company"), an aviation company in Texas (hereinafter "Texas Aviation Company"), and an aviation company in North Dakota (hereinafter "North Dakota Aviation Company").  These helicopters are made by a U.S. company, and, according to the manufacturer, "can be configured to an airborne command center, an air ambulance platform, special operations, or a homeland security base."  Both OFAC and BIS have confirmed that at all times relevant to this Complaint, a license was required to export or re-export these helicopters to Iran.*

22.    TWA lacks knowledge or information sufficient to form a belief regarding the allegations in this paragraph and, for that reason, denies these allegations.  Paragraph 22 also asserts legal conclusions to which no answer is required.  TWA denies any other factual allegations

in paragraph 22.  To the extent paragraph 22 alleges that TWA participated in a scheme or conspiracy, TWA denies these allegations.  At all times, TWA believed the defendant properties would only be used in countries, by end-users, and for end-uses authorized under applicable U.S. economic sanctions and export control laws.  To the extent that Ibrahim or any other party engaged in a scheme or conspiracy to launder funds into the United States, illicitly procure helicopters for Iran, or evade U.S. economic sanctions laws, they pursued those plans surreptitiously and separately from TWA.

23.    *As described infra in Sections IV.E. through IV.I., Ibrahim and his coconspirators engaged in five separate negotiations, designated Deals 1 through 5, with the goal of purchasing and exporting helicopters from U.S. companies to foreign entities in order to evade U.S. sanctions regimes and ultimately deliver helicopters to Iran.*

23.    TWA lacks knowledge or information sufficient to form a belief regarding the allegations in this paragraph and, for that reason, denies these allegations.  To the extent paragraph 23 alleges that TWA participated in a scheme conspiracy, TWA denies these allegations.  At all times, TWA believed the defendant properties would only be used in countries, by end-users, and for end-uses authorized under applicable U.S. economic sanctions and export control laws.  To the extent that Ibrahim or any other party engaged in a scheme or conspiracy to launder funds into the United States, illicitly procure helicopters for Iran, or evade U.S. economic sanctions laws, they pursued those plans surreptitiously and separately from TWA.

## B.    Relevant Entities

24.    *Nasir Ibrahim — Ibrahim is a Canadian citizen who is connected to many of the entities involved in these attempts to purchase helicopters. In the negotiations between InTran, Marilog, and Transworld for Deal #1, according to an InTran employee, Ibrahim represented Transworld.  He traveled to the United States to inspect the helicopter involved in Deal #4 and met with the Illinois Aviation Company regarding Deal #5.  When the Illinois Aviation Company was negotiating with Ibrahim for Deal #5, its representatives were under the impression that Ibrahim was the owner of Marilog.  Ibrahim also shares an address with InTran — his bank statements are sent to him at InTran's address in Arizona.*

24.     TWA admits that Ibrahim was an independent broker that occasionally worked with TWA between 2014 and 2016.  Ibrahim was never an employee of TWA and did not have authority to bind TWA in any contract or transaction that would violate applicable U.S. economic sanctions or export control laws.  TWA otherwise lacks knowledge or information sufficient to form a belief regarding the allegations in this paragraph and, for that reason, denies these allegations.  To the extent paragraph 24 alleges that TWA participated in a scheme or conspiracy, TWA denies these allegations.

25.     *Airborne Logistics LLC FZC — Airborne Logistics is a company under the laws of Sultanate of Oman and legally domiciled at C.R No 1/79103/6, Postal Code: 112, Ruwi, Sultanate of Oman.  Airborne was the seller of the six Bell 412 helicopters in the July 1, 2015 contract that was recovered from Ibrahim's iPad as described in greater detail below.*

25.     TWA admits that Airborne Logistics is a company organized under the laws of Sultanate of Oman.  TWA otherwise lacks knowledge or information sufficient to form a belief regarding the allegations in this paragraph and, for that reason, denies these allegations.

26.     *FARSCO Aviation MRO Center — FARSCO is an aviation company registered under the laws of the Islamic Republic of Iran and having its principal place of business at Sanaye Havapeymaei Blvd., Karaj Makhsous Road, 13976-13511 Tehran, Iran, with registration No. 200130.  It is an aircraft maintenance, repair, and overhaul services provider. FARSCO was the purchaser of the six Bell 412 helicopters in the July 1, 2015 contract that was recovered from Ibrahim's iPad. Ibrahim also exchanged emails with S.M. Mirbagheri, the Managing Director of FARSCO.*

26.     TWA admits that FARSCO Aviation MRO Center ("FARSCO") is a company organized under the laws of the Islamic Republic of Iran.  TWA admits that FARSCO is an aviation company but lacks knowledge or information sufficient to form a belief regarding its specific aviation activities.  TWA admits that it ultimately became aware of a purported contract of July 1, 2015 between FARSCO and Airborne Logistics to purchase six Bell 412 helicopters.  TWA further states that TWA was not a party to that purported contract, did not otherwise facilitate that

purposed contract and, consequently, has limited knowledge or information regarding the contract. TWA otherwise lacks knowledge or information sufficient to form a belief regarding the other allegations in this paragraph and, for that reason, denies the remaining allegations.

27. *InTran, LLC — InTran is an Arizona limited liability company, having its principal place of business at 170 S William Dillard Drive, Suite 1-100, Gilbert, AZ 85233. InTran purchased Target Helicopter 1 and then sold it to Marilog (Deal #1). Before the failure of Deal #2, InTran attempted to purchase eight helicopters (Deal #3). InTran also paid $1,544,450 towards the purchase of Target Helicopter 2 (Deal #4). InTran also paid the $2,999,930.50 for Deal #5, which comprises Target Property 3.*

    27.    TWA admits that InTran, LLC ("InTran") is a limited liability company that had its principal place of business in Arizona. TWA admits that InTran purchased Target Helicopter 1 (Serial Number 28118) and then sold it to Marilog Avion Services Co. Ltd. ("Marilog"). Upon information and belief, TWA admits that it paid $2,349,910 to help finance the purchase of Target Helicopter 1, and that these funds are part of the $2,999,930.50 that comprises Target Property 3. TWA otherwise lacks knowledge or information sufficient to form a belief regarding the remaining allegations in this paragraph and, for that reason, denies the remaining allegations.

28. *Marilog Avion Services Co. Ltd. — Marilog is a Bangkok, Thailand based corporation. Marilog was identified as the end user for Deal #1 and Deal #3, and leased the warehouse where Target Helicopter 1 was stored in Thailand. When agents interviewed Ibrahim, he told them that he had inspected a helicopter in Dallas, Texas that was being sold to Marilog in Thailand and that Marilog was owned by his employer. When the Illinois Aviation Company was negotiating with Ibrahim for Deal #5, its representatives were under the impression that Ibrahim was the owner of Marilog. In fact, official filings with the Thai Companies Registration Office listed Ibrahim as a Marilog director until January 2016. Marilog was also the buyer in a Helicopter Purchase and Resale Agreement with the Illinois Aviation Company's subsidiary dated December 2015 for the purchase of seven helicopters.*

    28.    TWA admits that Marilog is a corporation based in Thailand. TWA admits that it entered into a Collaboration Agreement, dated March 1, 2015, that Ibrahim brokered between TWA and Marilog. Ibrahim and Marilog represented to TWA that the purpose of the agreement

was to finance Marilog's purchasing of three (3) or four (4) helicopters that it would lease in civilian industries in South East Asia and the Middle East.  The Collaboration Agreement's terms reflect that same purpose for the helicopters.  Ibrahim and Marilog led TWA to believe that the helicopters financed under the Collaboration Agreement would be used only in countries, by end-users, and for end-uses authorized under the applicable U.S. economic sanctions and export control laws.  They never disclosed to TWA any plans to divert helicopters to Iran or any other prohibited country or party.  To the extent that Ibrahim, Marilog, or any other party engaged in a scheme or conspiracy to launder funds into the United States, illicitly procure helicopters for Iran, or evade U.S. economic sanctions laws, they pursued those plans surreptitiously and separately from TWA.  TWA otherwise lacks knowledge or information sufficient to form a belief regarding the remaining allegations in this paragraph and, for that reason, denies the remaining allegations.

29.   *PremiAir Aviation - PremiAir is a corporation operating in the United Kingdom and the UAE.  Its Chairman, Graham Avery, received a fax from the Iran Helicopter Support and Renewal Company in December 2014 regarding the acquisition of Bell 412 helicopters.  PremiAir and Avery were involved in the attempted purchase of the helicopter in Dallas (Deal #4).*

29.   TWA admits that PremiAir Aviation ("PremiAir") is a corporation operating in the United Kingdom.  TWA admits that Graham Avery ("Avery") is PremiAir's Chairman.  TWA otherwise lacks knowledge or information sufficient to form a belief regarding the remaining allegations in this paragraph and, for that reason, denies the remaining allegations.  TWA admits that PremiAir and Avery were involved in the purchase of Target Helicopter 2 (Serial Number 36403), pursuant to a Joint Purchase Agreement between TWA and PremiAir.  Under that agreement, PremiAir would purchase Target Helicopter 2 from Fargo Jet Center in North Dakota, and then resell Target Helicopter 2 to Marilog through a resale agreement.  Ibrahim and PremiAir led TWA to believe that Target Helicopter 2 would be leased to authorized end-users in Thailand

or in other countries that were not subject to restrictions under applicable U.S. economic sanctions and export control laws.  To the extent that Ibrahim, PremiAir, Marilog, or any other party engaged in a scheme or conspiracy to launder funds into the United States, illicitly procure helicopters for Iran, or evade U.S. economic sanctions laws, they pursued those plans surreptitiously and separately from TWA.  TWA otherwise lacks knowledge or information sufficient to form a belief regarding the remaining allegations in this paragraph and, for that reason, denies the remaining allegations.

30.   *Transworld Aviation Group - Transworld is a company registered under the laws of the United Arab Emirates and located in the free enterprise zone in Dubai. Transworld was the purported buyer of seven helicopters in October 2015 (Deal #2), and Transworld agreed to jointly finance the purchase of a helicopter in October 2015 (Deal #4).  Transworld also sent the majority of the funds ($2,349,910) that make up Target Property 3.*

30.   TWA admits that it is a company registered under the laws of the United Arab Emirates and located in the free enterprise zone in Dubai.  Transworld admits that it sent the majority of the funds ($2,349,910) that comprise Target Property 3 to InTran to help finance the purchase of Target Helicopter 1.  TWA admits it agreed to jointly finance the purchase of Target Property 2 in October 2015, but otherwise lacks knowledge or information sufficient to form a belief regarding the remaining allegations regarding Deal #4.  TWA denies that it was the purported buyer of seven helicopters in October 2015 (Deal #2).  TWA otherwise lacks knowledge or information sufficient to form a belief regarding the remaining allegations in this paragraph and, for that reason, denies the remaining allegations.

31.   *Texas Aviation Company — The Texas Aviation Company cancelled Deal #2 for seven helicopters when it received an unsatisfactory answer as to where the helicopters were going, and subsequently cancelled Deal #3 for eight helicopters due its similarity to Deal #2.*

31.     TWA lacks knowledge or information sufficient to form a belief regarding the allegations in this paragraph and, for that reason, denies the allegations.

32.     *Illinois Aviation Company — A Florida-based subsidiary of the Illinois Aviation Company sold Target Helicopter 1 to InTran before it was shipped to Thailand. The Illinois Aviation Company also entered into a contract to sell Marilog five helicopters that it was going to purchase from the Texas Aviation Company.*

32.     TWA admits that Ibrahim led it to believe that InTran purchased Target Helicopter 1 from AAR Corporation before it was shipped to Thailand.  TWA lacks knowledge or information sufficient to form a belief regarding whether the "Illinois Aviation Company" referred to in the Complaint was involved in such negotiations and, for that reason, denies the remaining allegations in this paragraph.

### C.     Interview of Ibrahim and Searches of His Devices and Emails

33.     *On December 9, 2015, Customs and Border Protection ("CBP") Officers interviewed Ibrahim as he entered the United States at the Dallas Fort Worth airport from Dubai.  Ibrahim was traveling on a Canadian passport, and said that he lived in Canada.  Ibrahim told CBP that he was in the United States to meet with a representative of Helicopter International Shipping Services and to conduct business regarding a helicopter sale.*

33.     TWA lacks knowledge or information sufficient to form a belief regarding the allegations in this paragraph and, for that reason, denies these allegations.

34.     *On December 16, 2015, CBP Officers at Chicago O'Hare Airport conducted a border search and interview of Ibrahim as he was leaving the country.  Several of his electronic devices were detained at that time.  He first advised he was in the United States to shop, and then said he was purchasing mining equipment.  When asked why he was in Chicago, Ibrahim advised he was there to purchase ground equipment from the Illinois Aviation Company.  The investigators found pictures of helicopters in his bag.  When asked about the pictures, Ibrahim admitted he met with the Illinois Aviation Company about a sale of helicopters to "Transworld" in Thailand.  Ibrahim further admitted to inspecting a helicopter in Dallas for a company called Marilog in Thailand.  He advised his employer owned Marilog and Transworld.  Finally, when asked, he advised that his employer did not conduct business in sanctioned countries, such as Syria or Iran.*

34.     TWA lacks knowledge or information sufficient to form a belief regarding the allegations in this paragraph and, for that reason, denies these allegations.

35.     *On January 6, 2016, a federal search warrant was obtained for Ibrahim's detained devices — three Apple iPhones and an Apple iPad.*

35.     TWA lacks knowledge or information sufficient to form a belief regarding the allegations in this paragraph and, for that reason, denies these allegations.

36.     *On May 27, 2016, a federal search warrant was obtained for various email accounts Nasir Ibrahim used.*

36.     TWA lacks knowledge or information sufficient to form a belief regarding the allegations in this paragraph and, for that reason, denies these allegations.

### D.     Ibrahim's Ties to Iran

37.     *While Ibrahim claimed Transworld did not do business with Iran, documents seized in the search of Ibrahim's electronic devices indicate that his attempts to purchase helicopters in the United States were on behalf of and funded by the Iranian government or entities associated with the Iranian government.  One of Ibrahim's iPhones contained photographs of two documents written in Farsi.  The first document appears to be dated October 23, 2014 and to have been photographed on October 24, 2014 in Tehran, Iran.  The document has a letterhead reading in part: "Ministry of Defense and Support of the Armed Forces, Organization for Armed Forces Aviation Industry"; it is from the "Iranian Helicopter Support and Renewal Company"; it is directed to the "Sepah Bank, Office of Helicopter Manufacturing"; and it requests the issuance of a 10 billion Rial check for payment on a contract.  The other document is dated October 19, 2014 and appears to have been photographed on August 20, 2015 in Tehran, Iran.  The document has a letterhead that reads in part: "Ministry of Defense and Armed Forces Logistics of the Islamic Republic of Iran."  It is addressed to the Director of the Central Bank of the Islamic Republic of Iran with a subject of "Request for appropriation of authoritative bank guarantee letter for banks outside the country."  The document requests a guarantee letter of at least $50 million "from the closed funds in Oman" for the purpose of importing "state of the art helicopters" to support the development of oil and gas fields and for air emergencies.*

37.     TWA lacks knowledge or information sufficient to form a belief regarding the allegations in this paragraph and, for that reason, denies these allegations.  To the extent this paragraph alleges that TWA engaged in commercial or financial transactions with Iran that were

prohibited under applicable U.S. economic sanctions and export control law, these allegations are

denied.  Ibrahim was never an employee of TWA and did not have authority to bind TWA in any

contract or transaction that would violate applicable U.S. economic sanctions or export control

laws.

38.     *Ibrahim's iPad also contained a July 1, 2015 unsigned contract for Airborne*
        *Logistics, LLC, a company in Oman, to sell FARSCO Aviation, a company in Iran,*
        *six helicopters - Helicopters A, B, C, E, F, and G.*

        38.     TWA lacks knowledge or information sufficient to form a belief regarding the

allegations in this paragraph and, for that reason, denies these allegations.

39.     *Ibrahim's email account contained a December 11, 2014 email that Ibrahim sent*
        *to "Shehab Ahmed" that was titled "Fwd: tender".  The body of the email stated,*
        *"This is for your and abdulah eyes only."  The email was forwarded to Ibrahim on*
        *December 11, 2014, with an attachment that was a December 10, 2014 fax from*
        *the Iran Helicopter Support and Renewal Company located in Tehran, Iran.  The*
        *fax was addressed to PREMIAIR AVIATION, "ATTN: Graham AVERY" and stated*
        *the following:*

        *"DEAR SIR,*

        *Please be informed that we attend [sic] in the tender regarding supplying five*
        *helicopters model 412 EP& eight company has been participated but at the end just*
        *two company remained for supply.so we hope for getting successfully result in this*
        *tender.  We will inform you the outcome as soon we receive any news in this regard.*

        *Best regards*

        *General Director of IHSRC [Iran Helicopter Support and Renewal Company]*

        *Dr. Mohammad Ahmadabadi."*

        39.     TWA lacks knowledge or information sufficient to form a belief regarding the

allegations in this paragraph and, for that reason, denies these allegations.

###        E.      Deal #1 — The Export of Target Helicopter 1 to Thailand

40.     *Ibrahim's emails also contained a contract attached to an email sent to Ibrahim on*
        *January 31, 2015.  That contract concerned the sale of several Bell 214 helicopters,*

*including Target Helicopter 1.  The parties to the contract were Gulf Technical Solutions FZE, a company located in either the UAE or Oman, and International Sepehr Kaveh Kish ("ISKK"), a company located in Iran according to the contract's language.*

40.     TWA lacks knowledge or information sufficient to form a belief regarding the allegations in this paragraph and, for that reason, denies these allegations.

*41.     In other emails between Ibrahim and the managing director of FARSCO, they appear to negotiate the prices of certain helicopters, including one labeled "N28014."  This combination of a letter and numbers corresponds with identifiers that the Federal Aviation Administration ("FAA") places upon helicopters registered in the United States.  N28014 is the FAA identifier for Target Helicopter 1.*

41.     TWA admits that N28014 is the FAA identifier for Target Helicopter 1.  TWA otherwise lacks knowledge or information sufficient to form a belief regarding the remaining allegations in this paragraph and, for that reason, denies the remaining allegations.  To the extent this paragraph alleges that Ibrahim acted on behalf of TWA, the allegation is denied.  Ibrahim was never an employee of TWA and did not have authority to bind TWA in any contract or transaction that would violate applicable U.S. economic sanctions or export control laws.

*42.     Target Helicopter 1 was the subject of negotiations involving InTran, the Illinois Aviation Company, and Marilog.  According to a helicopter purchase agreement, InTran purchased Target Helicopter 1 from a subsidiary of the Illinois Aviation Company on April 17, 2015.  The contract identified Target Helicopter 1, among other helicopters, by using its serial number (28118) and its FAA registration number (N28014). This contract valued Target Helicopter 1 at approximately $1.9 million.*

42.     TWA admits that Target Helicopter 1 was the subject of negotiations involving InTran, Marilog, and TWA around the same time period in 2015.  In early 2015, Ibrahim brokered a Collaboration Agreement, dated March 1, 2015, between TWA and Marilog.  Ibrahim and Marilog represented to TWA that the purpose of the agreement was to finance Marilog's purchasing of three (3) or four (4) helicopters that it would lease in civilian industries in South

East Asia and the Middle East.  The Collaboration Agreement's terms reflect that same purpose for the helicopters.  TWA lacks knowledge or information sufficient to form a belief regarding whether the "Illinois Aviation Company" referred to in the Complaint was involved in such negotiations.  TWA also lacks knowledge or information sufficient to form a belief regarding the remaining allegations in this paragraph and, for that reason, denies the remaining allegations.

43.   *After InTran purchased Target Helicopter 1, it exported Target Helicopter 1 from Jacksonville, Florida, to Bangkok, Thailand.  InTran listed the Electronic Export Information it was required by law to file in the Census Bureau's Automated Export System database that the ultimate consignee for Target Helicopter 1 was Marilog.*

43.   TWA admits that Ibrahim led it to believe that Target Helicopter 1 was exported by InTran to Thailand at some point.  Ibrahim and Marilog led TWA to believe that Target Helicopter 1 would be used only in countries, by end-users, and for end-uses authorized under the applicable U.S. economic sanctions and export control laws.  They never disclosed to TWA any plans to divert the helicopters to Iran or any other prohibited country or party.  Based on Ibrahim's and Marilog's representations, TWA made payments to Marilog for the storage of Target Helicopter 1 in Thailand until sometime around October 2018 when TWA learned that the federal government was conducting an inquiry into Marilog's potential diversion of Bell helicopters to Iran.  To the extent that Ibrahim, Marilog, or any other party engaged in a scheme or conspiracy to launder funds into the United States, illicitly procure helicopters for Iran, or evade U.S. economic sanctions laws, they pursued those plans surreptitiously and separately from TWA.  TWA lacks knowledge or information sufficient to form a belief regarding the remaining allegations in this paragraph and, for that reason, denies the remaining allegations.

44.   *A logistics company located in Bangkok (hereinafter, the "Thai Logistics Company"), leased a warehouse to Marilog beginning in approximately August 2015.  A representative from the Thai Logistics Company confirmed that the warehouse stored a Bell 214 helicopter bearing serial number 28118, i.e., Target*

*Helicopter 1.  That same representative indicated that Target Helicopter 1 would eventually be shipped to another, unknown country.*

44.    TWA admits that Ibrahim and Marilog led it to believe that Target Helicopter 1, was stored in a warehouse in Thailand.  TWA lacks knowledge or information sufficient to form a belief regarding the remaining allegations in this paragraph and, for that reason, denies the remaining allegations.

*45.    The end user agreement between InTran and Marilog and two invoices for Target Helicopter 1 demonstrate that InTran sold Target Helicopter 1 to Marilog for approximately $2 million, and separately charged Marilog approximately $60,000 in shipping costs.*

45.    TWA admits that there is an invoice indicating that InTran sold Target Helicopter 1 to Marilog for approximately $2 million.  TWA lacks knowledge or information sufficient to form a belief regarding the remaining allegations in this paragraph and, for that reason, denies the remaining allegations.

*46.    In the negotiations between InTran, Marilog, and Transworld, according to an InTran employee, Ibrahim represented Transworld, and Transworld financed the helicopter that was to be sent to Marilog.*

46.    TWA admits that Ibrahim was an independent broker that occasionally worked with TWA between 2014 and 2016, although Ibrahim was never an employee of TWA and did not have authority to bind TWA in any contract or transaction that would violate applicable U.S. economic sanctions or export control laws.  TWA further admits that it financed the purchase of Target Helicopter 1 pursuant to the Collaboration Agreement with Marilog, through payments of funds sent by TWA, as well as additional funds sent by AHE International that TWA also provided.  Ibrahim and Marilog led TWA to believe that the helicopters financed under the Collaboration Agreement would be used only in countries, by end-users, and for end-uses authorized under the applicable U.S. economic sanctions and export control laws.  They never disclosed to TWA any

plans to divert the helicopters to Iran or any other prohibited country or party.  To the extent that Ibrahim, Marilog, or any other party engaged in a scheme or conspiracy to launder funds into the United States, illicitly procure helicopters for Iran, or evade U.S. economic sanctions laws, they pursued those plans surreptitiously and separately from TWA.  TWA lacks knowledge or information sufficient to form a belief regarding the remaining allegations in this paragraph and, for that reason, denies the remaining allegations.

47.   *Target Helicopter 1 remained unclaimed in Thailand until March 2019.*

47.   TWA denies the allegation of paragraph 47 to the extent it alleges or implies that TWA abandoned, forfeited, waived, or otherwise failed to assert or protect its legally cognizable interests in Target Helicopter 1.  TWA otherwise lacks knowledge or information sufficient to form a belief regarding the allegations in this paragraph and, for that reason, denies these allegations.

48.   *In March 2019, Marilog claimed Target Helicopter 1, whereupon Target Helicopter 1 was rapidly prepared for transshipment. Marilog reexported Target Helicopter 1, and it is currently located in India. Based upon the contract attached to the email Ibrahim received on January 31, 2015, the country that the helicopter ultimately was meant to be shipped to was Iran.*

48.   TWA lacks knowledge or information sufficient to form a belief regarding the allegations in this paragraph and, for that reason, denies these allegations.  Ibrahim and Marilog led TWA to believe that the helicopters financed under the Collaboration Agreement would be used only in countries, by end-users, and for end-uses authorized under the applicable U.S. economic sanctions and export control laws.  They never disclosed to TWA any plans to divert the helicopters to Iran or any other prohibited country or party.  To the extent that Ibrahim, Marilog, or any other party engaged in a scheme or conspiracy to launder funds into the United States,

illicitly procure helicopters for Iran, or evade U.S. economic sanctions laws, they pursued those plans surreptitiously and separately from TWA.

    **F.**    **Deal #2 - The Attempted Purchase of Helicopters from the Texas Company**

*49.*    *Beginning in late July 2015, two UK aviation companies (UK Aviation Company 1 and PremiAir) and Transworld contacted the Texas Aviation Company regarding the purchase of seven Bell 412 helicopters. On July 24, 2015, UK Aviation Company 1 emailed the Texas Aviation Company a letter of intent from Transworld Aviation to purchase seven particular helicopters: Helicopters A, B, C, D, E, F, and G. Ibrahim had a copy of the same letter in his possession when he was searched on December 16, 2015. UK Aviation Company 1 also forwarded to the Texas Aviation Company an email from Transworld that attached the end use certificate ("EUC") for the seven helicopters, signed by PremiAir's chairman, Graham Avery. The purpose of an EUC is to detail the ultimate destination of a shipment. The certificate for this transaction stated that three of the helicopters would be shipped to PremiAir in London. The Texas Aviation Company noticed that the EUC had two boxes checked on the form: one box stated that the end user would use the items in the country listed on the certificate, and the other box stated that the items would be placed in inventory because "the end user information is not yet, known" and that the end user information would be provided after the items were sold. The Texas Aviation Company contacted UK Company 1 in September 2015 with questions about the certificate and to ask if the helicopters were to be delivered to London or Dubai. On September 16, 2015, UK Aviation Company 1 replied that it was Transworld's contractual understanding with PremiAir that the helicopters would be delivered to Dubai. On September 18, 2015, the Texas Aviation Company canceled the deal, stating it was not comfortable with the proposed resale of the helicopters from Transworld's headquarters in Dubai.*

    49.    TWA admits that it signed a Letter of Intent ("LOI") for the purchase of Helicopters A, B, C, D, E, F, and G with Bristow International ("Bristow"), a United Kingdom company, on or about July 15, 2015. Upon information and belief, TWA admits that Bristow later terminated the agreement and did not proceed with the transaction. TWA lacks knowledge or information sufficient to form a belief regarding the remaining allegations in this paragraph and, for that reason, denies the remaining allegations.

### G.   Deal #3 - The Attempted Purchase of Helicopters by InTran

*50.   On September 11, 2015, a few days after the Texas Aviation Company first expressed concerns about the Transworld deal, InTran, LLC (an Arizona-based company) reached out to the Texas Aviation Company about purchasing seven Bell 412 helicopters.  The Texas Aviation Company responded and provided a list of eight helicopters that were available for sale.  The list provided to InTran included Helicopters A, B, C, D, E, and three others, but it did not include helicopters F or G.  On September 14, 2015, InTran emailed the Texas Aviation Company a letter of intent to purchase seven Bell 412 helicopters, specifically Helicopters A, B, C, D, E, F, and G.  The Texas Aviation Company had not mentioned Helicopters F and G to InTran, but had previously discussed them with Transworld before it canceled Deal #2.  On September 15, 2015, InTran sent the Texas Aviation Company an EUC in which the end user was listed as Marilog Avion Service Co. Ltd., of Bangkok, Thailand.  On September 17 or 18, 2015, the Texas Aviation Company advised InTran that it was canceling the sale, noting that it was very similar to another attempted purchase that had been denied and remarking that it had been unable to find information on Marilog or indicating that Marilog had the capacity to operate seven helicopters.*

50.   TWA lacks knowledge or information sufficient to form a belief regarding the allegations in this paragraph and, for that reason, denies these allegations.

*51.   Intran, LLC was also associated with Ibrahim.  When Ibrahim was searched at the border on December 16, 2015, the Department of Homeland Security, Homeland Security Investigations found two personal bank statements.  These statements were addressed to Ibrahim at 170 S William Dillard Dr, Ste 1-100, Gilbert AZ, 85333, which was also InTran's address.  Ibrahim also had in his possession a draft contract for InTran to buy helicopters (the contract related to a later attempted purchase).*

51.   TWA lacks knowledge or information sufficient to form a belief regarding the allegations in this paragraph and, for that reason, denies these allegations.

*52.   Marilog is also connected to Ibrahim.  When interviewed on December 16, 2015, Ibrahim advised that he had inspected a helicopter in Dallas, Texas that was being sold to Marilog in Thailand and that Marilog was owned by his employer. Additional investigation suggested Ibrahim was a Director of Marilog at that time.*

52.   Upon information and belief, TWA admits that records indicate that Ibrahim worked as an independent consultant for Marilog for over 20 years, including during the period when he maintained an informal broker relationship with TWA.  TWA lacks knowledge or

information sufficient to form a belief regarding other allegations in this paragraph and, for that reason, denies these allegations.

### H.   Deal # 4 - The Purchase of the Helicopter in Dallas (Target Helicopter 2)

53.   *On October 8, 2015, Ibrahim sent an email an email to S.M. Mirbagheri, the Managing Director of FARSCO and Ali Asghar Ahmadi and Mehdi Alipour, respectively, the Secretary General and the Treasurer General of the Red Crescent Society of the Islamic Republic of Iran.  The title of the email was "Fwd: 1425". The body of the email stated "ATT Mr Mir", and "Pie find 3 one 1425 H.  I am in 001-788-837-3251 In case of any Q".  Attached to the email were photographs of what appeared to be the Bell 412EP with serial number 36403 (Target Helicopter 2).  The photographs sent were of an aircraft with the same interior and paint scheme as Target Helicopter 2.*

53.   TWA lacks knowledge or information sufficient to form a belief regarding the allegations in this paragraph and, for that reason, denies these allegations.

54.   *As noted above, FARSCO is an aircraft maintenance, repair, and overhaul services provider based in Tehran, Iran.  Ibrahim exchanged multiple other emails with S.M. Mirbagheri.*

54.   Per its response to paragraph 26, TWA admits that FARSCO is a company organized under the laws of Iran.  TWA otherwise lacks knowledge or information sufficient to form a belief regarding the remaining allegations in this paragraph and, for that reason, denies the remaining allegations.

55.   *According to the International Federation of Red Cross and Red Crescent Societies web page (www.ific.org), the secretary general of the Red Crescent Society of the Islamic Republic of Iran was Ali Asghar Ahmadi, and the Treasurer General was Mehdi Alipour, which names coincide with the above email recipients.*

55.   TWA lacks knowledge or information sufficient to form a belief regarding the allegations in this paragraph and, for that reason, denies these allegations.

56.   *In November 2015, the North Dakota Aviation Company entered into an Aircraft Purchase Agreement to sell PremiAir a helicopter for $5.8 million that would be exported from the United States.  The aircraft was the Bell 412EP helicopter, Serial Number 36403, registration N412EA (Target Helicopter 2) about which Ibrahim*

*wrote to the Iranians. The agreement was signed by Graham Avery, Chairman of PremiAir, on November 21, 2015, and by a representative of the North Dakota Aviation Company on November 23, 2015.*

56.     TWA lacks knowledge or information sufficient to form a belief regarding the allegations in this paragraph and, for that reason, denies these allegations. TWA admits that Ibrahim persuaded TWA and PremiAir to enter into a Joint Purchase Agreement, dated October 6, 2015, to finance the purchase of Target Helicopter 2. Ibrahim and PremiAir led TWA to believe that Target Helicopter 2 would be sold and delivered to Marilog in Thailand pursuant to a separate agreement between PremiAir and Marilog. Ibrahim and PremiAir further led TWA to believe that Target Helicopter 2 would be leased to authorized end-users in Thailand or in other countries that were not subject to restrictions under applicable U.S. economic sanctions and export control laws. To the extent that Ibrahim, Marilog, or any other party engaged in a scheme or conspiracy to launder funds into the United States, illicitly procure helicopters for Iran, or evade U.S. economic sanctions laws, they pursued those plans surreptitiously and separately from TWA.

57.     *The last page of the agreement was an "End Use/End User Certification" which Avery signed on behalf of the purchaser, PremiAir, on November 21, 2015. In signing the Certification, Avery agreed that he and PremiAir: (1) would not export or re-export the North Dakota Aviation Company's products to Iran unless otherwise authorized by the United States Government; and (2) would abide by all applicable U.S. export control laws and regulations for any products purchased from the North Dakota Aviation Company and would obtain any licenses or prior approvals required by the U.S. government prior to the export or re-export of the North Dakota Aviation Company's products, software or technology.*

57.     TWA lacks knowledge or information sufficient to form a belief regarding the allegations in this paragraph and, for that reason, denies these allegations. TWA's admits, however, that the End Use/End User Certification alleged in this paragraph is consistent with TWA's understanding of this particular transaction at the time, as reflected in the Joint Purchase

Agreement with PremiAir, which contained terms and conditions barring the diversion of Target

Helicopter 2 to prohibited countries or parties.

58.     *On October 25, 2015, Ibrahim sent an email to Mirbagheri, Ahmadi, and Alipour. The title of the email was "Fwd: 412 UNIT 3- EXTRA CHARGE". The body of the email stated the following: "Mr Mir, Please find attach extra on this units. for your info."  Attached to the email was a document named "UNIT 3 EXTRA CHARGES —FOC.xlsx".  The document was a list of charges for Target Helicopter 2.*

58.     TWA lacks knowledge or information sufficient to form a belief regarding the

allegations in this paragraph and, for that reason, denies these allegations.

59.     *On December 7, 2015, a Shipper's Export Declaration ("SED") with Internal Transaction Number of x20151207080028 was filed electronically with the Automated Export System.  The SED was for the export of a "Used Bell 412 Model Civil Helicopter, Serial Number (s/n) 36403," which was valued at $5.8 million. The United States Principal Party of Interest was the North Dakota Aviation Company and the declared ultimate consignee was Marilog in Bangkok, Thailand. The SED also identified a helicopter shipping company as the Forwarding Agent/Filer.  The date of exportation was listed as December 12, 2015, and the Port of Export was Dallas/Fort Worth, Texas.*

59.     TWA lacks knowledge or information sufficient to form a belief regarding the

allegations in this paragraph and, for that reason, denies these allegations.

60.     *On December 7, 2015, a confidential and reliable source informed a law enforcement agent that a person named "Nasir" was due to enter the United States to inspect a Bell 412 helicopter in Dallas, Texas, in connection with a potential export of that helicopter.  The source had concerns about the potential export because the end use destination had been suddenly changed from the UAE to Marilog Avion in Thailand.  The source also mentioned that Graham Avery of PremiAir was involved in this transaction.  Based on the information provided, law enforcement concluded Nasir Ibrahim was the person the source had described.*

60.     TWA lacks knowledge or information sufficient to form a belief regarding the

allegations in this paragraph and, for that reason, denies these allegations.

61.     *As noted above, Ibrahim arrived at the Dallas Fort Worth airport from the UAE on December 9, 2015.  During secondary inspection at the border, he indicated that he was in the Dallas area to inspect a helicopter and he had a meeting with the helicopter shipping company that was the forwarding agent for the transaction.*

61.   TWA lacks knowledge or information sufficient to form a belief regarding the allegations in this paragraph and, for that reason, denies these allegations.

62.   *During a subsequent search of one of Ibrahim's iPhones, agents located multiple images of what appeared to be Target Helicopter 2 being prepared for shipment. According to data retrieved from the forensic exam of the electronic devices, the images were photographed in Burleson, TX, the same location where Target Helicopter 2 was packaged for shipment out of Dallas Fort Worth airport.*

62.   TWA lacks knowledge or information sufficient to form a belief regarding the allegations in this paragraph and, for that reason, denies these allegations.

63.   *On December 8, 2015, CBP detained Target Helicopter 2 and subsequently administratively seized it.*

63.   TWA admits it was informed in 2016 that Target Helicopter 2 had been seized by CBP, although TWA lacks knowledge or information sufficient to form a belief regarding the exact date of the seizure, and for that reason denies the remaining allegations in this paragraph.

64.   *After CBP detained Target Helicopter 2, PremiAir Chairman Graham Avery contacted CBP about the detained helicopter. Avery provided a copy of a document titled "Joint Purchase of 1 EA Helicopter of Model Bell 412EP" and dated October 6, 2015. That contract was between PremiAir and Transworld Aviation Group. The document was signed by Avery on behalf of PremiAir and Shehab Ahmed Al Breiki, Director of Operations of Transworld. The Agreement proposed that PremiAir and Transworld would jointly finance the purchase of the Bell 412 Helicopter bearing S/N 364035, at a total price of $5,825,000, with PremiAir supplying $1,000,000 and Transworld providing $4,820,000. The parties agreed that they would re-sell the helicopter for $6,200,000 and would share profits proportionally. PremiAir would be responsible for delivering the helicopter by December 20, 2015. The contract did not state where the delivery would occur but noted that it was subject to U.S export control laws and regulations.*

64.   TWA admits that it entered into a Joint Purchase Agreement with PremiAir on October 6, 2015 to finance the purchase of Target Helicopter 2. Under the Joint Purchase Agreement, the purchase price would be $5,825,000, with PremiAir supplying $1,000,000 and Transworld providing $4,820,000. TWA further admits that the parties agreed to re-sell the helicopter for $6,200,000 and would share profits proportionally. Specifically, Ibrahim and

PremiAir led TWA to believe that Target Helicopter 2 would be sold and delivered to Marilog in Thailand pursuant to a separate agreement between PremiAir and Marilog.  Ibrahim and PremiAir further led TWA to believe that Target Helicopter 2 would be leased to authorized end-users in Thailand or in other countries that were not subject to restrictions under applicable U.S. economic sanctions and export control laws.  To the extent that Ibrahim, Marilog, or any other party engaged in a scheme or conspiracy to launder funds into the United States, illicitly procure helicopters for Iran, or evade U.S. economic sanctions laws, they pursued those plans surreptitiously and separately from TWA.  TWA lacks knowledge or information sufficient to form a belief regarding the remaining allegations in this paragraph, and, for that reason, denies the remaining allegations in this paragraph.

65.   *During an interview with law enforcement, Avery said PremiAir found the helicopter advertised on the internet in August 2015.  He stated the helicopter was being purchased by PremiAir "for the UK and our EU operations and it was going to be used by us through our client base," and that the helicopter was financed jointly with Transworld Aviation.  Avery stated Ibrahim contacted PremiAir regarding the helicopter and a PremiAir employee negotiated a deal for the sale of the helicopter, with the promise of future sales of helicopters.*

65.   TWA admits that the purchase of Target Helicopter 2, to which this paragraph refers, was jointly financed with PremiAir pursuant to a Joint Purchase Agreement between TWA and PremiAir.  TWA otherwise lacks knowledge or information sufficient to form a belief regarding the remaining allegations in this paragraph and, for that reason, denies the remaining allegations.

66.   *An employee of an affiliate of the North Dakota Aviation Company confirmed that Avery first contacted them in August 2015 concerning Target Helicopter 2, which was for sale.  The employee indicated, however, that Target Helicopter 2 was originally intended to go to Dubai, and contrary to Avery's assertion was never going to the United Kingdom.*

66.     TWA lacks knowledge or information sufficient to form a belief regarding the
allegations in this paragraph and, for that reason, denies these allegations.

67.     *The North Dakota Aviation Company received several payments in connection with*
*this attempted export by the following entities, all of which (except for InTran) are*
*located outside the United States:*

| Date: | Amount: | Source |
|---|---|---|
| *10/28/2015* | *$600,000* | *Aero Tech FZE (UAE)* |
| *11/12/2015* | *$1,058,380* | *Transworld Aviation FZE (UAE)* |
| *11/12/2015* | *$1,000,000* | *Lester Aldridge LLP (PremiAir's law firm) (UK)* |
| *11/16/2016* | *$1,544,450* | *Intran LLC* |
| *11/20/2015* | *$1,099,970* | *Transworld Aviation FZE (UAE)* |
| *11/30/2015* | *$517,130* | *Transworld Aviation FZE (UAE)* |
| | *$5,819,930* | *Total* |

67.     TWA admits that it made several payments to the Fargo Jet Center for Target
Helicopter 2, to which this paragraph refers, pursuant to the Joint Purchase Agreement between
TWA and PremiAir.  These included a payment of $1,058,400 on or about November 12, 2015, a
payment of $1,100,000 on or about November 20, 2015, and a payment of $517,130 on or about
November 22, 2015.  TWA further admits that Aerotech FZE made a payment of $600,000 on
behalf of TWA, to Insured Aircraft Title Service, Inc. on or about October 24, 2015.  TWA
otherwise lacks knowledge or information sufficient to form a belief regarding the remaining
allegations in this paragraph and, for that reason, denies the remaining allegations.

68.     *An employee of the helicopters shipping company said that they were contracted*
*by Ibrahim to package and ship Target Helicopter 2.  The employee said that*
*around December 9 and 10, 2015, he travelled to the Dallas-Fort Worth area to*
*meet with Ibrahim for the purpose of inspecting and supervising the packaging and*
*shipping of the Bell 412EP helicopter.  Ibrahim told the employee that he wanted*
*to see what he had purchased and took many photographs of Target Helicopter 2.*
*The employee stated he knew Ibrahim was a broker and also the purchaser of the*
*Target Helicopter from Avery and that Ibrahim was also involved with Marilog,*
*the purported end user of the Bell 412EP, but he did not know in what capacity.*
*The employee stated that Ibrahim was vague in answering questions concerning*

*Marilog. The employee stated he had known Ibrahim for over a year, and during that time frame, he knew Ibrahim only to be interested in acquiring Bell 412EP and Bell 214 helicopters. The employee stated that he exchanged emails with Ibrahim at several different email accounts, all of which were generic and did not reference any company or business.*

68.     TWA lacks knowledge or information sufficient to form a belief regarding the allegations in this paragraph and, for that reason, denies these allegations.

*69.     On February 4, 2016, Mohammed Rifan (a Director of Marilog Avion Service Co. Ltd, in Bangkok, Thailand) advised that Marilog had never conducted business in Iran and had no plans to do so in the future. Rifan stated the end use of the helicopter would be for lease and sale to interested government departments and the high-end commercial industry in the Kingdom of Thailand. In contrast to the official filings with the Thai Companies Registration Office, which listed Nasir Ibrahim as a Marilog director until January 29, 2016, Rifan also stated that Ibrahim only did work for Marilog on a freelance basis and was not an employee of Marilog, nor had Ibrahim ever been an employee of Marilog.*

69.     TWA admits it received various correspondence between Mohammed Rifan ("Rifan") and Special Agent Michael Boone ("Boone"), of the U.S. Department of Homeland Security, Homeland Security Investigations division, sometime on or around February 4, 2016. In this correspondence Rifan informed Boone that Marilog had never conducted business in Iran and had no plans to do so in the future. Rifan advised that Target Helicopter 2 was intended for use in Thailand exclusively. Rifan also described Ibrahim as a freelance advisor, and not an employee, of Marilog. Rifan's representations to Boone reflect TWA's understanding of this particular transaction. As previously explained, Ibrahim and PremiAir further led TWA to believe that Target Helicopter 2 would be leased to authorized end-users in Thailand or in other countries that were not subject to restrictions under applicable U.S. economic sanctions and export control laws. To the extent that Ibrahim, Marilog, or any other party engaged in a scheme or conspiracy to launder funds into the United States, illicitly procure helicopters for Iran, or evade U.S. economic sanctions laws, they pursued those plans surreptitiously and separately from TWA. TWA

otherwise lacks knowledge or information sufficient to form a belief regarding the remaining allegations in this paragraph and, for that reason, denies the remaining allegations.

I.      **Deal # 5 - The Attempted Purchase of Helicopters using the Illinois Company and the Payment of $2,999,930.50 (Target Property 3)**

70.     *Sometime between December 9 and 16, 2015, Ibrahim met with representatives of the Illinois Aviation Company and InTran near Chicago.  The Illinois Aviation Company was under the impression that Ibrahim was the owner of Marilog. According to the Illinois Aviation Company representative, the plan was for Marilog to send the money to InTran, which would send it to the Illinois Aviation Company.  In turn, the Illinois Aviation Company would buy the helicopters from the Texas Aviation Company.*

70.     TWA lacks knowledge or information sufficient to form a belief regarding the allegations in this paragraph and, for that reason, denies these allegations.

71.     *One of the documents found on Ibrahim when he was searched at the border on December 16, 2015 was a draft Helicopter Purchase and Resale Agreement between the Illinois Aviation Company's subsidiary and Marilog dated December 2015 for the purchase of seven helicopters.*

71.     TWA lacks knowledge or information sufficient to form a belief regarding the allegations in this paragraph and, for that reason, denies these allegations.

72      *On December 15, 2015, the Illinois Aviation Company offered to purchase five of the seven helicopters from the Texas Aviation Company: Helicopters A, B, C, E, and Z.  Helicopters A, B, C, and E were all listed in the draft sales contract to the Iranian Company, and in Deal #2 and Deal #3.*

72.     TWA admits that Helicopters A, B, C, and E were all listed in the purported draft sales contract between FARSCO and Airborne.  Per its response to paragraph 49, TWA admits that Helicopters A, B, C, and E, were among those helicopters listed in its LOI to Bristow, although as stated, TWA otherwise lacks knowledge or information sufficient to form a belief regarding most of the allegations surrounding Deal #2.  TWA otherwise lacks knowledge or information sufficient to form a belief regarding the remaining allegations in this paragraph and, for that reason, denies the remaining allegations.

73.  *Between approximately December 7, 2015 and January 20, 2015, InTran made initial payments of $2,999,930.50 to the Illinois Aviation Company for the Bell 412 helicopters. InTran received the funds for those payments between approximately December 7, 2015 and January 20, 2015, from Transworld Aviation and three other overseas entities. Transworld sent the majority of the funds, $2,349,910; the remainder, $650,020.50, came from other offshore companies: AeroTech FZE, Gulf Technical Solutions, and AHE International. As discussed previously, Transworld is a UAE registered entity associated with Ibrahim.*

73.  TWA admits that it made payments exceeding $2,349,910 to InTran between the periods of December 7, 2015 and January 20, 2016. TWA admits that Ibrahim was an independent broker that occasionally worked with TWA between 2014 and 2016, but Ibrahim was never an employee of TWA and did not have authority to bind TWA in any contract or transaction that would violate applicable U.S. economic sanctions or export control laws. TWA lacks information or knowledge regarding the details of Deal #5 alleged in the verified complaint, but based upon representations made by Ibrahim and Marilog in 2015, it is TWA's general understanding was that Ibrahim sought to broker the purchase of helicopters pursuant to the Marilog Collaboration Agreement. Ibrahim and Marilog led TWA to believe that any helicopters financed pursuant to the Collaboration Agreement would only be used in countries, by end-users, and for end-uses authorized under the applicable U.S. economic sanctions and export control laws. TWA only authorized payments to finance helicopter purchases in connection with the Marilog Collaboration Agreement under those conditions. To the extent that Ibrahim, Marilog, or any other party engaged in a scheme or conspiracy to launder funds into the United States, illicitly procure helicopters for Iran, or evade U.S. economic sanctions laws, they pursued those plans surreptitiously and separately from TWA. TWA otherwise lacks knowledge or information sufficient to form a belief regarding the remaining allegations in this paragraph and, for that reason, denies the remaining allegations.

74.   *On December 21, 2015, InTran's representative told U.S. authorities that Marilog had informed him the helicopters were for leasing to the Royal Thai Police. Representatives from the Royal Thai Police were unaware of any deal with Marilog.  InTran's representative further advised that Marilog had told him the helicopters would not be re-exported and sent an end user statement in which Marilog confirmed in March- 12, 2014 that it was aware of and in compliance with U.S. export law.*

74.   TWA lacks knowledge or information sufficient to form a belief regarding the allegations in this paragraph and, for that reason, denies these allegations.

75.   *On January 27, 2016, InTran wrote investigators an email to the effect that they had "potential customers" in Iran and they were wondering if they would be able to export civil or commercial helicopters to Iran.  They stated that they had not started any negotiations.*

75.   TWA lacks knowledge or information sufficient to form a belief regarding the allegations in this paragraph and, for that reason, denies these allegations.

76.   *On February 3, 2016, InTran canceled the deal with the Illinois Aviation Company and asked for its money back.  On February 12, 2016, InTran sent investigators another email saying that the transaction with the Illinois Aviation Company had "nothing to do with the Iran questions we asked before."*

76.   TWA lacks knowledge or information sufficient to form a belief regarding the allegations in this paragraph and, for that reason, denies these allegations.

77.   *On or about February 29, 2016, Magistrate Judge Alan Kay authorized the seizure of the $2,999,930.50.*

77.   TWA lacks knowledge or information sufficient to form a belief regarding the allegations in this paragraph and, for that reason, denies these allegations.

## COUNT ONE

78.   *The statements made in the above paragraphs are restated as if fully set forth herein.*

78.   TWA repeats and reasserts all the responses set forth above as if fully set forth herein.

79.  *Nasir Ibrahim and others known and unknown acted individually and conspired together to attempt to procure the above identified helicopters in violation of IEEPA, specifically 50 U.U.C. § 1705, the smuggling statute, 18 U.S.C. § 554(a), and the conspiracy statute, 18 U.S.C. § 371.*

79.  To the extent this paragraph alleges that TWA participated in a conspiracy and violated other federal laws, TWA denies these allegations.  TWA otherwise lacks knowledge or information sufficient to form a belief regarding the allegations in paragraph 79 and, for that reason, denies these allegations.

80.  *As such, the defendant properties are subject to forfeiture, pursuant to 18 U.S.C. § 981(a)(1)(C), as property which constitutes or is derived from proceeds traceable to a conspiracy to violate IEEPA and the smuggling statute.*

80.  To the extent this paragraph alleges that TWA participated in a conspiracy and violated other federal laws, TWA denies these allegations.  Otherwise, this paragraph asserts legal conclusions to which no answer is required.  To the extent that a response is required, TWA denies the allegations in paragraph 80.

## COUNT TWO

81.  *The factual statements made in the above paragraphs are restated as if fully set forth herein.*

81.  TWA repeats and reasserts all the responses set forth above as if fully set forth herein.

82.  *Nasir Ibrahim, and others known and unknown, conspired to transmit and transfer the $2,999,930.50 to a place inside the United States from or through a place outside the United States, with the intent to promote the carrying on of violations of IEEPA and 18 U.S.C. § 554, in violation of 18 U.S.C. §§ 1956(h), 1956(a)(2)(A).*

82.  To the extent this paragraph alleges that TWA participated in a conspiracy and violated other federal laws, TWA denies these allegations.  TWA otherwise lacks knowledge or information sufficient to form a belief regarding the allegations in paragraph 82 and, therefore, can neither admit nor deny these allegations.

*83.     As such, the defendant properties are subject to forfeiture to the United States, pursuant to 18 U.S.C. § 981(a)(1)(A), as property involved in transactions in violation of 18 U.S.C. §§ 1956(h), 1956(a)(2)(A), or as any property traceable to such property.*

83.     To the extent this paragraph alleges that TWA participated in a conspiracy and violated other federal laws, TWA denies these allegations.  Otherwise, this paragraph asserts legal conclusions to which no answer is required.  To the extent that a response is required, TWA denies the allegations in paragraph 83.

## PRAYER FOR RELIEF

*WHEREFORE, the United States of America requests that as to the above referenced defendant properties, that warrants for arrest in rem issue according to law; that pursuant to law, notice issue on the defendant properties as described above; that due notice be given to all parties to appear and show cause why the forfeiture should not be decreed; that judgment be entered declaring that the defendant properties be forfeited to the United States of America for disposition according to law; and that the United States of America be granted such other relief as this Court may deem just and proper, together with the costs and disbursements of this action.*

TWA denies that Plaintiff is entitled to any relief whatsoever.

## CLAIMANT'S AFFIRMATIVE DEFENSES

Without assuming any burden of proof that it would not otherwise bear, TWA asserts the following separate and additional affirmative defenses, all of which are pleaded in the alternative:

### First Defense

The seizure of the Target Properties violates the U.S. Constitution, including the Fourth, Fifth, and Eighth Amendments.

### Second Defense

The application of 18 U.S.C. § 981(a)(1)(C) and § 981(a)(1)(A) to TWA and the Target Properties violates the U.S. Constitution, including the Fourth, Fifth, and Eighth Amendments.

### Third Defense

The seizure and requested forfeiture of the Target Properties violates TWA's right to procedural and substantive due process under the United States Constitution.

### Fourth Defense

The Target Properties are not properties that constitute or are derived from proceeds traceable to violations of IEEPA, codified at 50 U.S.C. §§ 1701-1707.

### Fifth Defense

The Target Properties are not properties that constitute or are derived from proceeds traceable to violations of the smuggling statute, codified at 18 U.S.C. § 554(a).

### Sixth Defense

The Target Properties are not properties in a violation of the money laundering statute, codified at 18 U.S.C. §§ 1956(h), 1956(a)(2)(A) and (B).

### Seventh Defense

Plaintiff's claims for forfeiture against the Target Properties are barred due to failure of proof of illegal conduct.

### Eighth Defense

TWA is an innocent owner within the meaning of 18 U.S.C. § 983(d) of the Target Properties.  To the extent that any conduct or circumstances properly gave rise to forfeiture, TWA did not know of such conduct or circumstances.

### Ninth Defense

As to the Target Properties, the Complaint fails to state a claim upon which relief may be granted.

### Tenth Defense

Plaintiff's alleged causes of action, and each of them, are barred, in whole or in part, because the Complaint does not contain sufficient particularity to satisfy the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure.

### Eleventh Defense

Plaintiff lacks probable cause for the institution of this forfeiture action.

### Twelfth Defense

Forfeiture of the Target Properties is barred or precluded in whole or in part by the doctrines of waiver, unjust enrichment, bad faith, laches, estoppel, and/or unclean hands.

### CLAIMANT'S RESERVATION OF DEFENSES AND AFFIRMATIVE DEFENSES

TWA reserves the right to assert and rely on any additional defenses and affirmative defenses that may come available or apparent, and to amend their answer and/or defenses.

### CLAIMANT'S PRAYER FOR RELIEF

WHEREFORE, claimant TWA requests that this action against the defendant properties be dismissed; that the defendant properties be returned to TWA; that TWA be awarded its costs and attorneys' fees in this action; and for such other and further relief as this Court may deem just and proper.

Respectfully submitted,

By:___/s/Christopher M. Swift_____
Christopher M. Swift, D.C. Bar No. 997897
Matthew D. Krueger, D.C. Bar No. 979682
David A. Hickerson, D.C. Bar No. 414723
Ashley A. Gifford, D.C. Bar No. 1602595

FOLEY & LARDNER LLP
3000 K Street, N.W., Suite 600

Washington, D.C.  20007
(202) 672-5300
cswift@foley.com

*Attorneys for Transworld Aviation FZE*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on September 8, 2021, true and correct copies of the foregoing **CLAIMANT**

**TRANSWORLD AVIATION FZE'S ANSWER TO THE COMPLAINT**, was filed with the

Clerk of the United States District Court for the District of Columbia and a copy served via

electronic mail on the following:

> Arvind K. Lal
> Assistant United States Attorney
> 555 Fourth Street, N.W.
> Washington, D.C. 20530
> (202) 252-7688
> arvind.lal.@usdoj.gov

By: ___*/s/ Christopher M. Swift*___
Christopher M. Swift, D.C. Bar No. 997897
Matthew D. Krueger, D.C. Bar No. 979682
David A. Hickerson, D.C. Bar No. 414723
Ashley A. Gifford, D.C. Bar No. 1602595

FOLEY & LARDNER LLP
3000 K Street, N.W., Suite 600
Washington, D.C.  20007
(202) 672-5300
cswift@foley.com

*Attorneys for Transworld Aviation FZE*